Capital Reporting Company

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------x

MICHAEL ESTRADA, individually
and on behalf of others
similarly situated,

                Plaintiff,

  vs.                    CIVIL ACTION NO.: 12-604

MAGUIRE INSURANCE AGENCY,    ECF CASE
INC.,

                Defendant.

------------------------------------------------x

                DATE: November 26, 2012

                TIME: 9:56 a.m.

Deposition of:

                MICHAEL ESTRADA

called for oral examination by counsel for

Defendant, pursuant to Notice, held at the

office of CONRAD, O'BRIEN, GELLMAN & ROHN, 1500 Market

Street, Centre Square, West Tower, Suite 3900,

Philadelphia, Pennsylvania, before CORINNE J. BLAIR, a

CRR, CCR, RPR, CLR, of Capital Reporting Company, and

a Notary Public of the Commonwealth of Pennsylvania.

Capital Reporting Company

**Page 2**

```
 1              APPEARANCES
 2   On behalf of Plaintiff:
 3     ROBERT WILEY, P.C.
       1825 Market Center
 4     Boulevard #385
       Dallas, Texas 75207
 5     (214) 528-6500
       BY: ROBERT WILEY, ESQ.
 6     Email: rwiley@robwiley.com
       BY: JESSICA COHEN, ESQ.
 7     Email: jcohen@robwiley.com

 8   On behalf of Defendant:
 9     PROSKAUER ROSE, LLP
       Eleven Times Square
10     New York, New York 10036-8299
       BY: ELISE BLOOM, ESQ.
11     Email: ebloom@proskauer.com
       (212) 969-3140
12
       PROSKAUER ROSE, LLP
13     1001 Pennsylvania Avenue, NW
       Suite 400 South
14     Washington, DC 20004-2533
       BY: JOSHUA F. ALLOY, ESQ.
15     Email: jalloy@proskauer.com
       (202) 416-5876
16     BY: RAVINDER S. SANDHU, ESQ.
       Email: rsandhu@proskauer.com
17     (202) 416-6814

18   ALSO PRESENT:

19   Caryn E. Angelson, Esq.
     Executive Vice President
20   Chief Human Resources and Legal Officer
     TMNA Services
21   230 Park Avenue
     New York, NY 10169
22   (212) 297-6949
     caryn.angelson@tmnas.com
23
24
25
```

**Page 3**

```
 1
 2   ALSO PRESENT: (Continued)
 3     Roger Terry
       Scott Yurko, Esq.
 4     TMNA Services
       One Bala Plaza, Suite 100
 5     Bala Cynwyd, PA 19004
       (610) 538-2272
 6     scott.yurko@tmnas.com
```

**Page 4**

```
 1              INDEX
 2   WITNESS        EXAMINATION BY     PAGE
 3   MICHAEL ESTRADA   MS. BLOOM         7
 4
 5              EXHIBITS
 6     (Exhibits attached to transcript)
 7   EXHIBIT       DESCRIPTION          PAGE
 8   Estrada-1    Employment Application  30
 9   Estrada-2    Complaint               92
10   Estrada-3    Answers to
                  Interrogatories        92
11
     Estrada-4    Offer letter           113
12
     Estrada-5    Performance Review
13                for the period of
                  June 9, 2009 through
14                June 9, 2010           116

15   Estrada-6    Performance Review
                  for the period of
16                June 8, 2008 through
                  June 9, 2009           122
17
     Estrada-7    Unidentified           123
18
     Estrada-8    Notes entered in Apps
19                System when handling
                  a claim                124
20
     Estrada-9    Claim notes            124
21
     Estrada-10   Case notes             124
22
     Estrada-11   Resume                 146
23
     Estrada-12   Calendar excerpts      155
24
     Estrada-13   Declaration of witness 157
25
```

**Page 5**

```
 1              EXHIBITS
 2     (Exhibits attached to transcript)
 3   EXHIBIT       DESCRIPTION          PAGE
 4   Estrada-14   Job description for
                  Claims examiner position
 5                from company website   168
 6   Estrada-15   Resume submitted with
                  application for position
 7                at Philadelphia        168
 8
 9       INSTRUCTIONS NOT TO ANSWER
10   PAGE   LINE   PAGE   LINE   PAGE   LINE
11    24     19    158     13    159     24
12   160     22
```

Capital Reporting Company

**Page 6**

```
 1                STIPULATIONS
 2      IT IS HEREBY STIPULATED, by and between the
 3  attorneys for the respective parties hereto that:
 4      All rights provided by the C.P.L.R., and Part
 5  221 of the Uniform Rules for the Conduct of
 6  Depositions, including the right to object to any
 7  question, except as to form, or to move to strike
 8  any testimony at this examination is reserved; and
 9  in addition, the failure to object to any question
10  or to move to strike any testimony at this
11  examination shall not be a bar or a waiver to make
12  such motion at, and is reserved to, the trial of
13  this action.
14      This deposition may be sworn to by the witness
15  being examined before a Notary Public other than the
16  Notary Public before whom this examination was
17  begun, but the failure to do so or to return the
18  original of this deposition to counsel within 60
19  days, shall not be deemed a waiver of the rights
20  provided by Rule 3116 of the C.P.L.R., and shall be
21  controlled thereby. The filing of the original of
22  this deposition is waived.
23      IT IS FURTHER STIPULATED, that a copy of this
24  examination shall be furnished to the attorney for
25  the witness being examined without charge.
```

**Page 7**

```
 1                M. ESTRADA
 2  M-I-C-H-A-E-L  E-S-T-R-A-D-A, called as a witness,
 3  having been first duly sworn by a Notary Public of
 4  the Commonwealth of Pennsylvania}, was examined and
 5  testified as follows:
 6
 7  EXAMINATION BY
 8  MS. BLOOM:
 9      Q   Good morning, Mr. Estrada.
10      A   Good morning.
11      Q   My name is Elise Bloom. We met a few
12  minutes ago. I'm an attorney with Proskauer Rose
13  and we're representing the defendant in the case
14  that you instituted here in federal court.
15          I'm going to ask you some questions
16  today about the allegations that you've made in your
17  lawsuit. If I ask you a question that you don't
18  hear, please let know know that and I'll ask the
19  court reporter to read the question back.
20          If I ask you a question that you
21  don't understand, please advise me of that and I
22  will attempt to rephrase the question in a way
23  that's meaningful to you.
24          If you answer a question, I'm going
25  to assume that you've heard my question, that you've
```

**Page 8**

```
 1                M. ESTRADA
 2  understood my question, and that you've giving your
 3  best answer.
 4          Do you understand everything I've
 5  said so far?
 6      A   Yes.
 7      Q   Because this -- everything that we say
 8  here today, my questions and your answers, are being
 9  taken down by a court reporter, it's important that
10  we try not to speak over each other. It is not my
11  intent at all today to interfere or interrupt any of
12  your answers to questions, and I would ask that you
13  let me finish my question before you begin your
14  answer.
15          If I haven't finished my question,
16  I'll advise you of that, and you should feel free to
17  do the same if you feel that I've interrupted your
18  answer.
19          The last thing is that the court
20  reporter needs answers to be audible. You can't
21  rely on nodding your head or shaking your head.
22      A   Okay.
23      Q   So, again, I'm sure your attorneys will
24  remind you about that, but I wanted to mention that
25  before we got started.
```

**Page 9**

```
 1                M. ESTRADA
 2      A   Okay.
 3      Q   Okay. Can you state your full name,
 4  please?
 5      A   Michael Angelo Estrada.
 6      Q   And Mr. Estrada, have you ever been known
 7  by any names other than Michael Angelo Estrada?
 8      A   Mike Estrada and Miguel Estrada.
 9      Q   What is your -- any other names?
10      A   No.
11      Q   What is your address?
12      A   I'm sorry. I didn't hear you.
13      Q   Your address?
14      A   It's 7918 North McArthur Boulevard,
15  Apartment 4055, Irving, Texas, 75063.
16      Q   How long have you lived at that address?
17      A   Almost a year.
18      Q   You gave an apartment number. Is it fair
19  to assume that's an apartment?
20      A   Correct.
21      Q   And do you own or rent that apartment?
22      A   Rent.
23      Q   And do you live there with anybody else?
24      A   No.
25      Q   Where did you live immediately prior to
```

Capital Reporting Company

30

M. ESTRADA
2  you can in the private sectors.
3    Q  Did you interview with somebody for the
4  position?
5    A  I did.
6    Q  Who did you interview with?
7    A  Roger Terry and Mona Born.
8    Q  And you were offered the job?
9    A  Yes.
10   Q  And when you were offered the position,
11 did you understand that you'd be paid a salary?
12   A  Yes.
13   Q  Did you understand that you would not be
14 paid overtime?
15   A  Yes.
16   Q  What was it about your background and
17 experience that you felt made you a good candidate
18 for the job?
19   A  Um, I think my organizational skills,
20 working at MCI, my technical ability.
21   Q  What about your technical abilities?
22   A  Just extremely proficient with computers
23 and ...
24   Q  You filled out an employment application;
25 is that correct?

31

M. ESTRADA
2    A  Correct.
3    Q  At what point in the process did you fill
4  out the employment application?
5    A  I believe within the first couple of
6  weeks.
7    Q  Before you got the job?
8    A  Yes.
9    Q  So during the interview process?
10   A  Yes, correct.
11       MS. BLOOM: Can you mark this, please, as
12 Estrada-1.
13       (Estrada-1, Employment Application, was
14 received and marked for identification at this
15 time.)
16 BY MS. BLOOM:
17   Q  I've just handed you a copy of a document
18 that's been marked as Estrada Exhibit Number 1.
19 Could you take a moment to review that and let me
20 know when you've had a chance to review it?
21   A  Okay.
22   Q  Is this a copy of your employment
23 application?
24   A  Yes. That's what it looks like.
25   Q  Is there any information on Exhibit 1 that

32

M. ESTRADA
2  you did not supply?
3    A  Not that I can -- not that I see.
4    Q  Okay. And you understood in filling this
5  out that you were supposed to provide truthful
6  information; is that correct?
7    A  Correct.
8    Q  I notice that one of your references is
9  Tamisha Williams.
10   A  Yes.
11   Q  So you knew Miss Williams before you
12 started working for Philadelphia?
13   A  Yes. We worked together at United Auto
14 insurance.
15   Q  What, if anything, was her role in
16 bringing you to Philadelphia?
17   A  I brought her into Philadelphia.
18   Q  You brought her in?
19   A  Yes.
20   Q  So when you listed her as a reference, she
21 was still working at United?
22   A  Yes. Oh, no. Actually, she may have
23 already been fired by that time.
24   Q  She was fired by United?
25   A  Uh-huh. Well, she was laid off.

33

M. ESTRADA
2    Q  Laid off.
3    A  What happened is about whenever we needed
4  to find a claims assistant, her unemployment was
5  about to run out, and that's when I recommended her
6  to Mona, to interview.
7    Q  So when you listed her on your employment
8  application, was she still working for United?
9    A  I don't know. She may have been.
10   Q  Maria Gonzalez, has she ever worked for
11 Philadelphia?
12   A  No.
13   Q  Claudia Taloson (sic)?
14   A  Talosa, no.
15   Q  Has not worked for Philadelphia?
16   A  No.
17   Q  In looking at your employment application,
18 you list United Auto Insurance Company as your
19 employer at the time you were looking for a job at
20 Philadelphia; is that right?
21   A  Yes.
22   Q  And you were earning an hourly wage there?
23   A  Correct.
24   Q  Did you get overtime?
25   A  Yes.

Capital Reporting Company

---

Page 34

M. ESTRADA

Q  So you knew in going to Philadelphia that this was going to be a change?
A  Yes.
Q  Under your experience at United, you say, "Investigation of third-party auto accidents and resolving claims made against the insured's policy, negotiate settlement with third parties once coverage and liability have been determined." That's what you were doing at United Auto Insurance Company?
A  Yes.
Q  And what, if anything, about that experience did you believe was going to be helpful at Philadelphia?
A  Handling the claims, the auto accidents.
Q  Why?
A  Because I had -- because of the experience I got in doing that with United Auto.
Q  So the experience negotiating settlements?
A  Yes.
Q  And when you were investigating and resolving claims at United Auto Insurance Company, how did you go about that process?
A  I'm sorry?

---

Page 35

M. ESTRADA

Q  At United Auto, how did you go about that process?
A  I'm sorry. What was the process?
Q  How did you go about the process of investigating and resolving claims?
A  Oh. I would contact both parties, the claimant and insured, and get their statements on how the accident happened; the police report, if there is one, and make a liability decision. If there's coverage, then we would settle the claim.
Q  And you say "make a liability determination," what do you mean?
A  Deciding who's at fault.
    Usually, if there's a police report, we usually went by the police report.
Q  And then what would you do?
A  Get an appraiser out there to do an estimate on the damages, and pay the claim if liability was accepted.
Q  Now, when you applied for the job at Philadelphia, what, if anything, did you understand you would be doing?
A  Handling minor claims in like parking lots, just Fast Track simple claims. Non-injury

---

Page 36

M. ESTRADA

claims.
Q  When you say "Fast Track," what does that mean?
A  Simple claims. Easy claims that, you know, insured backed into a parked vehicle. Nothing that -- that involves a lot of investigation. Who ran a red light. Anything like that.
Q  When you got the job at Philadelphia, who did you work for; who was your immediate boss?
A  Mona Born.
Q  And were there other claims examiners that worked for Mona?
A  Yes.
Q  Who were they?
A  Craig Olleck, Vicky Manning. I think she was transitioning from an admin person to an adjuster at that time when I started.
Q  Anybody else?
A  Marvel Webb. And I believe Shakelia Hayes came shortly after I did.
Q  Did you handle any claims involving rental cars?
A  Not that I can recall. Rent a cars being damaged?

---

Page 37

M. ESTRADA

Q  Correct?
A  No, not that I recall.
Q  Was there anybody besides Mona who was responsible for supervising claims examiners in the Addison office?
A  Yeah. Rodger Terry.
Q  And did he supervise a different group of people?
A  Correct.
Q  And did that group have responsibility for handling damage to rental cars?
A  Yes.
Q  What state or states were you responsible for?
A  There was quite a few of them. I don't recall them all. It's been awhile.
Q  Well, can you recall any of them?
A  Yeah. There was Colorado, I believe, California, Florida, Washington. New Mexico, I think. That's all I can recall right now.
Q  Now, did you understand that when you started working for Philadelphia that you would also be responsible for investigating claims?
A  Yes.

---

Capital Reporting Company

---

Page 58

M. ESTRADA

1
2  order to do that, there were times when you might
3  not be familiar with the law in a particular state
4  and you had to go look it up to see who would be --
5  who's liable in the situation that you're presented
6  with?
7    A   On rare occasion. I mean, normally it was
8  parking lot accidents. Insured backed into a parked
9  car.
10   Q   So normally you knew?
11   A   Yeah. Yeah. Because it was in Fast
12 Track. I mean, it was mostly quick claims that --
13 simple accidents.
14   Q   Okay. But there were times when you
15 didn't know; is that right?
16   A   There were occasions, yeah, that a claim
17 would come up. If I wasn't sure, I would usually
18 ask my supervisor. She's more knowledgeable and
19 more experienced.
20   Q   But you could ask your supervisor or you
21 could consult the driving manual --
22   A   Yes.
23   Q   -- for the particular state; correct?
24   A   Yes.
25   Q   And that was a decision that you made,

---

Page 59

M. ESTRADA

1
2  right?
3    A   Yes.
4    Q   Now, you were talking about the types of
5  accidents.
6        Most of the accidents that you
7  handled were accidents that were worth about how
8  much money?
9    A   A couple thousand; three, four, 5,000.
10   Q   Small, right?
11   A   Yes.
12   Q   Okay. Can you give me a sense of what
13 kinds of things you'd be handling?
14   A   As?
15   Q   You said a parking lot accident.
16 Somebody --
17   A   Insured backed into a parked vehicle. Um,
18 normally we hit a parked car.
19   Q   So normally either your person hit a
20 parked car or somebody hit your insured?
21   A   Correct.
22   Q   Or how about if somebody broke into a car?
23   A   Yes.
24   Q   So there'd be -- it all centered on damage
25 to the car?

---

Page 60

M. ESTRADA

1
2    A   Correct.
3    Q   And most times the damage was small?
4    A   Yes.
5    Q   Is that right?
6        And part of what you had to determine
7  is how much the damage was; correct?
8    A   No. The appraiser would do that.
9    Q   Well, in every situation, were you
10 supposed to get an appraiser?
11   A   Absolutely.
12   Q   Even if it was under $2,000?
13   A   Absolutely.
14   Q   And so it's your testimony here today that
15 you always got an appraiser?
16   A   I always got an estimate.
17   Q   You always got an estimate?
18   A   Yeah. If it was under a couple of
19 thousand, then we were allowed to have the insured
20 or the claimant get an estimate from a local body
21 shop.
22   Q   Okay. So the claim comes in. You would
23 check to see if there was coverage; correct?
24   A   Yes.
25   Q   Okay. And then you would check to see if

---

Page 61

M. ESTRADA

1
2  there was liability?
3    A   Yes.
4    Q   Okay. And then you said that -- would you
5  call the insured?
6    A   Yes.
7    Q   And why were you calling the insured?
8    A   To get the statement from the driver on
9  what happened. Usually, they say I backed into a
10 vehicle. You know, whatever happened in the
11 accident.
12   Q   Did you ever have situations where the
13 insured said it wasn't their fault?
14   A   Yes.
15   Q   And how often would that happen?
16   A   On occasion.
17   Q   And what happened; what were you supposed
18 to do then?
19   A   I'd talk to the claimant and see their
20 side of the story. A lot of times there's a police
21 report, which we would go by that, the police
22 report. Being that it was a commercial insurance, a
23 lot of the companies made sure that the drivers
24 always got a police report, so that was really
25 helpful.

---

Capital Reporting Company

```
                                            62
         M. ESTRADA
 1
 2    Q   Okay. So you would talk to your insured;
 3  if your insured said it wasn't their fault, then you
 4  might reach out and talk to the other party?
 5    A   Yeah.
 6    Q   And what would you do if there was a
 7  disagreement between two parties about what
 8  happened?
 9    A   Conflicting statements and there's no
10  independent witnesses, then we would side with our
11  insured.
12    Q   Okay. And you made the decision to side
13  with your insured?
14    A   That's just something we're supposed to
15  do.
16    Q   Well, did you ever have any situations
17  where you felt that the person, the non-insured, had
18  the more credible story?
19    A   No. If there's conflicting statements and
20  no evidence to confirm that my insured was at fault,
21  I would side with my insured.
22    Q   Now, when you say "no evidence," what kind
23  of evidence?
24    A   Witnesses. If the damages didn't support
25  what the insured claimed.
```

```
                                            63
         M. ESTRADA
 1
 2    Q   So if you have conflicting statements,
 3  then you'd have to determine whether or not there's
 4  other evidence; is that right?
 5    A   Well, hopefully by then, you know, you
 6  know all the evidence.
 7    Q   But you would -- I assume you have to get
 8  the evidence or look for the evidence; correct?
 9    A   Yeah. As in evidence, was there any
10  witnesses.
11    Q   Okay.
12    A   Independent witness.
13    Q   And how would you find out if there was
14  any witnesses?
15    A   Asking both the driver and the claimant if
16  there were any independent witnesses. Was there a
17  police report done. If none exists, then I would
18  side with my insured, if the statements were
19  conflicting.
20    Q   Okay. Let's go one step at a time then.
21        So if there's a police report, what
22  would you do?
23    A   I'd go by the police report.
24    Q   You say you'd go by the police report.
25  What does that mean?
```

```
                                            64
         M. ESTRADA
 1
 2    A   If the police report says this person was
 3  at fault, which a lot of times it does.
 4    Q   So you would follow the police report?
 5    A   Correct.
 6    Q   So if you have conflicting statements,
 7  then you would ask whether there was a police
 8  report?
 9    A   No. I'd ask that regardless.
10    Q   Okay. So you always ask for the police
11  report?
12    A   If there's a police report.
13    Q   Okay. You said that you would ask if
14  there had been independent witnesses. Who would you
15  ask that question of?
16    A   Both the insured and the claimant.
17    Q   And what happens if there are independent
18  witnesses?
19    A   I would contact them and see what they
20  saw.
21    Q   Okay. So then you'd talk to the
22  independent witnesses?
23    A   Correct.
24    Q   So who decides in that situation if the --
25  once you talked to the independent witness, what do
```

```
                                            65
         M. ESTRADA
 1
 2  you do then?
 3    A   Whichever they corroborate whose story,
 4  that's who I go with.
 5        If the witness says the insured
 6  backed into the claimant's car, then -- and the
 7  claimant is saying that the insured backed into his
 8  car, you got two people saying the same thing, then
 9  that's what you go with.
10    Q   So you'd make a judgment that if two
11  people --
12    A   Versus the one, correct.
13    Q   And that in your judgment is you believe
14  the two people?
15    A   Yes.
16    Q   Okay. Now, you said before that sometimes
17  the damage didn't support the determination.
18    A   Didn't support the --
19    Q   The story. Okay. Yeah, what do you mean
20  by that?
21    A   Just, I've had people, like -- I had an
22  insured that was parked and she said somebody backed
23  into her car, but then she's claiming damages to the
24  front of the vehicle.
25        The other side is like, well, I mean,
```

Capital Reporting Company

66

M. ESTRADA

2 you can tell where the car was backed into, but
3 you're claiming these damages. It just -- it
4 doesn't make sense.
5   Q   So in that situation you made a
6 determination that the insured wasn't telling the
7 truth?
8   A   Correct.
9   Q   Okay. And you would deny coverage based
10 on that?
11   A   No. I wouldn't deny coverage. I wouldn't
12 pay for the damages that didn't support --
13   Q   Okay. So then you'd have to decide which
14 damages, if any, actually supported the claim?
15   A   Yeah. And the appraiser would usually
16 tell us, "Well, they're trying to say this damage
17 was also caused in that accident, but I don't
18 believe that it could have been, judging by that."
19 Because they're the ones -- the appraiser's the ones
20 looking at the vehicle, and they can tell, you know,
21 if a vehicle was hit, by their experience, and say,
22 it's not possible to cause that other damage.
23   Q   So the appraiser comes back and tells you
24 that the damage is in a place that does make sense,
25 in terms of the story, and then you determine, okay,

67

M. ESTRADA

2 I'm going to go with what the appraiser says?
3   A   Correct.
4   Q   Okay. Have you had situations where the
5 claimant is more credible, tells a story that makes
6 more sense than what your insured is telling you?
7   A   Not that I recall, no.
8   Q   Um, usually it's by, you know, police
9 report, if there is one, but if -- the only time I
10 would think that would happen if the damages that
11 the insured's saying just didn't match, if it just
12 didn't make sense like that, then, you know, yeah, I
13 think the claimant probably would be more credible.
14   Q   And then you'd side with the claimant --
15   A   Yes.
16   Q   -- or you'd decide that the claimant was
17 more credible?
18   A   Yes.
19   Q   Okay. Now, what if they both had some
20 degree of fault; what did you do then?
21   A   I would usually ask Mona, see what she
22 thought. See if she wanted comparative negligence
23 on that.
24   Q   You say you usually ask Mona.
25       What information would you bring to

68

M. ESTRADA

2 Mona?
3   A   The estimates amounts; how the accident
4 happened; you know, what I believe to be how the
5 accident happened. I would ask her what she
6 thought.
7   Q   So you would go to Mona and say, this is
8 what I believe happened, and would you tell her who
9 you thought was at fault and how much and why?
10   A   Yes.
11   Q   So you'd make a recommendation to her?
12   A   Correct.
13   Q   Okay. And did she always adopt your
14 recommendations?
15   A   No. No. Not always.
16   Q   And can you think of any examples, sitting
17 here today, when she didn't accept your
18 recommendation?
19   A   Um, it's not that she just flat out
20 didn't. She just thought, well, it's not worth it.
21 Just go ahead and pay the whole claim.
22   Q   And how many times did that happen?
23   A   I couldn't tell you.
24   Q   More than five?
25   A   Yes. I'm sure.

69

M. ESTRADA

2   Q   How many claims did you handle that were
3 more than $10,000?
4   A   Very few. But there were some, but not a
5 whole lot.
6   Q   Now, once you talked to your insured the
7 first time, how many other times would you talk to
8 the insured?
9   A   If I had more questions. It really
10 depends on -- on the -- depends on if there was any
11 other questions, or if the claimants had something,
12 I just wanted to confirm with the insured.
13   Q   So you might go back to the insured and
14 say, "I spoke to the claimant. They're saying
15 something different," and get the insured's view
16 again?
17   A   Correct.
18   Q   Right. And would you ever talk to the
19 insured about what you'd learn from third-party
20 witnesses?
21   A   Yes.
22   Q   So part of your job was really to
23 investigate what happened?
24   A   Yes. Yes.
25   Q   Are you familiar with the concept of

70

M. ESTRADA
1
2  betterment?
3   A   Yeah. Isn't that like when -- take a
4  tire, you know, a tire. We're going to give
5  somebody a brand new tire, but the tire that they
6  had on their vehicle before was older, a lot older,
7  wasn't new. So you would take betterment to be more
8  even as to what they had.
9   Q   So you would reduce what you were going to
10 pay them?
11  A   Yes.
12  Q   And did you?
13  A   The appraiser would do that.
14  Q   The appraiser would come to you with a
15 recommendation about that?
16  A   It would be on their -- their estimate.
17  Q   And would you make a determination as to
18 whether to go along with what the appraiser said, or
19 not?
20  A   I always go along with what the appraiser
21 says.
22  Q   I understand that you're saying that you
23 always went along with it, but each time you decided
24 whether to go along with it or not; correct?
25      MS. COHEN: Objection. Asked and

71

M. ESTRADA
1
2  answered.
3       THE WITNESS: I always go with what the
4  estimate is.
5  BY MS. BLOOM:
6   Q   So you made a decision to always go --
7   A   I was never told not to.
8   Q   Did anybody tell you to always go with the
9  appraiser?
10  A   No.
11  Q   So that was something that you decided for
12 yourself, because it made sense?
13  A   It's something we always did. We were
14 never told otherwise.
15  Q   When you say, it's something that you
16 always did, what knowledge, if any, do you have
17 about how other claims examiners handled an
18 appraiser report?
19  A   By talking to them.
20  Q   Are you -- when you say "by talking to
21 them," what do you mean by that?
22  A   We talk to each other about claims that
23 we've had; sometimes to get an opinion from them on
24 what they thought about it.
25  Q   So other claims examiners would seek out

72

M. ESTRADA
1
2  your opinion about some of their claims?
3   A   Well, not to -- to make the decision for
4  them. Just to say, "Hey, you know, what do you
5  think about this? I don't know if the insured's
6  telling the truth." You know, just talking.
7   Q   So other claims examiners were trying to
8  make a decision about a particular claim and they
9  might come and ask you your opinion?
10  A   Yeah.
11  Q   And did you do the same thing?
12  A   Yeah.
13  Q   So if you were trying to make a decision
14 about a particular claim, you might seek out the
15 opinion of one of your claims examiners; is that
16 right?
17  A   No. Just talking to them. Just to see
18 what they think, you know.
19      It wasn't to -- because I couldn't
20 make the decision. Just, you know, "Hey, what do
21 you think about this?"
22  Q   Because you felt that you could make the
23 decision on any particular claim?
24  A   Yeah, usually, yes.
25  Q   Were there times when -- you said for some

73

M. ESTRADA
1
2  claims where the damage was like under a couple
3  thousand dollars, where the insured might go out and
4  get their own appraisal; is that right?
5   A   Yes.
6   Q   Did you get an independent appraisal in
7  those cases, also?
8   A   No.
9   Q   And did you always agree with what the
10 insured's appraisal said?
11  A   Yeah. Pretty much. Unless there was some
12 obvious, um -- you know, if -- if, um, the damages
13 are claimed on the left side and then there's
14 something on the right side that the estimate is
15 willing to repair, then I would call the body shop
16 and ask them, "How does that fit with the impact
17 over here?"
18  Q   The impact on the other side?
19  A   Correct.
20  Q   And then you might decide to pay a lesser
21 amount?
22  A   Yeah.
23  Q   And you'd make that decision?
24  A   No. No. I would usually ask Mona what
25 she thought, because I'm really not that great with

Capital Reporting Company

---

Page 90

M. ESTRADA

1 efficient manner.
2 MS. BLOOM: Okay. I hear you. I think
3 the rules are really clear. I think if you
4 have a question about what federal stips are,
5 either you or her, you should read the rules.
6 And my position is that under federal
7 stips, she can only object to the form of the
8 question, if she truly believes there's a
9 problem with the form of the question.
10 And so, to the extent anything other than
11 that occurs, you know, clearly, if I think it's
12 becoming intrusive, we'll take whatever action
13 we need to.
14 Do you have an objection to us continuing
15 the deposition? And I would also ask that only
16 one attorney speak on the record.
17 MR. WILEY: Well, Miss Cohen will continue
18 to defend the deposition. I certainly have no
19 objection to continuing.
20 BY MS. BLOOM:
21 Q  You had the authority -- is there
22 something funny about that?
23 A  No.
24 Q  You had the authority to pay claims that

Page 91

M. ESTRADA

1 were under $10,000; is that right?
2 A  Yes.
3 Q  And you didn't have to discuss that with
4 your supervisor; correct?
5 A  Correct.
6 Q  When you got an appraiser, did you ask for
7 pictures of the property damage?
8 A  Yeah. They would always send pictures.
9 Q  Did you look at the pictures?
10 A  Yes. Sometimes.
11 Q  And in looking at the pictures, would
12 you -- why would you be looking at the pictures?
13 A  To see where the damages are. See what
14 damages were caused.
15 Q  And would you want to see where the damage
16 was?
17 A  Yes.
18 Q  And would you want to compare that with
19 what you were being told by your insured?
20 A  Correct.
21 Q  Why?
22 A  Just to make sure that it fit -- fit the
23 statement of what happened.
24 Q  Okay. So to make sure that -- that you

Page 92

M. ESTRADA

1 thought you agreed with what your insured was
2 telling you about how the accident happened;
3 correct?
4 A  Yes.
5 Q  One of the things that you were evaluating
6 as a claims examiner in the first instance was
7 whether there was or was not actually coverage;
8 correct?
9 A  Yes.
10 Q  And if there was coverage, whether there
11 was liability; correct?
12 First you would determine coverage,
13 and then you'd have to determine if there was
14 liability; is that right?
15 A  Correct. Correct.
16 Q  And if you determined that there was
17 liability, then you'd have to determine the value of
18 the claim; correct?
19 A  Right.
20 Q  And as part of that process, you would
21 interview your insured, right?
22 A  Yes.
23 Q  If there was -- if there were witnesses,
24 you would interview witnesses?

Page 93

M. ESTRADA

1 A  Correct.
2 Q  And you would also interview a claimant if
3 there was somebody other than your insured involved;
4 correct?
5 A  Correct.
6 MS. COHEN: Objection. Asked and
7 answered.
8 BY MS. BLOOM:
9 Q  And other than Miss Manning, you did not
10 help any of the other claims examiners with their
11 claims; is that right?
12 A  Correct.
13 Q  And with regard to the help that you gave
14 Miss Manning, that help was limited to helping her
15 find an independent appraiser; correct?
16 A  No. No. There was other times where I
17 helped her with other things.
18 Q  Like what?
19 A  She, um, her liability. She kind of
20 questioned herself sometimes. And I'd kind of just
21 help her walk through it, how the accident happened,
22 and she figures out that she was right to begin
23 with.
24 Q  So she was trying to determine whether

Capital Reporting Company

**Page 102**

M. ESTRADA

2  A  Yes.
3  Q  And in answering Interrogatory Number 6,
4  you provided a breakdown of the number of overtime
5  hours per-week that you believed you worked. And
6  can you just look at that with me, please?
7  A  Yes.
8  Q  It's on page 5.
9  A  I've got it here.
10 Q  So in Answer to Interrogatory Number 6,
11 you said that you worked, approximately, three to
12 four hours of overtime per-week in 2009; is that
13 right?
14 A  Correct.
15 Q  Does that sound accurate to you sitting
16 here today?
17 A  As a best guess.
18 Q  Do you have any records that would reflect
19 that?
20 A  No. No, no. Not at all.
21 Q  And then you say that in 2010, you worked
22 five to six hours of overtime?
23 A  Correct.
24 Q  And do you have any records that would
25 reflect that?

**Page 103**

M. ESTRADA

2  A  No.
3  Q  And then you say in 2011, seven to ten
4  hours of overtime a week?
5  A  Correct.
6  Q  Do you have any records that would reflect
7  that?
8  A  No. I don't.
9  Q  What were you doing during these three to
10 four hours in 2009?
11 A  Working in claims.
12 Q  Where?
13 A  I'm sorry?
14 Q  Were you working in the office?
15 A  Some -- some in the office and some
16 from -- at home.
17 Q  What kind of work were you doing at home,
18 or do you claim you were doing at home?
19 A  Reviewing subrogation demands and
20 estimates that would come in the day before.
21 Because I usually like to get those paid out the
22 following morning.
23 Q  The subrogation demands and estimates,
24 were they electronic?
25 A  Yes.

**Page 104**

M. ESTRADA

2  Q  Do they ever -- were they ever not -- were
3  they ever non-electronic?
4  A  No.
5  Q  So did you always have to review those on
6  Image Right?
7  A  No, no. It was a PDF file. I would
8  download them to a memory stick and take them home
9  to review them, or print them out sometimes.
10 Q  And what were you doing during the five to
11 six hours of overtime you claim you worked per-week
12 in 2010?
13 A  The same thing. Claim volume was higher.
14 So there was more work that needed to be done.
15 Q  And what about in 2011?
16 A  The same.
17 Q  And when you say three to four hours a
18 week, are you claiming that was every week?
19 A  No. No. Not every week.
20 Q  About how many weeks?
21 A  I honestly couldn't say for sure. More
22 than half.
23 Q  And was it always three to four hours?
24 A  No. Sometimes it was a little more.
25 Sometimes it probably could have been less.

**Page 105**

M. ESTRADA

2  Q  Did you have vacation?
3  A  Yes.
4  Q  And how many weeks vacation did you get a
5  year?
6  A  Two.
7  Q  And would it be fair to say that you
8  didn't work at all on your vacation?
9  A  Correct.
10 Q  And did you have any sick time at all?
11 A  Yes.
12 Q  How much?
13 A  I believe a week or two.
14 Q  Did you take your full sick time allotment
15 each year that you were there?
16 A  I believe so, yes.
17 Q  And would it be fair to say that you
18 didn't work during sick time?
19 A  Yes. Correct.
20 Q  Did you take any other time off while you
21 were working for Philadelphia?
22 A  Not that I recall offhand.
23 Q  Now, when you said in 2010 that you worked
24 five to six hours of overtime a week, are you
25 claiming every week?

Capital Reporting Company

114

M. ESTRADA
1
2  Q   And what did you tell Mona?
3  A   I told her what the appraiser had said on
4  his estimate, what the accident description was and
5  what happened, how the accident is reported to have
6  happened. And she agreed that those damages were
7  not related.
8  Q   So you told her your opinion was that it
9  wasn't related and that you should only pay a
10 portion of it, and then she agreed with your
11 opinion?
12 A   No. I was telling her the appraiser says
13 that those damages were not related to the accident.
14 Q   And you told her that that's what you told
15 the insured?
16 A   Correct.
17 Q   I assume that if you didn't agree with
18 that, you wouldn't have told the insured that; is
19 that right?
20 A   Right.
21 Q   Okay. So you thought that what the
22 appraiser said made sense in terms of everything
23 that you understood about the damage and the
24 description of the accident?
25 A   Correct.

115

M. ESTRADA
1
2  Q   Okay. And then you told Mona that?
3  A   Told --
4  Q   Did Mona back you up?
5  A   Yeah. Yeah. The insured actually ended
6  up filing a suit against us and never showed up.
7  Q   And what involvement did you have in the
8  lawsuit?
9  A   None.
10 Q   How many times do insureds file lawsuits
11 resulting from claims that you handled?
12 A   That's the only one that I can recall.
13 Q   So going back to negotiation, exactly what
14 do you mean by the term "negotiation" in paragraph 1
15 of the complaint?
16 A   Negotiating damage amounts, what I'm going
17 to pay them for their damages.
18         I don't decide or make any decisions
19 on how much their damages is going to be.
20 Q   You just rely on the appraiser?
21 A   Correct. Yeah. Because I don't have
22 access to the car. I've never seen it. I'm in the
23 Dallas office handling claims in other states.
24 Q   But if there's a disagreement between what
25 the insured said and what the appraiser says, what

116

M. ESTRADA
1
2  do you do?
3  A   I take it to Mona.
4  Q   What do you say to the insured? Like in
5  the example that you gave us, you told the insured
6  that you'd only pay what the appraiser said; is that
7  right?
8  A   Right.
9  Q   Before you told the insured that, did you
10 tell Mona?
11 A   Before I told the insured?
12 Q   Yeah.
13 A   No. No. She actually called Mona
14 herself.
15 Q   After you had told her that?
16 A   Yes. To complain.
17 Q   So when you say that you don't do
18 negotiations, you mean that you accept what the
19 appraiser says and you tell the insured that's what
20 we're paying?
21 A   Correct.
22 Q   And then if the insured says how about
23 $500 more, you'd say no, I'm only going to pay what
24 the appraiser says?
25 A   Um, yes. There are instances that I'll

117

M. ESTRADA
1
2  say, well, let me see what my supervisor says and
3  I'll ask Mona and usually no, we go by what the
4  estimate is.
5  Q   So you might go back to Mona and say --
6  A   This insured is not -- is not agreeing
7  with the estimate from the appraiser.
8  Q   And then do you ever end up paying more
9  money?
10 A   No. I've never -- I don't recall ever
11 having to pay more.
12 Q   So then you go back to the insured and
13 say, I'm not going to pay more?
14 A   Correct.
15 Q   Did you mean anything else by
16 "negotiation"?
17 A   No.
18     MR. WILEY: If this is a stopping point,
19 perhaps we can have a break?
20     MS. BLOOM: Sure.
21     MR. WILEY: It's also noon. I don't know
22 when you were planning on stopping for lunch.
23     MS. BLOOM: I'd actually like to go a
24 little -- like we can take a few minutes now,
25 and then I'd like to go maybe till one and then

146

M. ESTRADA
Q Did you have a personal e-mail address?
A On Yahoo.
Q And did you ever use that for work?
A For work. I sent myself stuff from work, um, things that I wanted to review. If I needed to, I'd send it to myself on that e-mail address so I can access it from home.
Q So you -- you would e-mail from your work address to your personal Yahoo address?
A Yes.
Q So that -- but that would be reflected in your work e-mail?
A Yes.
Q Okay. Did you ever e-mail from your personal Yahoo address to insureds or appraisers, anything like that?
A No.
Q You used your work for that?
A Yes.
Q Did you e-mail anybody from work from your Yahoo account about work-related business?
A I'm sorry?
Q Would you -- did you use your Yahoo account to conduct any work-related business?

147

M. ESTRADA
A No.
Q And you didn't have a Blackberry?
A No.
Q Any kind of a smart phone?
A No.
Q And you said that -- to the extent you took work home, you were taking home subrogation?
A Subrogation demands and estimates.
Sometimes just mail if it was piling up.
Q If it was what?
A Mail that may have been piling up.
Q You told me the hours of the office where you worked.
Do you know the hours in any of the other defendant's offices?
A No.
Q Have you, or has anyone on your behalf, asked anybody to join this lawsuit with you?
A No.
Q Do you know if there is anybody else interested in joining this lawsuit?
A No.
Q No, you don't know or, no, there isn't?

148

M. ESTRADA
A No, there isn't. Not that I know of.
Q Have you, or has anyone on your behalf, been in contact with any of the claims examiners that you worked with in Addison?
A Have I?
Q Or someone on your behalf, like your lawyer's been in contact with any of your --
A I have.
Q -- co-workers? You have?
A Personal.
Q Anything related to the lawsuit?
A No.
Q Has anybody expressed an interest to you in joining the lawsuit?
A No. I really don't talk to anybody about it.
Q During the time that you were working for the company, did anybody complain to you about their hours?
A Yes.
Q Who?
A Almost everybody in my group.
Q About -- what about the hours?
A Having to work so much overtime to keep up

149

M. ESTRADA
with the volume of claims we were receiving.
Q And that's the overtime hours that you previously described for me?
A Correct.
Q You have no knowledge about how much time anybody else actually spent working other than in the office; correct?
A Correct. They'll tell me about coming in on weekends and working late, till 8:00 in the evening during the work days, but I never physically saw them.
Q And you never came in the office on a weekend, right?
A Yes.
Q How many times?
A A few. I don't know how many exactly.
Q And do you remember seeing anybody else there?
A Yeah. I've seen Mona there. I've seen Shakelia Hayes there.
Q Anybody else?
A Not that I recall.
Q When you would contact an insured to investigate a claim, what method would you use to