1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO.: 12-604
ECF CASE

------------------------------------------------------X

MICHAEL ESTRADA, individually
and on behalf of others
similarly situated,

                    Plaintiff,

    vs.

MAGUIRE INSURANCE AGENCY,
INC.,

                    Defendant.

------------------------------------------------------X

                  DATE: November 27, 2012

                  TIME: 10:02 a.m.

Deposition of:

                  WILLIAM BENECKE

called for oral examination by counsel for

Plaintiff, pursuant to Subpoena, held at the

office of CONRAD, O'BRIEN, GELLMAN & ROHN, 1500 Market

Street, Centre Square, West Tower, Suite 3900,

Philadelphia, Pennsylvania, before CORINNE J. BLAIR, a

CRR, CCR, RPR, CLR, of Capital Reporting Company, and

a Notary Public of the Commonwealth of Pennsylvania.

Page 2

```
                APPEARANCES

On behalf of Plaintiff:
    ROBERT WILEY, P.C.
    1825 Market Center
    Boulevard #385
    Dallas, Texas 75207
    (214) 528-6500
    BY: ROBERT WILEY, ESQ.
    Email: rwiley@robwiley.com
    BY: JESSICA COHEN, ESQ.
    Email: jcohen@robwiley.com
On behalf of Defendant:

    PROSKAUER ROSE, LLP
    1001 Pennsylvania Avenue, NW
    Suite 400 South
    Washington, DC 20004-2533
    BY: JOSHUA F. ALLOY, ESQ.
    Email: jalloy@proskauer.com
    (202) 416-5876
    BY: RAVINDER S. SANDHU, ESQ.
    Email: rsandhu@proskauer.com
    (202) 416-6814
ALSO PRESENT:
    Scott Yurko, Esq.
    TMNA Services
    One Bala Plaza, Suite 100
    Bala Cynwyd, PA 19004
    (610) 538-2272
    scott.yurko@tmnas.com
```

Page 3

```
                    INDEX
WITNESS         EXAMINATION BY          PAGE
WILLIAM BENECKE    MR. WILEY              5
                   MR. ALLOY            218


                  EXHIBITS
          (Exhibits attached to transcript)
EXHIBIT         DESCRIPTION             PAGE
Benecke-1   Document, Bates Stamped 294    12
Benecke-2   Excerpt from Employee Handbook  157
Benecke-3   Employee New Hire Profile      160
Benecke-4   Claims Examiner Job Description,
            Active 10/25/10                179

Benecke-5   Claims Examiner Job Description,
            Active 3/15/06                 182

Benecke-6   Performance Review of Mr. Estrada,
            2009                           183

Benecke-7   Performance Review of Mr. Estrada,
            2010                           183
```

Page 4

                STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or a waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel within 60 days, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby. The filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED, that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

Page 5

                W. BENECKE

W-I-L-L-I-A-M B-E-N-E-C-K-E, called as a witness, having been first duly sworn by a Notary Public of the Commonwealth of Pennsylvania}, was examined and testified as follows:

EXAMINATION BY
MR. WILEY:

Q   The witness having been sworn, will you please state your full name for the record?
A   William John Benecke.
Q   Do you go by "Bill"?
A   I do.
Q   All right. Mr. Benecke, my name is Robert Wiley. I'm going to be taking your deposition today.
    Do you understand that?
A   Yes.
Q   And you understand that you're here testifying, not just as an individual human being, but as the corporate representative of Philadelphia Insurance Company; is that correct?
A   Yes.
    MR. ALLOY: Just to be clear, for the record, just like we were with the last deposition, when you refer to -- the defendant

86

W. BENECKE
1
2  truthful representation from Mr. Estrada. But
3  I don't recall coming across such circumstances
4  in my review of his work-product.
5       MR. ALLOY: Rob, if you have more
6  questions in this particular line, go ahead,
7  but, you know, we've been going about two
8  hours --
9       MR. WILEY: Yeah. Let's take a break.
10 And I'm going to leave it to you guys. Do you
11 want to do -- off the record.
12      (A luncheon recess was taken from
13 11:58 a.m. until 12:55 p.m.)
14      MR. WILEY: Back on the record.
15 BY MR. WILEY:
16    Q   All right. Sir, you understand that we
17 are back on the record and you are still under oath?
18    A   Yes.
19    Q   Are there any answers that you've given me
20 today that you wish to change or supplement at this
21 time?
22    A   No.
23    Q   And we did have a short conversation in
24 the hall when we ran into each other, but we didn't
25 talk about this case or in anything of substance,

87

W. BENECKE
1
2  did we?
3    A   No.
4    Q   We did talk about the Dallas Cowboys,
5  which is somewhat in substance, but not pertaining
6  to this case.
7       MR. ALLOY: Objection.
8  BY MR. WILEY:
9    Q   All right. Let me get back to the
10 questions.
11      Sir, what product or service does
12 Maguire bring to the marketplace?
13    A   Well, we issue an insurance policy that
14 provides coverages that are important for --
15 particularly for the commercial insurance operations
16 that Philadelphia insures, to have protection from
17 unexpected events, whether they be loss to property
18 or casualty loss, that allows them to maintain their
19 financial security by being put back into a position
20 they were in prior to the incident occurring.
21      In addition to the benefits and
22 protections offered under that contract,
23 Philadelphia and Maguire employees offer our
24 insureds loss control services, where we help them
25 identify risks and exposures to their business

88

W. BENECKE
1
2  operations where we can offer them advice and
3  recommendations how to reduce those risks to, you
4  know, potentially cause them to reduce the amount of
5  losses that they sustain; to reduce their potential
6  premium costs for insurance as a result of those
7  reductions and loss.
8    Q   Thank you.
9    A   As part of those loss control services, we
10 may provide them advice on circumstances of law or
11 industry that impacts them. We may introduce them
12 to other business partners within the industry that
13 provide services to their class of business that may
14 benefit them in someway. We may do that with
15 discounted pricing that we may have been able to
16 negotiate as a result of the relationships that
17 we've identified with these other businesses.
18      I think those are some of the items
19 that I would mention in answer to that question.
20    Q   Anything else?
21    A   I'm sure there is, but that would be my --
22    Q   Not that you can recall at this time?
23    A   That would be my answer at this time.
24    Q   You said, I think something along the
25 lines of putting the customers back in a position

89

W. BENECKE
1
2  where they were before the loss.
3       Could you explain that in a bit more
4  detail? What did you mean by that?
5    A   Well, what I meant by that was an incident
6  or a claim will have occurred. They will have
7  suffered a loss. And likely as a result of that
8  loss, sustained property damage, be exposed to
9  financial loss, and it would be the job of the
10 employee responsible for that claim to identify, you
11 know, what that loss has been or could be to help
12 remedy that loss.
13    Q   And you would agree that putting the
14 customer back in a position where they were before
15 the loss, that's an important service that you
16 offer?
17    A   Yes.
18    Q   And it is the claims examiners that go
19 about effectuating that service; is that correct?
20 That's what they're doing?
21    A   Yes.
22    Q   Just to knock some things out, claims
23 examiners are not engaged in Human Resources; is
24 that correct?
25      And when I say that, I'm not talking

## Page 98

W. BENECKE

I think probably that would be the more common of experiences in the Customer Service role.

Q And who's the head of the Customer Service department?

A Seth Hall.

Q Seth Hall. And is Mr. Estrada in Mr. Hall's chain of command?

A No.

Q And none of the other Fast Track auto claims examiners are in Mr. Hall's chain of command; is that correct?

A Correct.

Q Okay. And I'm just going to go out on a limb and say, the same is true for Information Technology; that is separate from what the claims examiners do. Is that correct?

A Yes.

Q What department do the claims examiners fall under?

A Claims department.

Q And what is your title, sir?

A Executive vice president and chief claims officer.

## Page 99

W. BENECKE

Q Are you the head of the claims department?

A Yes.

Q And Mr. Estrada would have been in your chain of command; is that correct?

A Yes.

Q As well as the rest of the Fast Track auto claims examiners; is that correct? They would have been in your chain of command?

A Yes.

Q How long have you been in that position?

A In title?

Q In title.

A Four years.

Q And were you somehow in that position but not in title?

A Yes.

Q Okay. Explain that to me.

A The title changed in 2008 --

Q Okay.

A -- to be executive vice president. Prior to that, it was senior vice president.

Q And how long were you in that position?

A I don't recall. Several years.

Q In 2008, was there a larger restructuring

## Page 100

W. BENECKE

or was it just you?

MR. ALLOY: Objection.

THE WITNESS: I'm not sure I understand what you mean by "larger restructuring."

BY MR. WILEY:

Q Was it just like they changed your title, or was it part of a larger -- some of these companies realign things, move lines of command around, things like that.

A My promotion and title was not associated with anything else involving any other parts of the organization.

Q Okay. During the time that you have been the executive vice president -- sorry. Let me say that differently.

During the time that you have been affiliated with Maguire Insurance Company, do you know whether or not claims examiners have ever been paid by the hour with overtime?

MR. ALLOY: Objection. Are you talking about a specific group of claims examiners, all claims examiners?

MR. WILEY: Yeah.

BY MR. WILEY:

## Page 101

W. BENECKE

Q Was there any individual claims examiners or group or sub-group of claims examiners that were paid hourly with overtime during the time you've been there?

A No.

Q So they've always been paid salary?

A Yes.

Q Was there -- has there always been essentially Fast Track claims examiner group for the duration of your time with Maguire?

A No.

Q Do you know when it was that that was created?

A The Fast Track process, I would believe would have been created sometime perhaps in the 2005 timeframe. Give or take a year. I'm guessing right now, but around that timeframe would probably be appropriate.

Q Prior to your time at Maguire, did you work for other insurance companies?

A Yes.

Q Are you aware whether or not any of those insurance companies had paid their claims examiners or claims adjusters by the hour with overtime?

102

W. BENECKE

1
2  MR. ALLOY: You can answer.
3  THE WITNESS: It's a confusing question.
4  I think it's a two-part question.
5 BY MR. WILEY:
6  Q  My question is whether or not you're aware
7  of whether or not they had a pay practice of any of
8  your prior employers where they were paying claims
9  adjusters or claims examiners by the hour with
10 overtime? (sic)
11  MR. ALLOY: Objection. You can answer.
12  THE WITNESS: I am aware of how the claims
13  examiners were paid. So the answer to that is
14  yes, I am aware of how they were paid. And --
15 BY MR. WILEY:
16  Q  Then my second question would be --
17  A  -- none of them were paid as a -- as
18 someone that would be entitled to overtime or on an
19 hourly basis.
20  Q  All right. Before lunch, we had been
21 talking about the process by which claims examiners
22 process claims. I'm going to talk some more about
23 that.
24   We were going to talk about outside
25 vendors. I think you had identified appraisers,

103

W. BENECKE

1
2 independent adjusters, and there was one -- oh,
3 private investigators as outside vendors.
4  A  Yes.
5  Q  Okay. Tell me what an appraiser is.
6  A  In what context?
7  Q  Well, I think you had said that the next
8 step after the investigation was to see whether or
9 not claims examiners want to hire outside vendors
10 and you had identified appraisers, PI's and
11 independent adjusters.
12   So my question is: When you say
13 "appraisers," what did you mean?
14  A  I'm sorry. I'm just looking for
15 clarification --
16  Q  In the context of a Fast Track --
17  A  In the context of Philadelphia Insurance
18 Company?
19  Q  At Maguire, yeah.
20  A  Okay.
21  Q  Forget wherever else you worked. We're
22 back to Maguire. And that's what these questions
23 will all relate to.
24  A  Okay. An appraiser is an independent
25 contractor that if the claims examiner determines it

104

W. BENECKE

1
2 appropriate or necessary for the particular claim,
3 they may engage or hire an independent contractor to
4 go out, take photos of the damages, and write up an
5 estimate; to then submit those photos and estimate
6 to the claims examiner for the claims examiner to
7 then review, evaluate and make judgments from.
8  Q  Now, the claims examiners, themselves, did
9 not physically examine the vehicle; isn't that
10 correct?
11  A  Yes.
12  Q  Okay. And they were not, themselves,
13 estimators or appraisers; isn't that correct?
14  A  That's not always entirely true.
15  Q  Can you tell me any of the Fast Track
16 claims adjusters who were, in fact, appraisers?
17  A  There may be -- there may be some in the
18 staff that are -- that were licensed appraisers, or
19 had trained and worked as appraisers in a prior
20 company or a prior job.
21  Q  So some of them may have been familiar
22 with appraising, but that wasn't why you hired them
23 to come work at Maguire. They were supposed to
24 process these claims; correct?
25  A  No, I wouldn't say that. I would

105

W. BENECKE

1
2 definitely not say that that's not why we hired them
3 for the job.
4   It is -- it was an added positive for
5 a candidate that they had estimating an appraiser's
6 skills because they would bring that skill-set to
7 the job that they were required to do, in the claims
8 examiner job for the company, when they're receiving
9 estimates from body shops and the independent
10 appraisers to understand better and more educated
11 what they're looking at and to do it more
12 efficiently.
13  Q  It was not a job requirement, however,
14 though, that someone be an appraiser in order to be
15 a claims examiner; correct?
16  A  It was an added plus, but not a job
17 requirement.
18  Q  So in the absence of -- well, let me ask
19 you this: Wouldn't Mr. Estrada have to hire an
20 appraiser in every case so that he would know how
21 much to pay?
22  A  No.
23  Q  And how is it that Mr. Estrada could
24 possibly know how much to pay if he didn't hire an
25 appraiser?

106

W. BENECKE

1
2   A   He would request estimates from the owners
3   of the vehicle, from their selection or preference
4   from body shops. And then he would be charged with
5   the responsibility of reviewing those estimates to
6   make a determination whether he believed them to be
7   a fair invoice for what -- for what is needed for
8   repairs for the vehicle.
9   Q   Are you aware of Mr. Estrada ever
10  challenging an appraiser's appraisal of a vehicle?
11  A   As part of his job responsibility, I would
12  have expected him to have been doing that, yes.
13        MR. WILEY: Objection. Non-responsive.
14  BY MR. WILEY:
15  Q   Are you aware of Mr. Estrada ever having
16  actually not followed an appraiser's recommendation?
17  A   I'm not aware of him not following the
18  estimate, because you're asking me something that
19  would have been an expectation that he would
20  normally do, and you're asking me do I have proof
21  that he did not normally do what he was supposed to
22  do.
23        I don't have any evidence of that as
24  I'm sitting here today.
25  Q   Are you aware of some documents that says

107

W. BENECKE

1
2   that he was supposed to challenge what the appraiser
3   said?
4   A   I don't know what specific language is in
5   our documents and how it's stated, but it's a --
6   it's a generally accepted understanding that you
7   review and challenge something that is being
8   submitted by a non-employee that is simply engaged
9   to take a photo, write an estimate, and submit it to
10  you for further review.
11        The estimate, itself -- almost every
12  estimate specifically supports that context. The
13  estimate says -- most of the estimates say, "This is
14  an estimate. It's not an approval to pay. It's not
15  acceptance by the company to pay. That approval
16  will be given by the insurance company." And that's
17  the job that Mr. Estrada was expected to do.
18        So the answer in and of itself that
19  Mr. Estrada reviewed regularly is supportive of the
20  context that it's not just written by the appraiser
21  and that becomes the number that the parties should
22  expect to receive.
23        That final number is the
24  determination by the claims examiner that's working
25  for the insurance company, and that's his job and

108

W. BENECKE

1
2   responsibility.
3   Q   Why would Mr. Estrada, someone with a high
4   school degree and dropped out of the University of
5   Phoenix, no background in appraising, and by his own
6   testimony, no good with estimates, supplant the view
7   of an appraiser who's actually seen and looked at
8   the vehicle with Mr. Estrada's own opinion?
9         MR. ALLOY: Objection.
10        THE WITNESS: I don't know what
11  Mr. Estrada's motivations may be for this
12  lawsuit and what he says in the context of this
13  lawsuit, but I do know what examiners are
14  trained to do and what is expected of them.
15  And what an estimate itself says.
16        It does not say the estimate is something
17  that you will receive from the insurance
18  company. It says that the amount is ultimately
19  the decision of the insurance company, and
20  Mr. Estrada would have been the person
21  responsible for determining that amount as
22  supported by the language of that contract --
23  I'm sorry -- as supported by the language of
24  that estimate.
25        I would also add that in the insurance

109

W. BENECKE

1
2   industry, I don't know that a college degree is
3   something that is anything close to a
4   requirement for automobile appraisers. It's
5   not something that would be a requirement for
6   someone that is looking at the photos of
7   damages for an automobile, seeing what the
8   parts and labor hours are on that estimate, and
9   making a determination whether he or she
10  believes those items on that estimate are
11  appropriate or not.
12  BY MR. WILEY:
13  Q   Did you receive a notice of today's
14  deposition?
15  A   Yes.
16  Q   Did you review it?
17  A   Yes.
18  Q   Okay. And I believe it had what's called
19  a Subpoena Duces Tecum on it. It mentioned a number
20  of documents.
21        Do you recall that?
22  A   I don't recall it as I'm sitting here
23  today.
24  Q   Do you or your attorneys have a written
25  response to that Subpoena Duces Tecum?

Page 146

```
1           W. BENECKE
2     A   Yes.
3     Q   Am I correct that Mr. Estrada never
4  interviewed physicians, because there was no bodily
5  injury?
6     A   Correct.
7     Q   And by definition, Fast Track claims
8  generally do not involve bodily injury; is that
9  correct?
10    A   The Fast Track process is not a process
11 that is expected to have bodily injury claims in it.
12        That's not to say that examiners that
13 are receiving Fast Track claims may not have claims
14 in their responsibility that have bodily injury in
15 it.
16    Q   Earlier you told me the steps that you
17 went through, and I think we started in terms of
18 what a examiner would do with the coverage issue.
19        Was there actually a first step where
20 they decided whether or not it was appropriate to be
21 handled as a Fast Track claim?
22    A   Yes.  That would be included within that,
23 um --
24    Q   And if the examiner decided it was not
25 appropriate to be handled as a Fast Track claim,
```

Page 147

```
1           W. BENECKE
2  could that examiner send it back to, I guess, the
3  home office, or whoever assigns those claims?
4     A   Depending upon the individual.  They may
5  make that determination.  They may speak to their
6  supervisor.  They may get feedback from the
7  supervisor that, although, you know, they formulated
8  this initial opinion, they should handle if for some
9  period of time, or they -- based upon what they
10 anticipate they should, they can stick with it.
11        I think it's dependent upon the
12 individual, their confidences, and the confidences
13 that the supervisor has in them.
14    Q   If somebody in the Fast Track claims
15 department got a American Specialty or a Commercial
16 Auto claim, would they be expected to send it to the
17 proper examiner group?
18    A   Well, American Specialty is a managing
19 general agent.  So any -- any claim that the agent
20 was American Specialty would -- it would be a very
21 rare circumstance where somehow or another that got
22 assigned to an employee of the company.  Just
23 because it's very obvious when you get the claim,
24 the claim has American Specialty on it, that you
25 would then send it off to the American Specialty
```

Page 148

```
1           W. BENECKE
2  folks.
3        Commercial Auto.  There are times
4  that a claim could have gone directly to the
5  Commercial Auto Group, but instead was sent to the
6  Fast Track Auto Group.
7        And again, I would say that it would
8  be up to the -- the individual and their supervisor
9  whether it's something that collectively they
10 believed they had the confidence and skill-set to
11 keep themselves, or pass on, or send back.
12    Q   It's not my intent to be repetitive.  We
13 may have hit some of these before.  I just want to
14 knock them out so I can get my punch list done.  We
15 can go home.
16        One of the ones on my list, though,
17 is "inspecting property damage."
18        And, again, I think we're agreed that
19 claims examiners do not personally inspect property
20 damage?
21    A   They do not personally inspect property
22 damage.
23    Q   Okay.
24    A   That is correct.  They do review photos of
25 property damage.
```

Page 149

```
1           W. BENECKE
2     Q   The next one I have was "evaluating and
3  making recommendations regarding coverage of a
4  claim."
5        And I think that we -- it's your
6  testimony earlier was that they do do that?
7     A   Yes.
8     Q   "Reviewing factual information to prepare
9  damage estimates."
10       Isn't it true that the -- Mr. Estrada
11 and the claims examiners did not, themselves,
12 prepare damage estimates but had it done by
13 appraisers or people that actually inspected the
14 vehicle?
15    A   Or a body shop that was going to be
16 responsible for the repairs of the vehicle.
17    Q   Correct.
18    A   Yes.
19    Q   If a settlement got negotiated, was there
20 some sort of settlement agreement that was expected
21 to be signed?
22    A   Typically, it would be for a third-party
23 claim.
24       For a first-party claim with an
25 insured, typically it would not be a claim that we
```