# Exhibit 1

# Plaintiff's Deposition Transcript Excerpts

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------x

MICHAEL ESTRADA, individually
and on behalf of others
similarly situated,

                Plaintiff,

  vs.                CIVIL ACTION NO.: 12-604

MAGUIRE INSURANCE AGENCY,    ECF CASE
INC.,

                Defendant.

----------------------------------------------------x

                DATE: November 26, 2012

                TIME: 9:56 a.m.

Deposition of:

                MICHAEL ESTRADA

called for oral examination by counsel for

Defendant, pursuant to Notice, held at the

office of CONRAD, O'BRIEN, GELLMAN & ROHN, 1500 Market

Street, Centre Square, West Tower, Suite 3900,

Philadelphia, Pennsylvania, before CORINNE J. BLAIR, a

CRR, CCR, RPR, CLR, of Capital Reporting Company, and

a Notary Public of the Commonwealth of Pennsylvania.

18

M. ESTRADA
Q   During what time period did you work for Philadelphia?
A   June 2008 till December of 2011, I believe.
Q   And by "Philadelphia," you're referring to the defendant in this case?
A   Correct.
Q   And you resigned or you quit your job at Philadelphia; is that correct?
A   Correct.
Q   If I refer to it as "Philadelphia," you'll understand I'm talking about the defendant?
A   Yes.
Q   Okay. Perfect.
A   Yes. Please.
    Excuse me. Do you mind if I use the restroom?
    MS. BLOOM: No. I do not mind.
    THE WITNESS: Okay.
    (A brief recess was taken from 10:09 a.m. until 10:13 a.m.)
    MS. BLOOM: Back on the record.
BY MS. BLOOM:
Q   I should have mentioned that if you need

19

M. ESTRADA
to take a break at any time, just let me know, but you should not take a break while there's a question pending, so answer the question and then you can certainly take a break.
A   Okay. I'm sorry about that.
Q   No. No problem at all.
    Are you taking any medication today?
A   Tramadol.
Q   I'm sorry?
A   Tramadol.
Q   And why are you taking Tramadol?
A   For RLS.
Q   And does that affect your ability to understand questions and provide truthful answers?
A   Not at all.
    (Clarification requested by the court reporter.)
    THE WITNESS: Restless leg syndrome.
BY MS. BLOOM:
Q   How long have you had RLS?
A   Maybe four years now.
Q   Did you have that while you worked for Philadelphia?
A   Yes.
Q   Did you have it before you worked for

20

M. ESTRADA
Philadelphia?
A   No. I think I started noticing something, but no. I think I was at Philadelphia when I was diagnosed.
Q   When you resigned your position at Philadelphia, did you have another job?
A   No.
Q   And why did you resign your position?
A   I just felt it was time to leave.
Q   Any other reason?
A   No.
Q   Other than your attorneys, who else have you spoken to about this case?
A   Nobody.
    I'm sorry. My best friend.
Q   Anybody else?
A   No.
Q   And who's your best friend?
A   Mark Griswold.
Q   And where does Mr. Griswold live?
A   He lives in Coppel, I believe.
Q   In Texas?
A   Texas, yes.
Q   Has he ever worked for Philadelphia or any

21

M. ESTRADA
of its affiliates?
A   No.
Q   What does he do?
A   He's a claim adjuster, as well.
Q   For what company?
A   Direct General.
Q   And what have you told him about this case?
A   Just little things about, you know, when I had meetings with the attorney's office. You know, when I was coming here for the trip. He's the one that took me to the airport and is taking care of my dog while I'm here. Nothing specific.
Q   Have you been in contact with anybody that either currently works for or has worked for Philadelphia?
A   Yes.
Q   Who?
A   Tamisha Williams. And Shakelia Hayes.
Q   Anybody else?
A   No.
Q   Have you told Tamisha about this lawsuit?
A   No.
Q   Have you mentioned anything about the fact

Capital Reporting Company

**Page 22**

M. ESTRADA

2 that you're suing the company?
3   A   I think I might have when I first filed, I
4 might have mentioned it to her, but since then no.
5   Q   Does Tamisha still work for the company?
6   A   Yes.
7   Q   What's her job?
8   A   She's a claims assistant.
9   Q   And did she work for the company when you
10 were employed?
11   A   Yes.
12   Q   And what was her position then?
13   A   Claims assistant.
14   Q   Was she your claims assistant?
15   A   Yes.
16   Q   You were employed by Philadelphia as a
17 claims adjuster; is that correct?
18   A   Claims examiner.
19   Q   Did you hold any other positions?
20   A   At Philadelphia?
21   Q   Correct.
22   A   No.
23   Q   And you were hired as a claims examiner?
24   A   Yes.
25   Q   And Tamisha, you supervise Tamisha; is

**Page 23**

M. ESTRADA

2 that correct?
3   A   No.
4   Q   She worked for you though?
5   A   She worked for my team, the entire team.
6   Q   Did you give her things to do?
7   A   Yes.
8   Q   You worked in what office?
9   A   The Addison, Texas office.
10   Q   Did you ever work in any offices other
11 than the Addison, Texas office?
12   A   No.
13   Q   And Tamisha also worked in the Addison
14 office?
15   A   Yes.
16   Q   Did you know anybody that worked in any of
17 the other offices?
18   A   No.
19   Q   Did you ever visit any of the other
20 offices?
21   A   No.
22   Q   Who is a Shakelia Hayes?
23   A   She was a claims examiner in my same team.
24   Q   And is she still working for the company?
25   A   Yes.  As far as I know, yes.

**Page 24**

M. ESTRADA

2   Q   And what contact have you had with her?
3   A   We went to lunch for my birthday in
4 October.  Just personal.
5   Q   And what have you told her about this
6 lawsuit?
7   A   Nothing.  Haven't talked to her about it.
8   Q   Have you put her in contact with your
9 lawyers?
10   A   No.
11   Q   Have you put Tamisha in contact with your
12 lawyers?
13   A   No.
14   Q   I had asked whether you've spoken to
15 anybody else who either is or was employed by the
16 company.
17       Have you communicated in any other
18 way, other than speaking; like, for example, texting
19 or e-mailing?
20   A   Just personal conversations.  Texting and
21 e-mail.
22   Q   With who?
23   A   Shakelia and Tamisha.
24   Q   Anybody else?
25   A   No.

**Page 25**

M. ESTRADA

2   Q   Have you kept copies of those texts and
3 e-mails?
4   A   No.
5   Q   Have you given your attorneys the names of
6 of any either current or former employees of the
7 company?
8   A   Yes.
9   Q   Who's names --
10       MS. COHEN:  Objection.  Privileged.
11 BY MS. BLOOM:
12   Q   Which names?
13       MR. WILEY:  Don't answer.
14       MS. BLOOM:  You're directing him not to
15 answer the question as to which names he's
16 given you?
17       MS. COHEN:  To the extent that he had a
18 conversation with me as his attorney, yes.
19       MS. BLOOM:  I'm not asking for the
20 substance of the conversation.  I'm just asking
21 for the identification of names.
22       MS. COHEN:  No, I'm instructing him not to
23 answer.
24 BY MS. BLOOM:
25   Q   Have you or has anybody on your behalf

26
M. ESTRADA

1  gotten any sworn statements from any current or
2  former employees of the company?
3     A   No.
4     Q   Do you know any employees of -- of the
5  company, either current or former, other than people
6  who worked in the Addison, Texas office?
7     A   Personally or -- I know of names, but I've
8  never met or spoken to them before.
9     Q   What are the names of the people that you
10 know that either work for or have worked for the
11 company outside of the Texas office?
12    A   I don't recall anymore because I never
13 really talked to them.
14    Q   Do you have any kind of a list anywhere?
15    A   No.
16    Q   Have you ever had a list?
17    A   No.
18    Q   And so sitting here today, you can't
19 remember anybody's name --
20    A   No.
21    Q   -- outside of Texas?
22    A   No.
23    Q   Do you know the names of anybody else in
24 the Texas office?

27
M. ESTRADA

1     A   Yeah.
2     Q   Who?
3     A   Just the names of the people there?
4     Q   Yeah.
5     A   Dee Stewart. Caroline. I believe her
6  name last name is Jackson. Vicky Manning. Craig
7  Olleck. Marvel Webb, M-A-R-V-E-L. I said Caroline.
8  Those others, I just can't recall them right now.
9  It's not people I dealt with all the time.
10    Q   It is or is not?
11    A   Is not.
12    Q   Did you maintain any kind of a list?
13    A   No.
14    Q   Do you have any records which would
15 reflect the people that you worked with when you
16 worked for Philadelphia?
17    A   No.
18    Q   What is your understanding about the
19 allegations that you're making in this case?
20    A   What do you mean?
21    Q   What are you suing for?
22    A   Um, we are -- or, in the job I'm in, we
23 are exempt. We're totally exempt. And are not
24 actually exempt under the administration -- um, I

28
M. ESTRADA

1  don't know what it's called. And we should have
2  been paid overtime.
3     Q   What made you bring this lawsuit?
4     A   I went and spoke to an attorney about
5  another issue and, um, we happened to talk about
6  this as well.
7     Q   What attorney was that?
8     A   Rob Wiley, P.C.
9     Q   You understand that you are the lead
10 plaintiff in this case?
11    A   Yes.
12    Q   What does that mean to you?
13    A   That I'm the first one bringing the suit
14 against the company.
15    Q   What is your understanding of your
16 obligations as the lead plaintiff?
17    A   I don't know.
18    Q   What are you hoping to get as a result of
19 this suit?
20    A   Overtime pay that was due.
21    Q   Anything else?
22    A   No.
23    Q   When did you first start working for
24 Philadelphia?

29
M. ESTRADA

1     A   In June.
2     Q   Of?
3     A   2008. I believe it was June 9th of 2008.
4     Q   And you said you were hired to be a claims
5  examiner; is that right?
6     A   Correct.
7     Q   What was your understanding as to the
8  claims examiner position?
9     A   I would handle auto claims, Fast Track
10 auto claims, minor accidents. Mostly parking lot
11 type accidents for the Fast Track group.
12    Q   And how did you learn about the position?
13    A   I was called. I was actually working with
14 United Auto Insurance Group and I received a call
15 from someone with Philadelphia Insurance who told me
16 about the position, and asked if I was interested.
17    Q   And what was it about the position that
18 was interesting to you?
19    A   It was different than what I had worked
20 before. It was commercial lines insurance as
21 opposed to personal auto insurance.
22    Q   And what about that was interesting?
23    A   It's a different -- it's a -- I guess you
24 could make more money in commercial insurance than

                                                                34
                  M. ESTRADA
 1
 2    Q   So you knew in going to Philadelphia that
 3  this was going to be a change?
 4    A   Yes.
 5    Q   Under your experience at United, you say,
 6  "Investigation of third-party auto accidents and
 7  resolving claims made against the insured's policy,
 8  negotiate settlement with third parties once
 9  coverage and liability have been determined."
10         That's what you were doing at United
11  Auto Insurance Company?
12    A   Yes.
13    Q   And what, if anything, about that
14  experience did you believe was going to be helpful
15  at Philadelphia?
16    A   Handling the claims, the auto accidents.
17    Q   Why?
18    A   Because I had -- because of the experience
19  I got in doing that with United Auto.
20    Q   So the experience negotiating settlements?
21    A   Yes.
22    Q   And when you were investigating and
23  resolving claims at United Auto Insurance Company,
24  how did you go about that process?
25    A   I'm sorry?

                                                                35
                  M. ESTRADA
 1
 2    Q   At United Auto, how did you go about that
 3  process?
 4    A   I'm sorry.  What was the process?
 5    Q   How did you go about the process of
 6  investigating and resolving claims?
 7    A   Oh.  I would contact both parties, the
 8  claimant and insured, and get their statements on
 9  how the accident happened; the police report, if
10  there is one, and make a liability decision.  If
11  there's coverage, then we would settle the claim.
12    Q   And you say "make a liability
13  determination," what do you mean?
14    A   Deciding who's at fault.
15         Usually, if there's a police report,
16  we usually went by the police report.
17    Q   And then what would you do?
18    A   Get an appraiser out there to do an
19  estimate on the damages, and pay the claim if
20  liability was accepted.
21    Q   Now, when you applied for the job at
22  Philadelphia, what, if anything, did you understand
23  you would be doing?
24    A   Handling minor claims in like parking
25  lots, just Fast Track simple claims.  Non-injury

                                                                36
                  M. ESTRADA
 1
 2  claims.
 3    Q   When you say "Fast Track," what does that
 4  mean?
 5    A   Simple claims.  Easy claims that, you
 6  know, insured backed into a parked vehicle.  Nothing
 7  that -- that involves a lot of investigation.  Who
 8  ran a red light.  Anything like that.
 9    Q   When you got the job at Philadelphia, who
10  did you work for; who was your immediate boss?
11    A   Mona Born.
12    Q   And were there other claims examiners that
13  worked for Mona?
14    A   Yes.
15    Q   Who were they?
16    A   Craig Olleck, Vicky Manning.  I think she
17  was transitioning from an admin person to an
18  adjuster at that time when I started.
19    Q   Anybody else?
20    A   Marvel Webb.  And I believe Shakelia Hayes
21  came shortly after I did.
22    Q   Did you handle any claims involving rental
23  cars?
24    A   Not that I can recall.  Rent a cars being
25  damaged?

                                                                37
                  M. ESTRADA
 1
 2    Q   Correct?
 3    A   No, not that I recall.
 4    Q   Was there anybody besides Mona who was
 5  responsible for supervising claims examiners in the
 6  Addison office?
 7    A   Yeah.  Rodger Terry.
 8    Q   And did he supervise a different group of
 9  people?
10    A   Correct.
11    Q   And did that group have responsibility for
12  handling damage to rental cars?
13    A   Yes.
14    Q   What state or states were you responsible
15  for?
16    A   There was quite a few of them.  I don't
17  recall them all.  It's been awhile.
18    Q   Well, can you recall any of them?
19    A   Yeah.  There was Colorado, I believe.
20  California, Florida, Washington.  New Mexico, I
21  think.  That's all I can recall right now.
22    Q   Now, did you understand that when you
23  started working for Philadelphia that you would also
24  be responsible for investigating claims?
25    A   Yes.

38

M. ESTRADA
2  Q  And you would also be responsible for
3  talking to the insured?
4  A  Yes.
5  Q  And you would also be responsible for
6  making a determination as to liability?
7  A  Yes.
8  Q  And you'd also be responsible for getting
9  an appraiser -- an appraisal, if one needed to be
10 gotten?
11 A  Yes.
12 Q  Are you familiar with the concept of
13 comparative negligence?
14 A  Yes.
15 Q  And what does that mean in terms of
16 resolving automobile claims?
17 A  Um, usually it's if both parties played
18 some part of the accident, you would determine,
19 percentage-wise, who was more at fault and who was
20 less at fault.  And I guess a percentage of the
21 damages would be paid, as opposed to a hundred
22 percent of it.
23 Q  And were you responsible for determining
24 percentages in comparative negligence jurisdictions?
25 A  Um, if I had some.

39

M. ESTRADA
2  Q  Well, which of the jurisdictions that you
3  were responsible for were comparative negligence
4  jurisdictions?
5  A  I don't recall.
6  Q  But you're aware that some of them were?
7  A  Yes.
8  Q  Okay.  And as to the ones that were part
9  of your duties and responsibilities, were one, to
10 determine that it was a comparative negligence
11 jurisdiction; correct?
12 A  Yes.
13 Q  And then once you determined that it was a
14 comparative jurisdiction, then you would have to
15 apportion percentages of fault; correct?
16 A  Yes.
17 Q  And that would impact how much ultimately
18 would get paid; correct?
19 A  Yes.
20 Q  Okay.  Now, going back to the
21 jurisdictions that you were responsible for, was
22 Texas one of them?
23 A  No.
24 Q  Florida was one of them?
25 A  Yes.

40

M. ESTRADA
2  Q  And you were licensed in Florida; is that
3  right?
4  A  Correct.
5  Q  Why?
6  A  I don't know.  They told us to get
7  licensed in Florida.
8  Q  Can you handle claims in Florida without a
9  license?
10 A  Not that I'm aware of, no.
11 Q  Did any of the other jurisdictions that
12 you were responsible for require a license?
13 A  Not that I'm aware of.
14 Q  Now, in terms of Rodger Terry's team, they
15 were responsible for different states; is that
16 correct?
17 A  Yes.
18 Q  And do you know what states those were?
19 A  No.
20 Q  And of the states that Rodger Terry's team
21 was responsible for, which of those states required
22 licenses?
23 A  I have no idea.
24 Q  Which of those states had comparative
25 negligence statutes?

41

M. ESTRADA
2  A  I have no idea.  I really don't know which
3  states they handled.
4  Q  Did you have to take a test to get
5  licensed in Florida?
6  A  In Florida, no.
7  Q  You said you're also licensed in Texas?
8  A  Mm-hmm.
9  Q  I'm sorry.  You have to answer yes or no.
10 A  Yes, I'm sorry.
11 Q  Do you have to take a test to get licensed
12 in Texas?
13 A  Yes.
14 Q  And what kinds of things were you tested
15 on?
16 A  It's been so many years ago.  I can't
17 remember what -- about coverage.  You know, there
18 had to be coverage in order for there to be a claim,
19 and just different questions.
20 Q  And we'll get back to coverage in a
21 minute.  But you mentioned that one of the
22 jurisdictions that you were responsible for was
23 California?
24 A  Yes.
25 Q  Did you have to be trained in California?

```
                                                    42
                M. ESTRADA
 1
 2    A    No.  Well, I was never trained in --
 3    Q    You were never trained.
 4         Have you ever heard of Grundy claims?
 5    A    No.
 6    Q    So you were never asked to handle a Grundy
 7  claim when you were at Philadelphia?
 8    A    I have never heard that.  I have no idea
 9  what that is.  I'm sorry.
10    Q    Did you have a certain amount of authority
11  for which you could settle claims?
12    A    We were told ten thousand dollar limit.
13    Q    Who told you that?
14    A    Mona and Rodger.
15    Q    And when you say "we were told," she told
16  you that your limit was $10,000?
17    A    Yes.
18    Q    Did she tell you how she arrived at
19  $10,000?
20    A    No.
21    Q    Did she tell you how the $10,000 was set?
22    A    No.
23    Q    Did you have any role in setting the
24  authority for any of the other claims examiners --
25    A    No.
```

```
                                                    43
                M. ESTRADA
 1
 2    Q    -- in the office?
 3    A    I'm sorry.  No.
 4    Q    Did you have a role in setting the
 5  authority for any of the other claims examiners in
 6  any of the other offices?
 7    A    No.
 8    Q    Do you know how many other offices, if
 9  any, had claims examiners that handled Fast Track
10  claims?
11    A    I just know that Philadelphia's office had
12  Fast Track claims examiners there.
13    Q    And how do you know that?
14    A    From the list of -- that we've had of all
15  the employees.  It would say "Fast Track."
16    Q    And did any claims examiners in
17  Philadelphia handle personal injury claims?
18    A    No.  Not that I'm aware of.
19    Q    It's possible that they did and you might
20  not know?
21    A    Correct.
22    Q    Have you ever talked to any of the claims
23  examiners in Philadelphia about what they did?
24    A    No.
25    Q    Who told you about the term "Fast Track"?
```

```
                                                    44
                M. ESTRADA
 1
 2    A    I've never heard of it until I went to
 3  Philadelphia and I was interviewing.  They told me
 4  it would be for the Fast Track group.  They just
 5  started it there in the Addison office and Mona was
 6  recently promoted to be a supervisor and that was
 7  going to be her group.
 8    Q    And did she supervise claims examiners
 9  that handled claims other than Fast Track claims?
10    A    No.
11    Q    Are you sure?
12    A    As far as I know, yes, I'm sure.
13    Q    Do you know anything about the background
14  and experience of any of the other claims examiners
15  that worked for Mona during the time that you were
16  there?
17    A    Just from speaking to them, how many years
18  they've been in the business of handling claims.
19    Q    Do you know anything about what the
20  authority limit was for any of the other claims
21  examiners?
22    A    No.  No, I didn't ask them that.
23    Q    So they could have had more or less
24  authority than you; correct?
25    A    Yes.
```

```
                                                    45
                M. ESTRADA
 1
 2    Q    Do you know who determines how much the
 3  settlement authority or how much authority a
 4  particular claims examiner has?
 5    A    No.
 6    Q    Do you know what the factors are that go
 7  into making that determination?
 8    A    No.
 9    Q    Let's talk about what you did when a claim
10  would come in.
11         First of all, where would you get the
12  claim from?
13    A    It would come into our Image Right system.
14  Come in as a task.
15    Q    Well, who assigned a particular claim to
16  you?
17    A    Home office.
18    Q    And when you say your Image Right system,
19  what do you mean by that?
20    A    It's a program where scanned items are
21  stored.  It holds electronic files as well as
22  scanned items.
23         Mail also goes into that same system.
24    Q    Is it essentially an electronic storage
25  system?
```

```
                                    46
 1              M. ESTRADA
 2    A   Correct.
 3    Q   It doesn't generate documents; correct?
 4    A   No, it does not.  Not that I'm aware of.
 5    Q   Okay.  You either scan a document and
 6  place it in Image Right, or you place an electronic
 7  file in Image Right; correct?
 8    A   Yes.
 9    Q   So it's the equivalent of like a storage
10  room for electronic versus paper documents?
11    A   Correct.
12    Q   And if you had a paper document that you
13  wanted to store in Image Right, you would scan it
14  and just put it into the system?
15    A   Yes.
16    Q   So when you refer to it by a program, what
17  did you mean?
18    A   It's a program like Word or Excel.
19  They're a program, Word document program, but Image
20  Right is a program that houses that information or
21  those files.
22    Q   Well, other than storing files, what else
23  does Image Right do?
24    A   Gives out reports.
25    Q   Does Image Right decide where to store a
```

```
                                    47
 1              M. ESTRADA
 2  particular file within its system?
 3    A   Um, no.  You usually tell it, you know,
 4  what's -- assign a claim number.  Everything has a
 5  claim number that goes for that claim.
 6    Q   So somebody -- if I want to put something
 7  in Image Right, I either -- if it's a new claim, I
 8  give it a claim number; is that right?
 9    A   Yes.
10    Q   Or if it's a document that's related to an
11  existing claim, I have to note whatever the claim
12  number is it -- I have to note whatever the claim
13  number is on the document and then the person
14  inputting the document decides where it gets stored;
15  correct?
16    A   Yes.  It goes into that claim --
17    Q   Okay.
18    A   -- that claim number folder.
19    Q   Image Right does not make a determination
20  about where to store --
21    A   No.
22    Q   -- documents; correct?
23    A   Yeah.  Correct.
24    Q   Okay.  When you said it generates reports,
25  what kind of a report are you talking about?
```

```
                                    48
 1              M. ESTRADA
 2    A   It's just home office reports.  I honestly
 3  couldn't tell you specifically what kind of reports.
 4    Q   Well, what would be in the report?
 5    A   I don't know.  I've never really seen one.
 6    Q   Where does the information come from that
 7  goes into the report?
 8    A   From Image Right.
 9    Q   Well, where in Image Right?
10    A   I don't know.  I didn't build the program.
11  I have no idea where it comes from.
12    Q   Give me an example of what would be
13  contained in one of these reports?
14    A   I've never seen one of the reports, so I
15  don't know.
16    Q   Okay.  So you've never seen a report from
17  Image Right; is that correct?
18    A   Not that I recall.  Yes.
19    Q   So you don't know what, if anything, would
20  be in that kind of a report, assuming that a report
21  was generated from Image Right; correct?
22    A   Correct.
23    Q   Okay.  So going back to what happens when
24  you get notified of a claim, you said Image Right
25  sets it up or sends you something, a task.  I didn't
```

```
                                    49
 1              M. ESTRADA
 2  understand your answer.  Explain to me exactly what
 3  would happen.  How would you know that you have a
 4  new claim?
 5    A   I have to go in and check it every so
 6  often to see if anything -- mail, or anything was
 7  put into that Image Right folder.
 8        Every adjuster has their own folder
 9  that the admin people in home office sends some --
10  whatever they need, their mail and some new claims,
11  whatever, it's all in that Image Right system.
12    Q   Okay.  So Michael Estrada has a folder in
13  Image Right?
14    A   Mm-hmm.
15    Q   Is that right?
16    A   Yes.
17    Q   And then within that folder there are
18  separate folders set up by claim for each of the
19  claims that you're handling?
20    A   Yes.
21    Q   And documents get put into the appropriate
22  folder depending on the claim number; is that right?
23    A   Yes.
24    Q   And whomever is putting the document into
25  the storage system determines what folder it goes
```

58

M. ESTRADA

1
2  order to do that, there were times when you might
3  not be familiar with the law in a particular state
4  and you had to go look it up to see who would be --
5  who's liable in the situation that you're presented
6  with?
7     A   On rare occasion.  I mean, normally it was
8  parking lot accidents.  Insured backed into a parked
9  car.
10    Q   So normally you knew?
11    A   Yeah.  Yeah.  Because it was in Fast
12 Track.  I mean, it was mostly quick claims that --
13 simple accidents.
14    Q   Okay.  But there were times when you
15 didn't know; is that right?
16    A   There were occasions, yeah, that a claim
17 would come up.  If I wasn't sure, I would usually
18 ask my supervisor.  She's more knowledgeable and
19 more experienced.
20    Q   But you could ask your supervisor or you
21 could consult the driving manual --
22    A   Yes.
23    Q   -- for the particular state; correct?
24    A   Yes.
25    Q   And that was a decision that you made,

59

M. ESTRADA

1
2  right?
3     A   Yes.
4     Q   Now, you were talking about the types of
5  accidents.
6         Most of the accidents that you
7  handled were accidents that were worth about how
8  much money?
9     A   A couple thousand; three, four, 5,000.
10    Q   Small, right?
11    A   Yes.
12    Q   Okay.  Can you give me a sense of what
13 kinds of things you'd be handling?
14    A   As?
15    Q   You said a parking lot accident.
16 Somebody --
17    A   Insured backed into a parked vehicle.  Um,
18 normally we hit a parked car.
19    Q   So normally either your person hit a
20 parked car or somebody hit your insured?
21    A   Correct.
22    Q   Or how about if somebody broke into a car?
23    A   Yes.
24    Q   So there'd be -- it all centered on damage
25 to the car?

60

M. ESTRADA

1
2     A   Correct.
3     Q   And most times the damage was small?
4     A   Yes.
5     Q   Is that right?
6         And part of what you had to determine
7  is how much the damage was; correct?
8     A   No.  The appraiser would do that.
9     Q   Well, in every situation, were you
10 supposed to get an appraiser?
11    A   Absolutely.
12    Q   Even if it was under $2,000?
13    A   Absolutely.
14    Q   And so it's your testimony here today that
15 you always got an appraiser?
16    A   I always got an estimate.
17    Q   You always got an estimate?
18    A   Yeah.  If it was under a couple of
19 thousand, then we were allowed to have the insured
20 or the claimant get an estimate from a local body
21 shop.
22    Q   Okay.  So the claim comes in.  You would
23 check to see if there was coverage; correct?
24    A   Yes.
25    Q   Okay.  And then you would check to see if

61

M. ESTRADA

1
2  there was liability?
3     A   Yes.
4     Q   Okay.  And then you said that -- would you
5  call the insured?
6     A   Yes.
7     Q   And why were you calling the insured?
8     A   To get the statement from the driver on
9  what happened.  Usually, they say I backed into a
10 vehicle.  You know, whatever happened in the
11 accident.
12    Q   Did you ever have situations where the
13 insured said it wasn't their fault?
14    A   Yes.
15    Q   And how often would that happen?
16    A   On occasion.
17    Q   And what happened; what were you supposed
18 to do then?
19    A   I'd talk to the claimant and see their
20 side of the story.  A lot of times there's a police
21 report, which we would go by that, the police
22 report.  Being that it was a commercial insurance, a
23 lot of the companies made sure that the drivers
24 always got a police report, so that was really
25 helpful.

## Page 62

M. ESTRADA

Q Okay. So you would talk to your insured; if your insured said it wasn't their fault, then you might reach out and talk to the other party?
A Yeah.
Q And what would you do if there was a disagreement between two parties about what happened?
A Conflicting statements and there's no independent witnesses, then we would side with our insured.
Q Okay. And you made the decision to side with your insured?
A That's just something we're supposed to do.
Q Well, did you ever have any situations where you felt that the person, the non-insured, had the more credible story?
A No. If there's conflicting statements and no evidence to confirm that my insured was at fault, I would side with my insured.
Q Now, when you say "no evidence," what kind of evidence?
A Witnesses. If the damages didn't support what the insured claimed.

## Page 63

M. ESTRADA

Q So if you have conflicting statements, then you'd have to determine whether or not there's other evidence; is that right?
A Well, hopefully by then, you know, you know all the evidence.
Q But you would -- I assume you have to get the evidence or look for the evidence; correct?
A Yeah. As in evidence, was there any witnesses.
Q Okay.
A Independent witness.
Q And how would you find out if there was any witnesses?
A Asking both the driver and the claimant if there were any independent witnesses. Was there a police report done. If none exists, then I would side with my insured, if the statements were conflicting.
Q Okay. Let's go one step at a time then.
So if there's a police report, what would you do?
A I'd go by the police report.
Q You say you'd go by the police report. What does that mean?

## Page 64

M. ESTRADA

A If the police report says this person was at fault, which a lot of times it does.
Q So you would follow the police report?
A Correct.
Q So if you have conflicting statements, then you would ask whether there was a police report?
A No. I'd ask that regardless.
Q Okay. So you always ask for the police report?
A If there's a police report.
Q Okay. You said that you would ask if there had been independent witnesses. Who would you ask that question of?
A Both the insured and the claimant.
Q And what happens if there are independent witnesses?
A I would contact them and see what they saw.
Q Okay. So then you'd talk to the independent witnesses?
A Correct.
Q So who decides in that situation if the -- once you talked to the independent witness, what do

## Page 65

M. ESTRADA

you do then?
A Whichever they corroborate whose story, that's who I go with.
If the witness says the insured backed into the claimant's car, then -- and the claimant is saying that the insured backed into his car, you got two people saying the same thing, then that's what you go with.
Q So you'd make a judgment that if two people --
A Versus the one, correct.
Q And that in your judgment is you believe the two people?
A Yes.
Q Okay. Now, you said before that sometimes the damage didn't support the determination.
A Didn't support the --
Q The story. Okay. Yeah, what do you mean by that?
A Just, I've had people, like -- I had an insured that was parked and she said somebody backed into her car, but then she's claiming damages to the front of the vehicle.
The other side is like, well, I mean,

66

M. ESTRADA

1
2  you can tell where the car was backed into, but
3  you're claiming these damages. It just -- it
4  doesn't make sense.
5     Q   So in that situation you made a
6  determination that the insured wasn't telling the
7  truth?
8     A   Correct.
9     Q   Okay. And you would deny coverage based
10 on that?
11    A   No. I wouldn't deny coverage. I wouldn't
12 pay for the damages that didn't support --
13    Q   Okay. So then you'd have to decide which
14 damages, if any, actually supported the claim?
15    A   Yeah. And the appraiser would usually
16 tell us, "Well, they're trying to say this damage
17 was also caused in that accident, but I don't
18 believe that it could have been, judging by that."
19 Because they're the ones -- the appraiser's the ones
20 looking at the vehicle, and they can tell, you know,
21 if a vehicle was hit, by their experience, and say,
22 it's not possible to cause that other damage.
23    Q   So the appraiser comes back and tells you
24 that the damage is in a place that does make sense,
25 in terms of the story, and then you determine, okay,

67

M. ESTRADA

1
2  I'm going to go with what the appraiser says?
3     A   Correct.
4     Q   Okay. Have you had situations where the
5  claimant is more credible, tells a story that makes
6  more sense than what your insured is telling you?
7     A   Not that I recall, no.
8     Q   Um, usually it's by, you know, police
9  report, if there is one, but if -- the only time I
10 would think that would happen if the damages that
11 the insured's saying just didn't match, if it just
12 didn't make sense like that, then, you know, yeah, I
13 think the claimant probably would be more credible.
14    Q   And then you'd side with the claimant --
15    A   Yes.
16    Q   -- or you'd decide that the claimant was
17 more credible?
18    A   Yes.
19    Q   Okay. Now, what if they both had some
20 degree of fault; what did you do then?
21    A   I would usually ask Mona, see what she
22 thought. See if she wanted comparative negligence
23 on that.
24    Q   You say you usually ask Mona.
25        What information would you bring to

68

M. ESTRADA

1
2  Mona?
3     A   The estimates amounts; how the accident
4  happened; you know, what I believe to be how the
5  accident happened. I would ask her what she
6  thought.
7     Q   So you would go to Mona and say, this is
8  what I believe happened, and would you tell her who
9  you thought was at fault and how much and why?
10    A   Yes.
11    Q   So you'd make a recommendation to her?
12    A   Correct.
13    Q   Okay. And did she always adopt your
14 recommendations?
15    A   No. No. Not always.
16    Q   And can you think of any examples, sitting
17 here today, when she didn't accept your
18 recommendation?
19    A   Um, it's not that she just flat out
20 didn't. She just thought, well, it's not worth it.
21 Just go ahead and pay the whole claim.
22    Q   And how many times did that happen?
23    A   I couldn't tell you.
24    Q   More than five?
25    A   Yes. I'm sure.

69

M. ESTRADA

1
2     Q   How many claims did you handle that were
3  more than $10,000?
4     A   Very few. But there were some, but not a
5  whole lot.
6     Q   Now, once you talked to your insured the
7  first time, how many other times would you talk to
8  the insured?
9     A   If I had more questions. It really
10 depends on -- on the -- depends on if there was any
11 other questions, or if the claimants had something,
12 I just wanted to confirm with the insured.
13    Q   So you might go back to the insured and
14 say, "I spoke to the claimant. They're saying
15 something different," and get the insured's view
16 again?
17    A   Correct.
18    Q   Right. And would you ever talk to the
19 insured about what you'd learn from third-party
20 witnesses?
21    A   Yes.
22    Q   So part of your job was really to
23 investigate what happened?
24    A   Yes. Yes.
25    Q   Are you familiar with the concept of

Page 70

M. ESTRADA

1  
2  betterment?
3    A  Yeah. Isn't that like when -- take a
4  tire, you know, a tire. We're going to give
5  somebody a brand new tire, but the tire that they
6  had on their vehicle before was older, a lot older,
7  wasn't new. So you would take betterment to be more
8  even as to what they had.
9    Q  So you would reduce what you were going to
10 pay them?
11   A  Yes.
12   Q  And did you?
13   A  The appraiser would do that.
14   Q  The appraiser would come to you with a
15 recommendation about that?
16   A  It would be on their -- their estimate.
17   Q  And would you make a determination as to
18 whether to go along with what the appraiser said, or
19 not?
20   A  I always go along with what the appraiser
21 says.
22   Q  I understand that you're saying that you
23 always went along with it, but each time you decided
24 whether to go along with it or not; correct?
25       MS. COHEN: Objection. Asked and

Page 71

M. ESTRADA

1  
2  answered.
3       THE WITNESS: I always go with what the
4    estimate is.
5  BY MS. BLOOM:
6    Q  So you made a decision to always go --
7    A  I was never told not to.
8    Q  Did anybody tell you to always go with the
9  appraiser?
10   A  No.
11   Q  So that was something that you decided for
12 yourself, because it made sense?
13   A  It's something we always did. We were
14 never told otherwise.
15   Q  When you say, it's something that you
16 always did, what knowledge, if any, do you have
17 about how other claims examiners handled an
18 appraiser report?
19   A  By talking to them.
20   Q  Are you -- when you say "by talking to
21 them," what do you mean by that?
22   A  We talk to each other about claims that
23 we've had; sometimes to get an opinion from them on
24 what they thought about it.
25   Q  So other claims examiners would seek out

Page 72

M. ESTRADA

1  
2  your opinion about some of their claims?
3    A  Well, not to -- to make the decision for
4  them. Just to say, "Hey, you know, what do you
5  think about this? I don't know if the insured's
6  telling the truth." You know, just talking.
7    Q  So other claims examiners were trying to
8  make a decision about a particular claim and they
9  might come and ask you your opinion?
10   A  Yeah.
11   Q  And did you do the same thing?
12   A  Yeah.
13   Q  So if you were trying to make a decision
14 about a particular claim, you might seek out the
15 opinion of one of your claims examiners; is that
16 right?
17   A  No. Just talking to them. Just to see
18 what they think, you know.
19       It wasn't to -- because I couldn't
20 make the decision. Just, you know, "Hey, what do
21 you think about this?"
22   Q  Because you felt that you could make the
23 decision on any particular claim?
24   A  Yeah, usually, yes.
25   Q  Were there times when -- you said for some

Page 73

M. ESTRADA

1  
2  claims where the damage was like under a couple
3  thousand dollars, where the insured might go out and
4  get their own appraisal; is that right?
5    A  Yes.
6    Q  Did you get an independent appraisal in
7  those cases, also?
8    A  No.
9    Q  And did you always agree with what the
10 insured's appraisal said?
11   A  Yeah. Pretty much. Unless there was some
12 obvious, um -- you know, if -- if, um, the damages
13 are claimed on the left side and then there's
14 something on the right side that the estimate is
15 willing to repair, then I would call the body shop
16 and ask them, "How does that fit with the impact
17 over here?"
18   Q  The impact on the other side?
19   A  Correct.
20   Q  And then you might decide to pay a lesser
21 amount?
22   A  Yeah.
23   Q  And you'd make that decision?
24   A  No. No. I would usually ask Mona what
25 she thought, because I'm really not that great with

74

1                M. ESTRADA
2  estimates.
3      Q    So you would go to Mona and you'd say,
4  "I've investigated.  This is what I found out.  This
5  is when I think we should do.  What do you think?"
6      A    Yes.
7      Q    Okay.  So you'd make a recommendation?
8      A    Yes.
9      Q    Now, when you were going through this
10 process, would you keep notes of what you were
11 doing?
12     A    If speaking to people.  Depends what type
13 of notes.
14     Q    Did you -- every time you talked to the
15 insured, or a claimant, or an appraiser, did you
16 make notes of that?
17     A    Yes.
18     Q    And where did you keep those notes?
19     A    In the Apps System.
20     Q    Okay.  So you kept them electronically?
21     A    Correct.
22     Q    And you kept them as you went along?
23     A    Yes.
24     Q    When you talk about the Apps system, what
25 is the Apps system?

75

1                M. ESTRADA
2      A    It's where the note system is.  Been so
3  long.  What else does it have?
4           You can, um, do letters and faxes
5  from there.  Well, some forms.  Like a "request
6  appraisers" and stuff from it.
7      Q    So you could type in your notes of a
8  conversation that you had with a claimant, an
9  insured or a witness?
10     A    Correct.
11     Q    Okay.  And you could also -- what else
12 could you do from it?
13     A    Generate like a cover fax sheet.  You can
14 generate and request for an independent appraiser.
15     Q    Like a form letter?
16     A    Yes.  You could request payment from the
17 Apps System.
18     Q    Meaning, you could say to the Apps System,
19 I want you to issue a check for $4,500 to this
20 person?
21     A    Correct.
22     Q    And then a check would be issued?
23     A    It would go to home office.  They would
24 review and approve it, or whatever they needed to
25 do.

76

1                M. ESTRADA
2      Q    Okay.  So you'd make the request and then
3  it would go to home office and they'd pay it or not
4  pay it?
5      A    Correct.
6      Q    So you could just make the request through
7  the Apps System?
8      A    Yes.
9      Q    The Apps System didn't calculate how much
10 any particular claim was worth, did it?
11     A    No.
12     Q    You didn't have any software that did
13 that?
14     A    No.
15     Q    No, you had no software that did that?
16     A    Correct.
17     Q    Okay.  It did not -- the Apps System did
18 not put a value on any particular claim; is that
19 right?
20     A    No.
21     Q    No, it did not?
22     A    It did not.
23     Q    Did you ever have any situations where an
24 insured claimed that their car was totalled?
25          Do you understand what I mean by

77

1                M. ESTRADA
2  "totalled"?
3      A    Yes.
4      Q    Okay.  What do I mean by "totalled"?
5      A    Where it would cost more to repair it than
6  what the vehicle's actually worth, or a percentage
7  of.
8      Q    And did you have claims like that?
9      A    Yes.
10     Q    And did you have to make a determination
11 as to whether or not the car had actually been
12 totalled?
13     A    The appraiser usually does that.
14 They'll -- they'll -- different states have
15 different requirements, as far as what percentage of
16 the vehicle value before it can be considered a
17 total loss.
18     Q    So you would figure out what state it was
19 and then figure out what percentage of the vehicle
20 value loss there needed to be?
21     A    No.  Once -- depending on what state it
22 is, I send an appraiser from that state to go and do
23 an estimate on the vehicle.
24          If their estimate for that state
25 exceeds the total loss threshold, then they would

102

M. ESTRADA
1
2  A  Yes.
3  Q  And in answering Interrogatory Number 6,
4  you provided a breakdown of the number of overtime
5  hours per-week that you believed you worked. And
6  can you just look at that with me, please?
7  A  Yes.
8  Q  It's on page 5.
9  A  I've got it here.
10  Q  So in Answer to Interrogatory Number 6,
11  you said that you worked, approximately, three to
12  four hours of overtime per-week in 2009; is that
13  right?
14  A  Correct.
15  Q  Does that sound accurate to you sitting
16  here today?
17  A  As a best guess.
18  Q  Do you have any records that would reflect
19  that?
20  A  No. No, no. Not at all.
21  Q  And then you say that in 2010, you worked
22  five to six hours of overtime?
23  A  Correct.
24  Q  And do you have any records that would
25  reflect that?

103

M. ESTRADA
1
2  A  No.
3  Q  And then you say in 2011, seven to ten
4  hours of overtime a week?
5  A  Correct.
6  Q  Do you have any records that would reflect
7  that?
8  A  No. I don't.
9  Q  What were you doing during these three to
10  four hours in 2009?
11  A  Working in claims.
12  Q  Where?
13  A  I'm sorry?
14  Q  Were you working in the office?
15  A  Some -- some in the office and some
16  from -- at home.
17  Q  What kind of work were you doing at home,
18  or do you claim you were doing at home?
19  A  Reviewing subrogation demands and
20  estimates that would come in the day before.
21  Because I usually like to get those paid out the
22  following morning.
23  Q  The subrogation demands and estimates,
24  were they electronic?
25  A  Yes.

104

M. ESTRADA
1
2  Q  Do they ever -- were they ever not -- were
3  they ever non-electronic?
4  A  No.
5  Q  So did you always have to review those on
6  Image Right?
7  A  No, no. It was a PDF file. I would
8  download them to a memory stick and take them home
9  to review them, or print them out sometimes.
10  Q  And what were you doing during the five to
11  six hours of overtime you claim you worked per-week
12  in 2010?
13  A  The same thing. Claim volume was higher.
14  So there was more work that needed to be done.
15  Q  And what about in 2011?
16  A  The same.
17  Q  And when you say three to four hours a
18  week, are you claiming that was every week?
19  A  No. No. Not every week.
20  Q  About how many weeks?
21  A  I honestly couldn't say for sure. More
22  than half.
23  Q  And was it always three to four hours?
24  A  No. Sometimes it was a little more.
25  Sometimes it probably could have been less.

105

M. ESTRADA
1
2  Q  Did you have vacation?
3  A  Yes.
4  Q  And how many weeks vacation did you get a
5  year?
6  A  Two.
7  Q  And would it be fair to say that you
8  didn't work at all on your vacation?
9  A  Correct.
10  Q  And did you have any sick time at all?
11  A  Yes.
12  Q  How much?
13  A  I believe a week or two.
14  Q  Did you take your full sick time allotment
15  each year that you were there?
16  A  I believe so, yes.
17  Q  And would it be fair to say that you
18  didn't work during sick time?
19  A  Yes. Correct.
20  Q  Did you take any other time off while you
21  were working for Philadelphia?
22  A  Not that I recall offhand.
23  Q  Now, when you said in 2010 that you worked
24  five to six hours of overtime a week, are you
25  claiming every week?

Capital Reporting Company

106

M. ESTRADA
1
2  A  No. No. Not every week.
3  Q  Are you claiming -- you're claiming how
4  much; what percentage of weeks?
5  A  Seventy-five.
6  Q  And do you have any records that would
7  reflect that?
8  A  No.
9  Q  And sitting here today, do you know that
10 or are you just guessing?
11 A  Just guessing. Just a guess, approximate.
12 Q  And is the same true for 2011?
13 A  Correct.
14 Q  And when you say three to four hours a
15 week, three to four hours over what total number of
16 hours a week? Are you claim -- strike that.
17    Are you claiming you had to work a
18 minimum number of hours in order to get overtime?
19 A  Yes. Thirty-seven and a half hours, I
20 believe is what we had to work.
21 Q  So when you're saying three to four hours
22 a week, you're saying three to four hours a week
23 over 37 and a half hours?
24 A  Correct.
25 Q  And is that the same for 2010, when you

107

M. ESTRADA
1
2  say five to six hours?
3  A  Yes.
4  Q  And the same for 2011?
5  A  Yes.
6  Q  So the base is 37 and a half hours?
7  A  Correct.
8  Q  And you understood when you took the job
9  that regardless of whether you worked 37 and a half
10 hours, 40 hours, 45 hours or 25 hours, you'd get the
11 same salary?
12 A  Correct.
13 Q  And you knew you wouldn't get docked if
14 you worked less than 37 and a half hours?
15 A  Yes. Correct.
16 Q  Can you purchase additional vacation days?
17 A  Yes.
18 Q  And did you do that?
19 A  Yes.
20 Q  How much vacation did you take in 2009?
21 A  Three weeks, I believe.
22 Q  And how about in 2010?
23 A  Three weeks, again.
24 Q  And how about in 2011?
25 A  I believe also three weeks.

108

M. ESTRADA
1
2  Q  Is that -- would that be three weeks,
3  total?
4  A  Yes. You could buy a week's vacation.
5  Q  So you got two weeks, and then you could
6  buy another week?
7  A  Correct.
8  Q  Would it also be true that during your
9  additional week in 2009, '10 and '11, you did not
10 work when you were on vacation?
11 A  Correct.
12 Q  You resigned in December of 2011; is that
13 correct?
14 A  Yes.
15 Q  When was your last day of work?
16 A  December 29th, I believe.
17 Q  So you did not work in January of 2012;
18 correct?
19 A  No.
20 Q  No, you didn't work?
21 A  Not that I recall, no. I don't believe I
22 did.
23 Q  And you didn't work in February of 2012;
24 is that right?
25 A  Correct.

109

M. ESTRADA
1
2  Q  Okay. If you could look at Exhibit 2,
3  which is your complaint.
4     On page 12, the complaint is dated
5  February 3rd of 2012.
6  A  Uh-huh.
7  Q  As of February 3rd of 2012, you were no
8  longer working for the company; is that right?
9  A  That's correct.
10 Q  So if you can look at page 3, paragraph 8.
11    Why don't you read that paragraph to
12 yourself?
13 A  Okay.
14 Q  It says in the second sentence between
15 June 9th, 2008 and current.
16    As of February 3rd of 2012, you were
17 no longer employed; correct?
18 A  Correct.
19 Q  So that statement in your complaint is
20 inaccurate; is that right?
21 A  Yes, it is.
22 Q  Can you look at the first page of your
23 complaint, please?
24 A  Okay.
25 Q  In the first paragraph, you talk about