# Exhibit 1

# Defendant's Response to Plaintiff's Statement of Facts and Defendant's Counter-Statement of Additional Material Facts

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ESTRADA, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | CIVIL ACTION NO. 12-604 |
| Plaintiff, | ) ) | FILED ELECTRONICALLY ON |
| v. | ) ) ) | |
| MAGUIRE INSURANCE AGENCY, INC., | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and the Honorable Mitchell S. Goldberg's Policies and Practices No. 10, Defendant Maguire Insurance Agency, Inc. ("Defendant" or "Maguire") hereby submits its Response to Plaintiff Michael Estrada's ("Plaintiff") Statement of Facts. Maguire's Response demonstrates that Plaintiff is not entitled to summary judgment because the duties he performed as an insurance claims examiner fall squarely within the administrative exemption.

**PLAINTIFF'S NUMBERED FACTS AND DEFENDANT'S RESPONSES**

1. Plaintiff was employed as a Fast Track Auto Claims examiner from approximately June 9, 2008 until approximately December 2011. (Estrada Dep., 18:2-5, 28:24-29:4).

**RESPONSE:** Admit that Maguire employed Plaintiff as a claims examiner handling fast track auto claims from approximately June 9, 2008 until December 2011, but deny that there is a "Fast

Track Auto Claims Examiner" title.  (Deposition of William Benecke ("Benecke Tr.") 7:12 – 8:3; Doc. No. 19-1 at ¶3; Doc. No. 38-2 at ¶¶ 3 and 5-8).[1]

       2.      Plaintiff and other Fast Track Auto Claims Examiners were responsible for processing claims using the Fast Track Auto process.  (Estrada Dep., 29:5-12).

**RESPONSE:**  Admit that Plaintiff and other claims examiners handled and processed fast track auto claims.  Deny that Plaintiff and other claims examiners "us[ed]" the "Fast Track Auto process" to process claims.  "Fast track" refers to the process by which claims are <u>assigned</u> to claims examiners, not to the process of how claims are actually handled by claims examiners. (Benecke Tr. 7:21 – 8:3; Doc. No. 19-1 at ¶3; *see also* Doc. No. 38-2 at ¶¶ 6-8).

       3.      During 2009, Plaintiff worked approximately three to four hours of over time per week. (Estrada Dep., 102:10-17).

**RESPONSE:**  Deny.  Plaintiff testified in his deposition that (i) any estimates of overtime he allegedly worked were "[j]ust guess[es]"; (ii) he had absolutely no evidence beyond his speculative conjecture to support his overtime claims; and (iii) his speculative "guesses" regarding overtime worked were based on the incorrect assumption that any time worked beyond his scheduled 37.5 hours per week constituted overtime.  (Deposition of Michael Estrada ("Pl. Tr.") 100:23 – 101:2, 102:18 – 20, 106:6 –13, and 106:21 – 107:7).  Moreover, contemporaneous records demonstrate that Plaintiff did not work more than 40 hours per week.  (*See*, *generally*, Doc. No. 38-2 at ¶¶ 67-83).

---

[1] Excerpts from Plaintiff's and William Benecke's deposition transcripts are cited herein as "(Pl. Tr. ___)" and "(Benecke Tr. ___)," and are attached as Exhibits 2 and 3 to Defendant's Opposition to Plaintiff's Motion for Summary Judgment.

2

4.      During 2010, Plaintiff worked approximately five to six hours of overtime per week. (Estrada Dep., 102:21-23).

**RESPONSE:** Deny.  Plaintiff testified in his deposition that (i) any estimates of overtime he allegedly worked were "[j]ust guess[es]"; (ii) he had absolutely no evidence beyond his speculative conjecture to support his overtime claims; and (iii) his speculative "guesses" regarding overtime worked were based on the incorrect assumption that any time worked beyond his scheduled 37.5 hours per week constituted overtime.  (Pl. Tr. 100:23 – 101:2, 102:24 – 103:2, 106:6 – 13, and 106:21 – 107:7).  Moreover, contemporaneous records demonstrate that Plaintiff did not work more than 40 hours per week.  (*See*, *generally*, Doc. No. 38-2 at ¶¶ 67-83).

5.      Furthermore, Plaintiff worked approximately seven to ten hours of overtime per week in 2011. (Estrada Dep., 103:3-7).

**RESPONSE:** Deny.  Plaintiff testified in his deposition that (i) any estimates of overtime he allegedly worked were "[j]ust guess[es]"; (ii) he had absolutely no evidence beyond his speculative conjecture to support his overtime claims; and (iii) his speculative "guesses" regarding overtime worked were based on the incorrect assumption that any time worked beyond his scheduled 37.5 hours per week constituted overtime.  (Pl. Tr. 100:23 – 101:2, 103:6 – 8, 106:6 – 13, and 106:21 – 107:7).  Moreover, contemporaneous records demonstrate that Plaintiff did not work more than 40 hours per week.  (*See*, *generally*, Doc. No. 38-2 at ¶¶ 67-83).

6.      All Fast Track Auto Claims Examiners were salaried employees. (Benecke Dep., 101:7-8).

**RESPONSE:** Admit that Plaintiff and other claims examiners who handled fast track auto claims were salaried employees.

3

7.  Regardless of the number of hours Plaintiff worked in a week, he was never compensated for any overtime hours he worked. (Benecke Dep., 101:2-6).

**RESPONSE:** Admit that Plaintiff was paid a salary and was not paid hourly with overtime.

8.  Defendant is an insurance marketing company licensed in all fifty states. (Website).

**RESPONSE:** Admit.

9.  Defendant's corporate representative identified the primary products and/or services that Defendant brings to the marketplace. (Benecke Dep., 87:11-20).

**RESPONSE:** Admit that Mr. Benecke identified some of the products and/or services that Maguire provides to the marketplace.

10. One such service that the corporate representative identified was "putting the customer back in the position where they were before [a] loss." (Benecke Dep., 89:13-17).

**RESPONSE:** Admit.

11. Defendant's corporate representative identified claims examiners as the employees who fulfill this service. (Benecke Dep., 89:18-21).

**RESPONSE:** Admit.

12. Plaintiff is a Fast Track Auto Claims Examiner performing the exact duties, which Defendant has identified as its primary product and/or service. (See Estrada Dep., 29:8-12).

**RESPONSE:** Admit that Plaintiff handled and processed fast track auto claims and that this was an important service that Maguire offered. (Benecke Tr. 89:13 – 21).

4

13. Plaintiff was employed as a claim examiner working exclusively on "Fast Track Auto Claims." (Estrada Dep., 29:8-12).

**RESPONSE:** Admit that Plaintiff was employed as a claims examiner handling fast track auto claims. Deny that the testimony cited supports the allegation that Plaintiff worked "exclusively" on fast track auto claims.

14. Fast Track claims were "Simple claims. Easy claims that, you know, insured backed into a parked vehicle. Nothing that – that involved a lot of investigation. Who ran a red light. Anything like that." (Estrada Dep., 36:3-8).

**RESPONSE:** Admit that Plaintiff so testified. Deny that fast track auto claims are "easy" or do not involve a lot of investigation. There is nothing basic or simple about fast track auto claims. Each claim is different and requires its own investigation into the facts and circumstances. (Benecke Tr. 33:15 – 34:20, 44:25 – 48:5, and 52:6 – 53:10; Doc. No. 38-2, ¶ 18, 30-38, 65(a)).

15. Fast Track Auto claims were especially noncomplex because they solely pertained to property damage and did not include bodily injury claims. (Benecke Dep., 146:3-11).

**RESPONSE:** Deny that fast track auto claims are "especially noncomplex" and deny that they "solely" involved property damage and did not include bodily injury claims. (Benecke Tr. 33:15 – 34:20, 44:25 – 48:5, 52:6 – 53:10, and 146:7 – 15; Doc. No. 19-1 at ¶ 3; Doc. No. 38-2, ¶¶ 9, 18, 30-38, 65(a)).

16. In fact, if a claim assigned to Plaintiff contained a bodily injury claim, that claim would be reassigned to a different claims examiner group. (Estrada Dep., 54:5-11; 55:7-15).

**RESPONSE:** Admit.

5

17.   Fast Track Auto Claims only included particularly low value claims, totaling at most only a few thousand dollars. (Estrada Dep., 59:6-1, 60:3-5).

**RESPONSE:** Deny.  Most claims that Plaintiff handled were accidents worth between $2,000 and $5,000, but Plaintiff had the authority to independently settle claims up to $10,000 and handled "some" claims over $10,000.  (Pl. Tr. 42:10 – 12, 59:6 – 9, 69:2 – 5, and 90:25 – 91:6).

18.   When Plaintiff received a new claim, he would perform a "coverage review." (Decl. ¶4(c)).

**RESPONSE:** Admit.

19.   The purpose of the review was to check if the damaged vehicle was covered by the policy. (Decl. ¶4(c)).

**RESPONSE:** Admit that one purpose of the coverage review was to check if the damaged vehicle was covered by the policy.  Deny any implication that this was the only purpose of a coverage review.  The primary purpose of a coverage review is to apply the facts and circumstances of the claim to the policy language to determine whether there was coverage for the claim or whether a potential coverage issue existed. (Pl. Tr. 92:6 – 93:6; Benecke Tr. 52:6 – 8, 52:15 – 22, 55:16 – 20, 149:2 – 7, 199:20 – 201:16, and 204:6 – 23; *see also* Doc. No. 38-2 at ¶¶ 28-29).

20.   Plaintiff would open the program "Apps" and search the policy for the VIN number of the damaged vehicle. (Decl. ¶4(c)).

**RESPONSE:** Admit that Plaintiff would open the program "Apps" and search the policy for the VIN number of the damaged vehicle for purposes of checking if the vehicle was covered by the

policy. Deny any implication that Plaintiff would do so in order to determine whether the claim was covered by the policy.

       21.     If the VIN was in the policy, there is coverage. (Decl. ¶4(c)).

**RESPONSE:** Admit that if a vehicle's VIN was in the policy then the vehicle was covered by the policy. Deny any implication that the vehicle's coverage under the policy is somehow relevant to or determinative of whether there is coverage for the particular claim. Determining whether the claim qualified for coverage required an investigation into the facts and circumstances of the particular claim and an analysis of the applicable insurance policy language. (Benecke Tr. 45:19 – 46:12 and 51:4 – 53:10; *see also* Doc. No. 38-2, ¶¶ 28-29).

       22.     If the VIN was not in the policy, Plaintiff would contact the insured, the insured's agent or the driver to inquire who owned the vehicle. (Decl. ¶4(c)).

**RESPONSE:** Admit, but deny any implication that this has any relevance to whether a particular claim is covered.

       23.     If the coverage issue became any further complicated, Plaintiff would seek direction from his supervisor. (Decl. ¶4(c)).

**RESPONSE:** Admit, but only with respect to issues concerning coverage of the vehicle under the policy.

       24.     Plaintiff did not make liability determinations. (See Estrada Dep., 61:4-65:5).

**RESPONSE:** Deny. Plaintiff was responsible for determining who was at fault for an accident and making liability determinations. (Pl. Tr. 57:21 – 24 and 92:6 – 20; *see also* Doc. No. 38-2 at

7

¶¶ 30-38). Specifically, as part of the investigation process, Plaintiff interviewed the insured and witnesses in order to "see their side of the story" and determine who was at fault. (Pl. Tr. 61:4 – 65:15).

25. Plaintiff followed an established procedure with regard to liability. (See Estrada Dep., 61:4-65:5).

**RESPONSE:** Admit that Plaintiff so testified but deny that any procedure Plaintiff allegedly followed was "established" or consistent with Defendant's job requirements and expectations of the position, or with how claims examiners are trained to make liability determinations. In addition, Plaintiff's testimony and claims notes establish that he also researched the facts and circumstances of each claim and synthesized complex and diverse information to make liability decisions. (Pl. Tr. 57:21 – 24, 66:9 – 12, 67:4 – 68:12, 69:22 – 24, 72:22 – 24, and 92:6 – 93:6; Benecke Tr. 61:18 – 63:22, 66:8 – 67:14, 71:23 – 73:3, 81:4 – 83:16, 206:14 – 208:2, 214:10 – 215:18, and 218:16 – 220:7; *see also* Doc. No. 38-2 at ¶¶ 30-38).

26. In most circumstances, Plaintiff would contact the insured and the insured would admit fault. (Estrada Dep., 61:4-11).

**RESPONSE:** Admit that, on occasion, Plaintiff would contact the insured and the insured would admit fault. Deny that the testimony cited supports the allegation that this occurred "in most circumstances."

27. Occasionally, the insured denied liability, in which case Plaintiff would assume the liability determination made in the police report. (Estrada Dep., 61:12-25; 63:20-64:5).

**RESPONSE:** Admit that Plaintiff so testified. Deny that police reports make liability determinations, and deny any implication that making liability determinations based on what is

8

determined or communicated in a police report would have been consistent with Plaintiff's instruction, training, and job responsibilities. (Benecke Tr. 61:18 – 63:22 and 66:8 – 67:14).

28. Because Plaintiff exclusively handled commercial automobile insurance claims, there was almost always a police report filed. (Estrada Dep., 61:19-25).

**RESPONSE:** Admit that Plaintiff handled commercial automobile insurance claims and that a police report was filed "[a] lot of times." Deny that the testimony cited supports the allegation that there was "almost always" a police report filed.

29. In the rare instance the police report did not resolve liability, then Plaintiff would contact any independent witnesses. (Estrada Dep., 64:13-65:11).

**RESPONSE:** Admit that Plaintiff would contact independent witnesses. Deny that Plaintiff only did so in the "rare instance the police report did not resolve liability" and deny that police reports resolve liability. (Pl. Tr. 92:21 – 93:6; Benecke Tr. 61:18 – 62:15).

30. Plaintiff would accept whichever version of the facts, either the insured's or the claimant's, that the witness corroborated. (Estrada Dep., 64:13-65:4).

**RESPONSE:** Admit that Plaintiff so testified, but deny any implication that doing so would have been consistent with the job requirements and expectations of the position, or with how claims examiners are trained to make liability determinations. (Benecke Tr. 68:20 – 73:18).

31. In the event that there was not a police report or any witnesses, Plaintiff would side with the insured. (Estrada Dep., 62:6-21).

**RESPONSE:** Admit that Plaintiff so testified, but deny any implication that doing so would have been consistent with the job requirements and expectations of the position, with how claims

9

examiners are trained to make liability determinations, or with state laws pertaining to fair claims practices. (Benecke Tr. 77:23 – 82:8).

32. If for any reason, the liability determination could not be made based on the above process, Plaintiff would bring the claim to his supervisor to direct him how to proceed. (Estrada Dep., 58:14-19).

**RESPONSE:** Deny that the testimony cited supports the allegation. (Pl. Tr. 57:21 – 59:3) Plaintiff testified that "on rare occasion" he made the decision to ask his supervisor about state law if he wasn't sure or didn't know the law.

33. Further, if the claim were more complicated because both sides were at fault, Plaintiff would bring the matter to his supervisor and receive direction as to how to proceed. (Estrada Dep., 67:19-68:6).

**RESPONSE:** Deny that the testimony cited supports the allegation. Plaintiff testified that, in situations where Plaintiff concluded that multiple parties were at fault, he would usually (but not always) speak to his supervisor and make a recommendation to his supervisor regarding what he believed to be how the accident happened, who he thought was at fault, the amount he thought that each party was at fault, and why. (Pl. Tr. 67:19 – 68:12).

34. Plaintiff never valued the damages in his claims. (Estrada Dep., 60:6-16).

**RESPONSE:** Deny that the testimony cited supports the allegation. Plaintiff testified that he did not come up with damage estimates in his claims. Plaintiff's testimony and records establish that he was actively involved in reviewing all factual information concerning damages, set damage reserves, and ultimately made the decision to hire an independent appraiser and accept (or not accept) a damages estimate. (Doc. No. 38-2, ¶¶ 30-38, 41-43, 54-55, 62, 65).

35. Plaintiff always used an appraiser to value the property damage. Id.

**RESPONSE:** Deny. Plaintiff testified that he did not enlist an appraiser for claims that were less than a couple thousand dollars; rather, the insured would obtain their own estimate and if Plaintiff determined that the insured's estimate was too high, he would make a recommendation to his supervisor to pay a lesser amount. (Pl. Tr. 72:25 – 74:8).

36. Plaintiff always followed the appraiser's estimate and never replaced the estimate with his own valuation of damages. (Estrada Dep., 71:11-19).

**RESPONSE:** Deny. When Plaintiff made the decision to procure an appraiser, he would ask the appraiser to send him pictures of the damaged vehicles so that he could determine if the damages were consistent with the amount of money claimed. (Doc. No. 38-2, ¶ 42). Plaintiff testified that he evaluated and changed the default reserve number for each claim based on his own judgment and experience and "how severe the accident was." (Doc. No. 38-2, ¶ 54-55). Plaintiff also testified that he ultimately approved or challenged damages estimates, or made recommendations to his supervisor to pay a different amount based on his own investigation. (Doc. No. 38-2, ¶ 41).

37. Plaintiff did not negotiate the price of repairs or the valuation of damages. (Estrada Dep., 110:17-25; 111:9-18; 115:13-23.).

**RESPONSE:** Deny. Plaintiff had the responsibility of negotiating and settling claims. (Doc. No. 38-2 at ¶¶ 47-53). Further, Plaintiff set reserves for each claim he handled. (Doc. No. 38-2 at ¶¶ 54-55).

38. In fact, the appraiser was the only person who had actually personally examined the vehicles. (see Benecke Dep., 103:24-104:7).

11

**RESPONSE:** Deny that the testimony cited supports the allegation that appraisers were the "only" person who personally examines vehicles.

39. Plaintiff and other Fast Track Auto Claims Examiners never physically visited the accident scene or examined the vehicles in the claims. (Benecke Dep., 104:8-11).

**RESPONSE:** Deny that the testimony cited supports the allegation. The testimony does not reference "the accident scene" and, although the testimony confirms that claims examiners do not physically examine the vehicle (i.e., in person), claims examiners do routinely examine the vehicles through photographs and are expected to "review, evaluate and make judgments from" the photographs submitted by the appraisers. (Benecke Tr. 103:24 – 104:11; Pl.'s Tr. 91:7 – 92:5).

40. In some cases, betterment was applicable to an insured's claim. (Estrada Dep., 69:25-70:13).

**RESPONSE:** Admit.

41. However, it was always the appraiser and not Plaintiff, who made determinations as to whether or not betterment was appropriate. (Estrada Dep., 69:25-70:21).

**RESPONSE:** Admit that Plaintiff testified that when he made the decision to procure an appraiser and betterment might be applicable, Plaintiff made the choice to follow the appraiser's recommendation but no one told him to always go along with the appraiser. (Pl. Tr. 70:14 – 71:10).

42. Similarly, the appraiser and not Plaintiff, made determinations as to whether a car was totaled. (Estrada Dep., 77:13-78:14; 78:15-79:16).

12

**RESPONSE:** Deny.  Plaintiff was for responsible for estimating loss, making total loss determinations, and apportioning blame for loss.  (Benecke Tr. 139:24-141:18, 144:3-6, and 145:3-8; *see also* Doc. No. 38-2 at ¶¶ 56-57).  Additionally, Plaintiff voluntarily and independently created a total loss Excel worksheet that helps determine the amount of a total loss and that is now used by other claims examiners.  (Pl. Tr. 123:15 – 125:15 and 183:2 – 20*; see also* Doc. No. 38-2 at ¶¶ 58-59).

43.    Plaintiff merely followed the appraiser's determination as to whether the car was totaled. (Estrada Dep., 77:13-78:14).

**RESPONSE:** Deny.  Plaintiff was for responsible for estimating loss, making total loss determinations, and apportioning blame for loss.  (Benecke Tr. 139:24 – 141:18, 144:3 – 6, and 145:3 – 8; *see also* Doc. No. 38-2 at ¶¶ 56-57).  Additionally, Plaintiff voluntarily and independently created a total loss Excel worksheet that helps determine the amount of a total loss and that is now used by other claims examiners.  (Pl. Tr. 123:15 – 125:15 and 183:2 – 20*; see also* Doc. No. 38-2 at ¶¶ 58-59).

44.    Defendant could not point to single instance where Plaintiff or any other Fast Track Auto Claims Examiner examiners did not follow an appraiser's estimation of whether a car was totaled. (Benecke Dep., 106:15-24).

13

**RESPONSE:** Deny. When asked whether he was aware of Plaintiff ever having challenged or not followed an independent appraisers damage estimate, Mr. Benecke explained why he would have been expected to do so (it was part of his job responsibilities, which he then explained in detail) but that he did not have "proof that he did not normally do what he was supposed to do." (Benecke Dep. 106:9 - 109:11).


45. Plaintiff was limited to a $10,000 independent settlement authority. (Estrada Dep., 42:10-17).

**RESPONSE:** Admit.


46. If any of his claims required a settlement amount more than $10,000, Plaintiff would have to bring the claim to his supervisor to approve the settlement. (See Estrada Dep., 90:25-91:6).

**RESPONSE:** Deny that the testimony cited supports the allegation.


47. If there was ever an occasion in which there was a dispute between the insured and the appraiser's estimate, Plaintiff did not reconcile the dispute. (Estrada Dep., 73:9-74:2).

**RESPONSE:** Deny. Plaintiff testified that he would investigate the dispute and then make a recommendation to his supervisor as to what he thinks they should do. (Pl. Tr. 73:9 – 74:8).


48. Instead, Plaintiff would bring the dispute to his supervisor and receive instruction from her. (Estrada Dep., 115:24-116:3).

**RESPONSE:** Deny. Plaintiff testified that he would investigate the dispute and then make a recommendation to his supervisor as to what he thinks they should do. (Pl. Tr. 73:9 – 74:8).

14

**DEFENDANT'S COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS**

I. **Plaintiff's Alleged Three-Step Process For Handling Claims And Determining Liability Was In Direct Contravention Of Maguire's Expectations And Job Requirements And Further Demonstrates That Plaintiff Exercised Discretion And Independent Judgment**

1. One of the primary job functions of a claims examiner like Plaintiff is to conduct an investigation into a particular claim and make a fair determination of liability based upon the facts and circumstances of the claim. (Benecke Tr. 44:14 – 48:5 and 81:9 – 17).

2. The results of this investigation and liability determination are what permit a claims examiner to either pay off a claim, or make an offer to or negotiate with a claimant. (Benecke Tr. 44:14 – 48:5 and 204:6 – 19).

3. There is nothing basic or simple about fast track auto claim; rather, each claim is different and requires its own investigation into the facts and circumstances. (Benecke Tr. 33:15 – 34:20, 44:25 – 48:5, and 52:6 – 53:10).

4. The three-step process for determining liability that Plaintiff described and allegedly followed would have been unique to him and in direct contravention of Maguire's expectations and the requirements of the job, and in possible violation of state laws on fair claims practices. (Benecke Tr. 61:18 – 63:22, 66:8 – 67:14, 71:23 – 73:3, and 81:4 – 83:16).

5. Claims examiners should not be making liability determinations based on what is determined or communicated in a police report and if they are doing so, they would be deviating from their instruction, training, and their job responsibilities. (Benecke Tr. 61:18 – 63:22 and 66:8 – 67:14).

6. Claims examiners should not be making liability determinations based upon the party with the most number of witnesses, and if they are doing so, they would be doing their job wrong and probably disciplined for it.  (Benecke Tr. 68:20 – 73:18).

7. If there is no police report and if each side has the same number of witnesses, claims examiners should not simply side with the insured, and if they are doing so, they would not be conducting a proper investigation or making a proper determination of liability and they would be potentially acting in violation of state laws pertaining to fair claims practices. (Benecke Tr. 77:23 – 82:8).

8. If Plaintiff made liability determinations in accordance with the three-step process he described, he would have been exercising discretion and independent judgment, albeit wrong discretion and judgment.  (Benecke Tr. 65:10 – 21, 69:14 – 70:8; 73:20 – 77:14).

## II.     Plaintiff Did Not Work More Than 40 Hours In Any Given Week

9. Between Plaintiff's Complaint, Plaintiff's Declaration, Plaintiff's Responses to Interrogatories, and Plaintiff's deposition testimony, he has given consistently inconsistent and at times inaccurate testimony and sworn statements concerning his alleged overtime hours. (Doc. No. 1, ¶ 8; Doc. No. 18-1, ¶ 3; Plaintiff's Responses to Defendant's First Set of Interrogatories, ¶ 6;[2] Pl. Tr. 104:17 – 106:11 and 168:15 – 171:25).

---

[2] Plaintiff's Responses to Defendant's First Set of Interrogatories are attached as Exhibit 4 to Defendant's Opposition to Plaintiff's Motion for Summary Judgment.

Dated: February 1, 2013                                  Respectfully submitted,

MAGUIRE INSURANCE AGENCY, INC.

/s/ Joshua F. Alloy

Elise M. Bloom, admitted *pro hac vice*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
Tel: (212) 969-3000
Fax: (212) 969-2900
ebloom@proskauer.com

Josh F. Alloy, admitted *pro hac vice*
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899
jalloy@proskauer.com