# Exhibit 2

# Plaintiff's Deposition Transcript Excerpts

1

```
          IN  THE  UNITED  STATES  DISTRICT  COURT
       FOR  THE  EASTERN  DISTRICT  OF  PENNSYLVANIA
```

-------------------------------------------------------x

MICHAEL ESTRADA, individually
and on behalf of others
similarly situated,

                        Plaintiff,

      vs.                        CIVIL ACTION NO.: 12-604

MAGUIRE INSURANCE AGENCY,       ECF CASE
INC.,

                        Defendant.

-------------------------------------------------------x

                        DATE: November 26, 2012

                        TIME: 9:56 a.m.


Deposition of:

                   MICHAEL ESTRADA

called for oral examination by counsel for

Defendant, pursuant to Notice, held at the

office of CONRAD, O'BRIEN, GELLMAN & ROHN, 1500 Market

Street, Centre Square, West Tower, Suite 3900,

Philadelphia, Pennsylvania, before CORINNE J. BLAIR, a

CRR, CCR, RPR, CLR, of Capital Reporting Company, and

a Notary Public of the Commonwealth of Pennsylvania.

38

M. ESTRADA
1
2    Q    And you would also be responsible for
3    talking to the insured?
4    A    Yes.
5    Q    And you would also be responsible for
6    making a determination as to liability?
7    A    Yes.
8    Q    And you'd also be responsible for getting
9    an appraiser -- an appraisal, if one needed to be
10   gotten?
11   A    Yes.
12   Q    Are you familiar with the concept of
13   comparative negligence?
14   A    Yes.
15   Q    And what does that mean in terms of
16   resolving automobile claims?
17   A    Um, usually it's if both parties played
18   some part of the accident, you would determine,
19   percentage-wise, who was more at fault and who was
20   less at fault.  And I guess a percentage of the
21   damages would be paid, as opposed to a hundred
22   percent of it.
23   Q    And were you responsible for determining
24   percentages in comparative negligence jurisdictions?
25   A    Um, if I had some.

39

M. ESTRADA
1
2    Q    Well, which of the jurisdictions that you
3    were responsible for were comparative negligence
4    jurisdictions?
5    A    I don't recall.
6    Q    But you're aware that some of them were?
7    A    Yes.
8    Q    Okay.  And as to the ones that were part
9    of your duties and responsibilities, were one, to
10   determine that it was a comparative negligence
11   jurisdiction; correct?
12   A    Yes.
13   Q    And then once you determined that it was a
14   comparative jurisdiction, then you would have to
15   apportion percentages of fault; correct?
16   A    Yes.
17   Q    And that would impact how much ultimately
18   would get paid; correct?
19   A    Yes.
20   Q    Okay.  Now, going back to the
21   jurisdictions that you were responsible for, was
22   Texas one of them?
23   A    No.
24   Q    Florida was one of them?
25   A    Yes.

40

M. ESTRADA
1
2    Q    And you were licensed in Florida; is that
3    right?
4    A    Correct.
5    Q    Why?
6    A    I don't know.  They told us to get
7    licensed in Florida.
8    Q    Can you handle claims in Florida without a
9    license?
10   A    Not that I'm aware of, no.
11   Q    Did any of the other jurisdictions that
12   you were responsible for require a license?
13   A    Not that I'm aware of.
14   Q    Now, in terms of Rodger Terry's team, they
15   were responsible for different states; is that
16   correct?
17   A    Yes.
18   Q    And do you know what states those were?
19   A    No.
20   Q    And of the states that Rodger Terry's team
21   was responsible for, which of those states required
22   licenses?
23   A    I have no idea.
24   Q    Which of those states had comparative
25   negligence statutes?

41

M. ESTRADA
1
2    A    I have no idea.  I really don't know which
3    states they handled.
4    Q    Did you have to take a test to get
5    licensed in Florida?
6    A    In Florida, no.
7    Q    You said you're also licensed in Texas?
8    A    Mm-hmm.
9    Q    I'm sorry.  You have to answer yes or no.
10   A    Yes, I'm sorry.
11   Q    Do you have to take a test to get licensed
12   in Texas?
13   A    Yes.
14   Q    And what kinds of things were you tested
15   on?
16   A    It's been so many years ago.  I can't
17   remember what -- about coverage.  You know, there
18   had to be coverage in order for there to be a claim,
19   and just different questions.
20   Q    And we'll get back to coverage in a
21   minute.  But you mentioned that one of the
22   jurisdictions that you were responsible for was
23   California?
24   A    Yes.
25   Q    Did you have to be trained in California?

42

```
1           M. ESTRADA
2    A   No.  Well, I was never trained in --
3    Q   You were never trained.
4        Have you ever heard of Grundy claims?
5    A   No.
6    Q   So you were never asked to handle a Grundy
7  claim when you were at Philadelphia?
8    A   I have never heard that.  I have no idea
9  what that is.  I'm sorry.
10   Q   Did you have a certain amount of authority
11 for which you could settle claims?
12   A   We were told ten thousand dollar limit.
13   Q   Who told you that?
14   A   Mona and Rodger.
15   Q   And when you say "we were told," she told
16 you that your limit was $10,000?
17   A   Yes.
18   Q   Did she tell you how she arrived at
19 $10,000?
20   A   No.
21   Q   Did she tell you how the $10,000 was set?
22   A   No.
23   Q   Did you have any role in setting the
24 authority for any of the other claims examiners --
25   A   No.
```

43

```
1           M. ESTRADA
2    Q   -- in the office?
3    A   I'm sorry.  No.
4    Q   Did you have a role in setting the
5  authority for any of the other claims examiners in
6  any of the other offices?
7    A   No.
8    Q   Do you know how many other offices, if
9  any, had claims examiners that handled Fast Track
10 claims?
11   A   I just know that Philadelphia's office had
12 Fast Track claims examiners there.
13   Q   And how do you know that?
14   A   From the list of -- that we've had of all
15 the employees.  It would say "Fast Track."
16   Q   And did any claims examiners in
17 Philadelphia handle personal injury claims?
18   A   No.  Not that I'm aware of.
19   Q   It's possible that they did and you might
20 not know?
21   A   Correct.
22   Q   Have you ever talked to any of the claims
23 examiners in Philadelphia about what they did?
24   A   No.
25   Q   Who told you about the term "Fast Track"?
```

44

```
1           M. ESTRADA
2    A   I've never heard of it until I went to
3  Philadelphia and I was interviewing.  They told me
4  it would be for the Fast Track group.  They just
5  started it there in the Addison office and Mona was
6  recently promoted to be a supervisor and that was
7  going to be her group.
8    Q   And did she supervise claims examiners
9  that handled claims other than Fast Track claims?
10   A   No.
11   Q   Are you sure?
12   A   As far as I know, yes, I'm sure.
13   Q   Do you know anything about the background
14 and experience of any of the other claims examiners
15 that worked for Mona during the time that you were
16 there?
17   A   Just from speaking to them, how many years
18 they've been in the business of handling claims.
19   Q   Do you know anything about what the
20 authority limit was for any of the other claims
21 examiners?
22   A   No.  No, I didn't ask them that.
23   Q   So they could have had more or less
24 authority than you; correct?
25   A   Yes.
```

45

```
1           M. ESTRADA
2    Q   Do you know who determines how much the
3  settlement authority or how much authority a
4  particular claims examiner has?
5    A   No.
6    Q   Do you know what the factors are that go
7  into making that determination?
8    A   No.
9    Q   Let's talk about what you did when a claim
10 would come in.
11       First of all, where would you get the
12 claim from?
13   A   It would come into our Image Right system.
14 Come in as a task.
15   Q   Well, who assigned a particular claim to
16 you?
17   A   Home office.
18   Q   And when you say your Image Right system,
19 what do you mean by that?
20   A   It's a program where scanned items are
21 stored.  It holds electronic files as well as
22 scanned items.
23       Mail also goes into that same system.
24   Q   Is it essentially an electronic storage
25 system?
```

54

M. ESTRADA

1
2       So if you went into Image Right, you
3   would see if a new claim had been assigned to you?
4       A   Yes.
5       Q   And do you know what -- what criteria was
6   used in determining who would get a particular
7   claim?
8       A   If it was a simple claim, it would go to
9   Fast Track.  If it had bodily injury, it would go to
10  a different group.  Just depending on what group
11  handles which types of accidents.
12      Q   Within the groups, though, do you know who
13  decided which claims examiner got what claim?
14      A   No.
15      Q   And at least with regard to claims that
16  you got, you never got claims for rental car damage;
17  correct?
18      A   Correct.
19      Q   And no Grundy claims; you've never heard
20  of that?
21      A   Yeah.
22      Q   And the claims that you got were limited
23  to certain jurisdictions?
24      A   Yes.
25      Q   And your testimony is that you did or did

55

M. ESTRADA

1
2   not have responsibility for claims in Texas?
3       A   Did not.
4       Q   Did not.
5       So when you would get a new claim,
6   what is the first thing that you would do?
7       A   I would open it up and see what state it
8   was in, just to confirm that it was one that my --
9       Q   That it was what?
10      A   -- group handled.
11      Oh, to confirm that it was one that I
12  should be handling.
13      If there was any bodily injury on it,
14  I'd send it to my supervisor to send back to home
15  office to be reassigned.
16      Q   Okay.  So you would open up the claim.
17  And what would you see when you opened it up?
18      A   A Cord (ph) form.  And it would give you
19  the insurance information, the claim date, the city,
20  state, location of where the accident happened.
21  Give a description of the accident.
22      Q   Now, you said you looked to see what state
23  it was in.
24      Was that what state the accident
25  happened in or --

56

M. ESTRADA

1
2       A   Correct.
3       Q   And why was that important?
4       A   Because I only handle specific states.
5       Q   And within the states that you handled,
6   did it make a difference what state the claim
7   occurred in?
8       A   I'm sorry. I don't understand your
9   question.
10      Q   If it fell within one of the states that
11  you were responsible for, what, if anything, did you
12  need to know about the law in that state for
13  insurance?
14      A   Oh, I guess what laws that they had for
15  traffic accidents or -- the traffic laws.
16      Q   And that was something that you would look
17  up?
18      A   Yes.  Sometimes.  When I needed to.
19      Q   Okay.  And why would you be looking that
20  up?
21      A   It depends on the accident.  You know, if
22  it was something that I wasn't sure of, you know,
23  who was at fault, we'd look up the -- I guess the
24  driving handbook and see what it -- for that state
25  and see what it says about that particular scenario.

57

M. ESTRADA

1
2       Q   So you would determine -- if you felt
3   unsure, you would determine whether you needed to
4   consult the driving handbook for a particular state?
5       A   Right.
6       Q   And what would you be looking for in the
7   driving handbook?
8       A   For that scenario.
9       Q   When you say "for that scenario," can you
10  explain to me what you mean?
11      A   Honestly, um, I can't think of an example.
12      Q   Were you looking to see if it was a
13  comparative negligence state?
14      A   No.  No.  Looking to see if -- it hardly
15  ever happened to me.  That was something extremely
16  rare, but sometimes you weren't sure if the party
17  was at fault, because some states are different as
18  far as their lines or -- I don't know.  It's just --
19  I'm trying to think of an example.  I'm sorry.  You
20  got me at a blank right now.
21      Q   So one of the things that you had to do
22  initially when you would get a new claim is you had
23  to determine who was at fault; is that right?
24      A   Yes.  Yes.  One of the things, yes.
25      Q   Okay.  So one of the things.  And so in

Capital Reporting Company

58

M. ESTRADA

1
2 order to do that, there were times when you might
3 not be familiar with the law in a particular state
4 and you had to go look it up to see who would be --
5 who's liable in the situation that you're presented
6 with?
7    A    On rare occasion.  I mean, normally it was
8 parking lot accidents.  Insured backed into a parked
9 car.
10    Q    So normally you knew?
11    A    Yeah.  Yeah.  Because it was in Fast
12 Track.  I mean, it was mostly quick claims that --
13 simple accidents.
14    Q    Okay.  But there were times when you
15 didn't know; is that right?
16    A    There were occasions, yeah, that a claim
17 would come up.  If I wasn't sure, I would usually
18 ask my supervisor.  She's more knowledgeable and
19 more experienced.
20    Q    But you could ask your supervisor or you
21 could consult the driving manual --
22    A    Yes.
23    Q    -- for the particular state; correct?
24    A    Yes.
25    Q    And that was a decision that you made,

59

M. ESTRADA

1
2 right?
3    A    Yes.
4    Q    Now, you were talking about the types of
5 accidents.
6         Most of the accidents that you
7 handled were accidents that were worth about how
8 much money?
9    A    A couple thousand; three, four, 5,000.
10    Q    Small, right?
11    A    Yes.
12    Q    Okay.  Can you give me a sense of what
13 kinds of things you'd be handling?
14    A    As?
15    Q    You said a parking lot accident.
16 Somebody --
17    A    Insured backed into a parked vehicle.  Um,
18 normally we hit a parked car.
19    Q    So normally either your person hit a
20 parked car or somebody hit your insured?
21    A    Correct.
22    Q    Or how about if somebody broke into a car?
23    A    Yes.
24    Q    So there'd be -- it all centered on damage
25 to the car?

60

M. ESTRADA

1
2    A    Correct.
3    Q    And most times the damage was small?
4    A    Yes.
5    Q    Is that right?
6         And part of what you had to determine
7 is how much the damage was; correct?
8    A    No.  The appraiser would do that.
9    Q    Well, in every situation, were you
10 supposed to get an appraiser?
11    A    Absolutely.
12    Q    Even if it was under $2,000?
13    A    Absolutely.
14    Q    And so it's your testimony here today that
15 you always got an appraiser?
16    A    I always got an estimate.
17    Q    You always got an estimate?
18    A    Yeah.  If it was under a couple of
19 thousand, then we were allowed to have the insured
20 or the claimant get an estimate from a local body
21 shop.
22    Q    Okay.  So the claim comes in.  You would
23 check to see if there was coverage; correct?
24    A    Yes.
25    Q    Okay.  And then you would check to see if

61

M. ESTRADA

1
2 there was liability?
3    A    Yes.
4    Q    Okay.  And then you said that -- would you
5 call the insured?
6    A    Yes.
7    Q    And why were you calling the insured?
8    A    To get the statement from the driver on
9 what happened.  Usually, they say I backed into a
10 vehicle.  You know, whatever happened in the
11 accident.
12    Q    Did you ever have situations where the
13 insured said it wasn't their fault?
14    A    Yes.
15    Q    And how often would that happen?
16    A    On occasion.
17    Q    And what happened; what were you supposed
18 to do then?
19    A    I'd talk to the claimant and see their
20 side of the story.  A lot of times there's a police
21 report, which we would go by that, the police
22 report.  Being that it was a commercial insurance, a
23 lot of the companies made sure that the drivers
24 always got a police report, so that was really
25 helpful.

62

M. ESTRADA

1
2  Q   Okay.  So you would talk to your insured;
3  if your insured said it wasn't their fault, then you
4  might reach out and talk to the other party?
5  A   Yeah.
6  Q   And what would you do if there was a
7  disagreement between two parties about what
8  happened?
9  A   Conflicting statements and there's no
10 independent witnesses, then we would side with our
11 insured.
12 Q   Okay.  And you made the decision to side
13 with your insured?
14 A   That's just something we're supposed to
15 do.
16 Q   Well, did you ever have any situations
17 where you felt that the person, the non-insured, had
18 the more credible story?
19 A   No.  If there's conflicting statements and
20 no evidence to confirm that my insured was at fault,
21 I would side with my insured.
22 Q   Now, when you say "no evidence," what kind
23 of evidence?
24 A   Witnesses.  If the damages didn't support
25 what the insured claimed.

63

M. ESTRADA

1
2  Q   So if you have conflicting statements,
3  then you'd have to determine whether or not there's
4  other evidence; is that right?
5  A   Well, hopefully by then, you know, you
6  know all the evidence.
7  Q   But you would -- I assume you have to get
8  the evidence or look for the evidence; correct?
9  A   Yeah.  As in evidence, was there any
10 witnesses.
11 Q   Okay.
12 A   Independent witness.
13 Q   And how would you find out if there was
14 any witnesses?
15 A   Asking both the driver and the claimant if
16 there were any independent witnesses.  Was there a
17 police report done.  If none exists, then I would
18 side with my insured, if the statements were
19 conflicting.
20 Q   Okay.  Let's go one step at a time then.
21     So if there's a police report, what
22 would you do?
23 A   I'd go by the police report.
24 Q   You say you'd go by the police report.
25 What does that mean?

64

M. ESTRADA

1
2  A   If the police report says this person was
3  at fault, which a lot of times it does.
4  Q   So you would follow the police report?
5  A   Correct.
6  Q   So if you have conflicting statements,
7  then you would ask whether there was a police
8  report?
9  A   No.  I'd ask that regardless.
10 Q   Okay.  So you always ask for the police
11 report?
12 A   If there's a police report.
13 Q   Okay.  You said that you would ask if
14 there had been independent witnesses.  Who would you
15 ask that question of?
16 A   Both the insured and the claimant.
17 Q   And what happens if there are independent
18 witnesses?
19 A   I would contact them and see what they
20 saw.
21 Q   Okay.  So then you'd talk to the
22 independent witnesses?
23 A   Correct.
24 Q   So who decides in that situation if the --
25 once you talked to the independent witness, what do

65

M. ESTRADA

1
2  you do then?
3  A   Whichever they corroborate whose story,
4  that's who I go with.
5      If the witness says the insured
6  backed into the claimant's car, then -- and the
7  claimant is saying that the insured backed into his
8  car, you got two people saying the same thing, then
9  that's what you go with.
10 Q   So you'd make a judgment that if two
11 people --
12 A   Versus the one, correct.
13 Q   And that in your judgment is you believe
14 the two people?
15 A   Yes.
16 Q   Okay.  Now, you said before that sometimes
17 the damage didn't support the determination.
18 A   Didn't support the --
19 Q   The story.  Okay.  Yeah, what do you mean
20 by that?
21 A   Just, I've had people, like -- I had an
22 insured that was parked and she said somebody backed
23 into her car, but then she's claiming damages to the
24 front of the vehicle.
25      The other side is like, well, I mean,

66

M. ESTRADA

1
2 you can tell where the car was backed into, but
3 you're claiming these damages.  It just -- it
4 doesn't make sense.
5     Q    So in that situation you made a
6 determination that the insured wasn't telling the
7 truth?
8     A    Correct.
9     Q    Okay.  And you would deny coverage based
10 on that?
11     A    No.  I wouldn't deny coverage.  I wouldn't
12 pay for the damages that didn't support --
13     Q    Okay.  So then you'd have to decide which
14 damages, if any, actually supported the claim?
15     A    Yeah.  And the appraiser would usually
16 tell us, "Well, they're trying to say this damage
17 was also caused in that accident, but I don't
18 believe that it could have been, judging by that."
19 Because they're the ones -- the appraiser's the ones
20 looking at the vehicle, and they can tell, you know,
21 if a vehicle was hit, by their experience, and say,
22 it's not possible to cause that other damage.
23     Q    So the appraiser comes back and tells you
24 that the damage is in a place that does make sense,
25 in terms of the story, and then you determine, okay,

67

M. ESTRADA

1
2 I'm going to go with what the appraiser says?
3     A    Correct.
4     Q    Okay.  Have you had situations where the
5 claimant is more credible, tells a story that makes
6 more sense than what your insured is telling you?
7     A    Not that I recall, no.
8     Q    Um, usually it's by, you know, police
9 report, if there is one, but if -- the only time I
10 would think that would happen if the damages that
11 the insured's saying just didn't match, if it just
12 didn't make sense like that, then, you know, yeah, I
13 think the claimant probably would be more credible.
14     Q    And then you'd side with the claimant --
15     A    Yes.
16     Q    -- or you'd decide that the claimant was
17 more credible?
18     A    Yes.
19     Q    Okay.  Now, what if they both had some
20 degree of fault; what did you do then?
21     A    I would usually ask Mona, see what she
22 thought.  See if she wanted comparative negligence
23 on that.
24     Q    You say you usually ask Mona.
25          What information would you bring to

68

M. ESTRADA

1
2 Mona?
3     A    The estimates amounts; how the accident
4 happened; you know, what I believe to be how the
5 accident happened.  I would ask her what she
6 thought.
7     Q    So you would go to Mona and say, this is
8 what I believe happened, and would you tell her who
9 you thought was at fault and how much and why?
10     A    Yes.
11     Q    So you'd make a recommendation to her?
12     A    Correct.
13     Q    Okay.  And did she always adopt your
14 recommendations?
15     A    No.  No.  Not always.
16     Q    And can you think of any examples, sitting
17 here today, when she didn't accept your
18 recommendation?
19     A    Um, it's not that she just flat out
20 didn't.  She just thought, well, it's not worth it.
21 Just go ahead and pay the whole claim.
22     Q    And how many times did that happen?
23     A    I couldn't tell you.
24     Q    More than five?
25     A    Yes.  I'm sure.

69

M. ESTRADA

1
2     Q    How many claims did you handle that were
3 more than $10,000?
4     A    Very few.  But there were some, but not a
5 whole lot.
6     Q    Now, once you talked to your insured the
7 first time, how many other times would you talk to
8 the insured?
9     A    If I had more questions.  It really
10 depends on -- on the -- depends on if there was any
11 other questions, or if the claimants had something,
12 I just wanted to confirm with the insured.
13     Q    So you might go back to the insured and
14 say, "I spoke to the claimant.  They're saying
15 something different," and get the insured's view
16 again?
17     A    Correct.
18     Q    Right.  And would you ever talk to the
19 insured about what you'd learn from third-party
20 witnesses?
21     A    Yes.
22     Q    So part of your job was really to
23 investigate what happened?
24     A    Yes.  Yes.
25     Q    Are you familiar with the concept of

66

M. ESTRADA

1
2 you can tell where the car was backed into, but
3 you're claiming these damages. It just -- it
4 doesn't make sense.
5    Q   So in that situation you made a
6 determination that the insured wasn't telling the
7 truth?
8    A   Correct.
9    Q   Okay. And you would deny coverage based
10 on that?
11   A   No. I wouldn't deny coverage. I wouldn't
12 pay for the damages that didn't support --
13   Q   Okay. So then you'd have to decide which
14 damages, if any, actually supported the claim?
15   A   Yeah. And the appraiser would usually
16 tell us, "Well, they're trying to say this damage
17 was also caused in that accident, but I don't
18 believe that it could have been, judging by that."
19 Because they're the ones -- the appraiser's the ones
20 looking at the vehicle, and they can tell, you know,
21 if a vehicle was hit, by their experience, and say,
22 it's not possible to cause that other damage.
23   Q   So the appraiser comes back and tells you
24 that the damage is in a place that does make sense,
25 in terms of the story, and then you determine, okay,

67

M. ESTRADA

1
2 I'm going to go with what the appraiser says?
3    A   Correct.
4    Q   Okay. Have you had situations where the
5 claimant is more credible, tells a story that makes
6 more sense than what your insured is telling you?
7    A   Not that I recall, no.
8    Q   Um, usually it's by, you know, police
9 report, if there is one, but if -- the only time I
10 would think that would happen if the damages that
11 the insured's saying just didn't match, if it just
12 didn't make sense like that, then, you know, yeah, I
13 think the claimant probably would be more credible.
14   Q   And then you'd side with the claimant --
15   A   Yes.
16   Q   -- or you'd decide that the claimant was
17 more credible?
18   A   Yes.
19   Q   Okay. Now, what if they both had some
20 degree of fault; what did you do then?
21   A   I would usually ask Mona, see what she
22 thought. See if she wanted comparative negligence
23 on that.
24   Q   You say you usually ask Mona.
25       What information would you bring to

68

M. ESTRADA

1
2 Mona?
3    A   The estimates amounts; how the accident
4 happened; you know, what I believe to be how the
5 accident happened. I would ask her what she
6 thought.
7    Q   So you would go to Mona and say, this is
8 what I believe happened, and would you tell her who
9 you thought was at fault and how much and why?
10   A   Yes.
11   Q   So you'd make a recommendation to her?
12   A   Correct.
13   Q   Okay. And did she always adopt your
14 recommendations?
15   A   No. No. Not always.
16   Q   And can you think of any examples, sitting
17 here today, when she didn't accept your
18 recommendation?
19   A   Um, it's not that she just flat out
20 didn't. She just thought, well, it's not worth it.
21 Just go ahead and pay the whole claim.
22   Q   And how many times did that happen?
23   A   I couldn't tell you.
24   Q   More than five?
25   A   Yes. I'm sure.

69

M. ESTRADA

1
2    Q   How many claims did you handle that were
3 more than $10,000?
4    A   Very few. But there were some, but not a
5 whole lot.
6    Q   Now, once you talked to your insured the
7 first time, how many other times would you talk to
8 the insured?
9    A   If I had more questions. It really
10 depends on -- on the -- depends on if there was any
11 other questions, or if the claimants had something,
12 I just wanted to confirm with the insured.
13   Q   So you might go back to the insured and
14 say, "I spoke to the claimant. They're saying
15 something different," and get the insured's view
16 again?
17   A   Correct.
18   Q   Right. And would you ever talk to the
19 insured about what you'd learn from third-party
20 witnesses?
21   A   Yes.
22   Q   So part of your job was really to
23 investigate what happened?
24   A   Yes. Yes.
25   Q   Are you familiar with the concept of

70

M. ESTRADA

1          M. ESTRADA
2  betterment?
3    A  Yeah.  Isn't that like when -- take a
4  tire, you know, a tire.  We're going to give
5  somebody a brand new tire, but the tire that they
6  had on their vehicle before was older, a lot older,
7  wasn't new.  So you would take betterment to be more
8  even as to what they had.
9    Q  So you would reduce what you were going to
10  pay them?
11    A  Yes.
12    Q  And did you?
13    A  The appraiser would do that.
14    Q  The appraiser would come to you with a
15  recommendation about that?
16    A  It would be on their -- their estimate.
17    Q  And would you make a determination as to
18  whether to go along with what the appraiser said, or
19  not?
20    A  I always go along with what the appraiser
21  says.
22    Q  I understand that you're saying that you
23  always went along with it, but each time you decided
24  whether to go along with it or not; correct?
25      MS. COHEN:  Objection.  Asked and

71

M. ESTRADA

1          M. ESTRADA
2  answered.
3      THE WITNESS:  I always go with what the
4  estimate is.
5  BY MS. BLOOM:
6    Q  So you made a decision to always go --
7    A  I was never told not to.
8    Q  Did anybody tell you to always go with the
9  appraiser?
10    A  No.
11    Q  So that was something that you decided for
12  yourself, because it made sense?
13    A  It's something we always did.  We were
14  never told otherwise.
15    Q  When you say, it's something that you
16  always did, what knowledge, if any, do you have
17  about how other claims examiners handled an
18  appraiser report?
19    A  By talking to them.
20    Q  Are you -- when you say "by talking to
21  them," what do you mean by that?
22    A  We talk to each other about claims that
23  we've had; sometimes to get an opinion from them on
24  what they thought about it.
25    Q  So other claims examiners would seek out

72

M. ESTRADA

1          M. ESTRADA
2  your opinion about some of their claims?
3    A  Well, not to -- to make the decision for
4  them.  Just to say, "Hey, you know, what do you
5  think about this?  I don't know if the insured's
6  telling the truth."  You know, just talking.
7    Q  So other claims examiners were trying to
8  make a decision about a particular claim and they
9  might come and ask you your opinion?
10    A  Yeah.
11    Q  And did you do the same thing?
12    A  Yeah.
13    Q  So if you were trying to make a decision
14  about a particular claim, you might seek out the
15  opinion of one of your claims examiners; is that
16  right?
17    A  No.  Just talking to them.  Just to see
18  what they think, you know.
19      It wasn't to -- because I couldn't
20  make the decision.  Just, you know, "Hey, what do
21  you think about this?"
22    Q  Because you felt that you could make the
23  decision on any particular claim?
24    A  Yeah, usually, yes.
25    Q  Were there times when -- you said for some

73

M. ESTRADA

1          M. ESTRADA
2  claims where the damage was like under a couple
3  thousand dollars, where the insured might go out and
4  get their own appraisal; is that right?
5    A  Yes.
6    Q  Did you get an independent appraisal in
7  those cases, also?
8    A  No.
9    Q  And did you always agree with what the
10  insured's appraisal said?
11    A  Yeah.  Pretty much.  Unless there was some
12  obvious, um -- you know, if -- if, um, the damages
13  are claimed on the left side and then there's
14  something on the right side that the estimate is
15  willing to repair, then I would call the body shop
16  and ask them, "How does that fit with the impact
17  over here?"
18    Q  The impact on the other side?
19    A  Correct.
20    Q  And then you might decide to pay a lesser
21  amount?
22    A  Yeah.
23    Q  And you'd make that decision?
24    A  No.  No.  I would usually ask Mona what
25  she thought, because I'm really not that great with

74

M. ESTRADA

1
2    estimates.
3        Q   So you would go to Mona and you'd say,
4    "I've investigated.  This is what I found out.  This
5    is when I think we should do.  What do you think?"
6        A   Yes.
7        Q   Okay.  So you'd make a recommendation?
8        A   Yes.
9        Q   Now, when you were going through this
10   process, would you keep notes of what you were
11   doing?
12       A   If speaking to people.  Depends what type
13   of notes.
14       Q   Did you -- every time you talked to the
15   insured, or a claimant, or an appraiser, did you
16   make notes of that?
17       A   Yes.
18       Q   And where did you keep those notes?
19       A   In the Apps System.
20       Q   Okay.  So you kept them electronically?
21       A   Correct.
22       Q   And you kept them as you went along?
23       A   Yes.
24       Q   When you talk about the Apps system, what
25   is the Apps system?

75

M. ESTRADA

1
2        A   It's where the note system is.  Been so
3    long.  What else does it have?
4            You can, um, do letters and faxes
5    from there.  Well, some forms.  Like a "request
6    appraisers" and stuff from it.
7        Q   So you could type in your notes of a
8    conversation that you had with a claimant, an
9    insured or a witness?
10       A   Correct.
11       Q   Okay.  And you could also -- what else
12   could you do from it?
13       A   Generate like a cover fax sheet.  You can
14   generate and request for an independent appraiser.
15       Q   Like a form letter?
16       A   Yes.  You could request payment from the
17   Apps System.
18       Q   Meaning, you could say to the Apps System,
19   I want you to issue a check for $4,500 to this
20   person?
21       A   Correct.
22       Q   And then a check would be issued?
23       A   It would go to home office.  They would
24   review and approve it, or whatever they needed to
25   do.

76

M. ESTRADA

1
2        Q   Okay.  So you'd make the request and then
3    it would go to home office and they'd pay it or not
4    pay it?
5        A   Correct.
6        Q   So you could just make the request through
7    the Apps System?
8        A   Yes.
9        Q   The Apps System didn't calculate how much
10   any particular claim was worth, did it?
11       A   No.
12       Q   You didn't have any software that did
13   that?
14       A   No.
15       Q   No, you had no software that did that?
16       A   Correct.
17       Q   Okay.  It did not -- the Apps System did
18   not put a value on any particular claim; is that
19   right?
20       A   No.
21       Q   No, it did not?
22       A   It did not.
23       Q   Did you ever have any situations where an
24   insured claimed that their car was totalled?
25           Do you understand what I mean by

77

M. ESTRADA

1
2    "totalled"?
3        A   Yes.
4        Q   Okay.  What do I mean by "totalled"?
5        A   Where it would cost more to repair it than
6    what the vehicle's actually worth, or a percentage
7    of.
8        Q   And did you have claims like that?
9        A   Yes.
10       Q   And did you have to make a determination
11   as to whether or not the car had actually been
12   totalled?
13       A   The appraiser usually does that.
14   They'll -- they'll -- different states have
15   different requirements, as far as what percentage of
16   the vehicle value before it can be considered a
17   total loss.
18       Q   So you would figure out what state it was
19   and then figure out what percentage of the vehicle
20   value loss there needed to be?
21       A   No.  Once -- depending on what state it
22   is, I send an appraiser from that state to go and do
23   an estimate on the vehicle.
24           If their estimate for that state
25   exceeds the total loss threshold, then they would

Capital Reporting Company

90

M. ESTRADA

1  efficient manner.
2
3      MS. BLOOM: Okay. I hear you. I think
4  the rules are really clear. I think if you
5  have a question about what federal stips are,
6  either you or her, you should read the rules.
7      And my position is that under federal
8  stips, she can only object to the form of the
9  question, if she truly believes there's a
10 problem with the form of the question.
11     And so, to the extent anything other than
12 that occurs, you know, clearly, if I think it's
13 becoming intrusive, we'll take whatever action
14 we need to.
15     Do you have an objection to us continuing
16 the deposition? And I would also ask that only
17 one attorney speak on the record.
18     MR. WILEY: Well, Miss Cohen will continue
19 to defend the deposition. I certainly have no
20 objection to continuing.
21 BY MS. BLOOM:
22     Q   You had the authority -- is there
23 something funny about that?
24     A   No.
25     Q   You had the authority to pay claims that

91

M. ESTRADA

1
2  were under $10,000; is that right?
3      A   Yes.
4      Q   And you didn't have to discuss that with
5  your supervisor; correct?
6      A   Correct.
7      Q   When you got an appraiser, did you ask for
8  pictures of the property damage?
9      A   Yeah. They would always send pictures.
10     Q   Did you look at the pictures?
11     A   Yes. Sometimes.
12     Q   And in looking at the pictures, would
13 you -- why would you be looking at the pictures?
14     A   To see where the damages are. See what
15 damages were caused.
16     Q   And would you want to see where the damage
17 was?
18     A   Yes.
19     Q   And would you want to compare that with
20 what you were being told by your insured?
21     A   Correct.
22     Q   Why?
23     A   Just to make sure that it fit -- fit the
24 statement of what happened.
25     Q   Okay. So to make sure that -- that you

92

M. ESTRADA

1
2  thought you agreed with what your insured was
3  telling you about how the accident happened;
4  correct?
5      A   Yes.
6      Q   One of the things that you were evaluating
7  as a claims examiner in the first instance was
8  whether there was or was not actually coverage;
9  correct?
10     A   Yes.
11     Q   And if there was coverage, whether there
12 was liability; correct?
13     First you would determine coverage,
14 and then you'd have to determine if there was
15 liability; is that right?
16     A   Correct. Correct.
17     Q   And if you determined that there was
18 liability, then you'd have to determine the value of
19 the claim; correct?
20     A   Right.
21     Q   And as part of that process, you would
22 interview your insured, right?
23     A   Yes.
24     Q   If there was -- if there were witnesses,
25 you would interview witnesses?

93

M. ESTRADA

1
2      A   Correct.
3      Q   And you would also interview a claimant if
4  there was somebody other than your insured involved;
5  correct?
6      A   Correct.
7      MS. COHEN: Objection. Asked and
8  answered.
9  BY MS. BLOOM:
10     Q   And other than Miss Manning, you did not
11 help any of the other claims examiners with their
12 claims; is that right?
13     A   Correct.
14     Q   And with regard to the help that you gave
15 Miss Manning, that help was limited to helping her
16 find an independent appraiser; correct?
17     A   No. No. There was other times where I
18 helped her with other things.
19     Q   Like what?
20     A   She, um, her liability. She kind of
21 questioned herself sometimes. And I'd kind of just
22 help her walk through it, how the accident happened,
23 and she figures out that she was right to begin
24 with.
25     Q   So she was trying to determine whether

Capital Reporting Company

98

M. ESTRADA

1    Q    And prior to December of 2010, were you
2  able to access Apps remotely?
3    A    Not that I recall, no.
4    Q    After December 2010, were you able to
5  access Apps remotely?
6    A    Yes.
7    Q    It may have been before that or it may
8  have been after that date, but from what I recall,
9  it was about a year before I left.
10   Q    Okay. What time did you get to the
11  office?
12   A    Usually about 8:00.
13   Q    And what time did you leave?
14   A    5:30, six.
15   Q    And did you keep your computer on during
16  lunch?
17   A    Yes. It was locked so nobody could access
18  it.
19   Q    Did you actually lock it?
20   A    Yes.
21   Q    And then you'd have to unlock it?
22   A    Yeah. I had to put in a password to
23  unlock it.
24   Q    And how would you lock it? What would you

99

M. ESTRADA

1  have to do to lock it?
2    A    Control-alt-delete, I think.
3    Q    Now, you said earlier today that you are
4  seeking overtime pay in this case?
5    A    Yes.
6    Q    What is the basis for your claim that
7  you're entitled to overtime?
8    A    I don't understand.
9    Q    You're claiming that you should have been
10  paid overtime?
11   A    Correct.
12   Q    Okay. Why?
13   A    Because I don't think we should have been
14  exempt.
15   Q    And upon what facts do you base your
16  allegation that you shouldn't have been exempt?
17   A    Because I don't think we fit the -- an
18  admin portion of that -- I don't know what it's
19  called.
20   Q    In what ways do you believe that you
21  didn't fit the admin, whatever it's called?
22        MS. COHEN: Objection. Overly broad.
23        THE WITNESS: Because the work really -- I
24  didn't do anything that was detrimental to the

100

M. ESTRADA

1  company. I mean, I didn't -- you know, they
2  say we have authority over 10,000, but I've
3  never made a decision for any amount of money
4  to pay a claim on myself. Usually it was from
5  estimates.
6  BY MS. BLOOM:
7    Q    Any other facts that you base your claim
8  on that you didn't fit within what you're calling
9  the admin?
10   A    No. I think that's pretty much -- that I
11  can think of right now.
12   Q    And when you say that you never made a
13  decision; you based it on estimates, those are the
14  statements you've talked about today?
15   A    Estimates that came from appraisers.
16   Q    So when you say you never made a decision,
17  what you mean is that you relied on the appraisers'
18  estimates?
19   A    Correct.
20   Q    Did you mean anything else?
21   A    No.
22   Q    About how many hours of overtime do you
23  believe that you're owed?
24   A    I don't know. I couldn't say for sure an

101

M. ESTRADA

1  amount, a specific amount.
2    Q    If you can look at Interrogatory Number 6
3  in Exhibit 3 and your Answer to Interrogatory Number
4  6. Let me know when you've had a chance to read it.
5  It's on pages 4 and 5.
6        MS. BLOOM: Why don't you show him
7        Interrogatory 6?
8        MR. WILEY: You're asking for the
9        response?
10       MS. BLOOM: And to read the question, too.
11       THE WITNESS: Oh, you want me to read it?
12       MS. BLOOM: Read it to yourself, the
13       question and the answer, and then I'm going to
14       ask you some questions about the answer. But
15       take whatever time you need so that you
16       familiarize yourself with the question and the
17       answer.
18       THE WITNESS: Okay.
19       Okay.
20  BY MS. BLOOM:
21   Q    So in Interrogatory Number 6, you were
22  asked about the damages that you're claiming in this
23  case.
24        Did you understand that?

Capital Reporting Company

102

W. BENECKE
1
2      MR. ALLOY: You can answer.
3      THE WITNESS: It's a confusing question.
4   I think it's a two-part question.
5   BY MR. WILEY:
6      Q   My question is whether or not you're aware
7   of whether or not they had a pay practice of any of
8   your prior employers where they were paying claims
9   adjusters or claims examiners by the hour with
10  overtime? (sic)
11     MR. ALLOY: Objection. You can answer.
12     THE WITNESS: I am aware of how the claims
13  examiners were paid. So the answer to that is
14  yes, I am aware of how they were paid. And --
15  BY MR. WILEY:
16     Q   Then my second question would be --
17     A   -- none of them were paid as a -- as
18  someone that would be entitled to overtime or on an
19  hourly basis.
20     Q   All right. Before lunch, we had been
21  talking about the process by which claims examiners
22  process claims. I'm going to talk some more about
23  that.
24         We were going to talk about outside
25  vendors. I think you had identified appraisers,

103

W. BENECKE
1
2   independent adjusters, and there was one -- oh,
3   private investigators as outside vendors.
4      A   Yes.
5      Q   Okay. Tell me what an appraiser is.
6      A   In what context?
7      Q   Well, I think you had said that the next
8   step after the investigation was to see whether or
9   not claims examiners want to hire outside vendors
10  and you had identified appraisers, PI's and
11  independent adjusters.
12         So my question is: When you say
13  "appraisers," what did you mean?
14     A   I'm sorry. I'm just looking for
15  clarification --
16     Q   In the context of a Fast Track --
17     A   In the context of Philadelphia Insurance
18  Company?
19     Q   At Maguire, yeah.
20     A   Okay.
21     Q   Forget wherever else you worked. We're
22  back to Maguire. And that's what these questions
23  will all relate to.
24     A   Okay. An appraiser is an independent
25  contractor that if the claims examiner determines it

104

W. BENECKE
1
2   appropriate or necessary for the particular claim,
3   they may engage or hire an independent contractor to
4   go out, take photos of the damages, and write up an
5   estimate; to then submit those photos and estimate
6   to the claims examiner for the claims examiner to
7   then review, evaluate and make judgments from.
8      Q   Now, the claims examiners, themselves, did
9   not physically examine the vehicle; isn't that
10  correct?
11     A   Yes.
12     Q   Okay. And they were not, themselves,
13  estimators or appraisers; isn't that correct?
14     A   That's not always entirely true.
15     Q   Can you tell me any of the Fast Track
16  claims adjusters who were, in fact, appraisers?
17     A   There may be -- there may be some in the
18  staff that are -- that were licensed appraisers, or
19  had trained and worked as appraisers in a prior
20  company or a prior job.
21     Q   So some of them may have been familiar
22  with appraising, but that wasn't why you hired them
23  to come work at Maguire. They were supposed to
24  process these claims; correct?
25     A   No, I wouldn't say that. I would

105

W. BENECKE
1
2   definitely not say that that's not why we hired them
3   for the job.
4         It is -- it was an added positive for
5   a candidate that they had estimating an appraiser's
6   skills because they would bring that skill-set to
7   the job that they were required to do, in the claims
8   examiner job for the company, when they're receiving
9   estimates from body shops and the independent
10  appraisers to understand better and more educated
11  what they're looking at and to do it more
12  efficiently.
13     Q   It was not a job requirement, however,
14  though, that someone be an appraiser in order to be
15  a claims examiner; correct?
16     A   It was an added plus, but not a job
17  requirement.
18     Q   So in the absence of -- well, let me ask
19  you this: Wouldn't Mr. Estrada have to hire an
20  appraiser in every case so that he would know how
21  much to pay?
22     A   No.
23     Q   And how is it that Mr. Estrada could
24  possibly know how much to pay if he didn't hire an
25  appraiser?

Capital Reporting Company

106

M. ESTRADA

1
2    A    No.  No.  Not every week.
3    Q    Are you claiming -- you're claiming how
4    much; what percentage of weeks?
5    A    Seventy-five.
6    Q    And do you have any records that would
7    reflect that?
8    A    No.
9    Q    And sitting here today, do you know that
10   or are you just guessing?
11   A    Just guessing.  Just a guess, approximate.
12   Q    And is the same true for 2011?
13   A    Correct.
14   Q    And when you say three to four hours a
15   week, three to four hours over what total number of
16   hours a week?  Are you claim -- strike that.
17        Are you claiming you had to work a
18   minimum number of hours in order to get overtime?
19   A    Yes.  Thirty-seven and a half hours, I
20   believe is what we had to work.
21   Q    So when you're saying three to four hours
22   a week, you're saying three to four hours a week
23   over 37 and a half hours?
24   A    Correct.
25   Q    And is that the same for 2010, when you

107

M. ESTRADA

1
2    say five to six hours?
3    A    Yes.
4    Q    And the same for 2011?
5    A    Yes.
6    Q    So the base is 37 and a half hours?
7    A    Correct.
8    Q    And you understood when you took the job
9    that regardless of whether you worked 37 and a half
10   hours, 40 hours, 45 hours or 25 hours, you'd get the
11   same salary?
12   A    Correct.
13   Q    And you knew you wouldn't get docked if
14   you worked less than 37 and a half hours?
15   A    Yes.  Correct.
16   Q    Can you purchase additional vacation days?
17   A    Yes.
18   Q    And did you do that?
19   A    Yes.
20   Q    How much vacation did you take in 2009?
21   A    Three weeks, I believe.
22   Q    And how about in 2010?
23   A    Three weeks, again.
24   Q    And how about in 2011?
25   A    I believe also three weeks.

108

M. ESTRADA

1
2    Q    Is that -- would that be three weeks,
3    total?
4    A    Yes.  You could buy a week's vacation.
5    Q    So you got two weeks, and then you could
6    buy another week?
7    A    Correct.
8    Q    Would it also be true that during your
9    additional week in 2009, '10 and '11, you did not
10   work when you were on vacation?
11   A    Correct.
12   Q    You resigned in December of 2011; is that
13   correct?
14   A    Yes.
15   Q    When was your last day of work?
16   A    December 29th, I believe.
17   Q    So you did not work in January of 2012;
18   correct?
19   A    No.
20   Q    No, you didn't work?
21   A    Not that I recall, no.  I don't believe I
22   did.
23   Q    And you didn't work in February of 2012;
24   is that right?
25   A    Correct.

109

M. ESTRADA

1
2    Q    Okay.  If you could look at Exhibit 2,
3    which is your complaint.
4         On page 12, the complaint is dated
5    February 3rd of 2012.
6    A    Uh-huh.
7    Q    As of February 3rd of 2012, you were no
8    longer working for the company; is that right?
9    A    That's correct.
10   Q    So if you can look at page 3, paragraph 8.
11        Why don't you read that paragraph to
12   yourself?
13   A    Okay.
14   Q    It says in the second sentence between
15   June 9th, 2008 and current.
16        As of February 3rd of 2012, you were
17   no longer employed; correct?
18   A    Correct.
19   Q    So that statement in your complaint is
20   inaccurate; is that right?
21   A    Yes, it is.
22   Q    Can you look at the first page of your
23   complaint, please?
24   A    Okay.
25   Q    In the first paragraph, you talk about

122

M. ESTRADA

1
2    read it and discussed the content with your manager;
3    is that right?
4        A   Correct.
5        Q   It says here, "My signature means that
6    I've been advised of my performance status and does
7    not necessarily imply that I agree with the
8    evaluation."
9            Do you see that?
10       A   Yes.
11       Q   Did you agree with the evaluation?
12       A   Yeah.  For the most part, yeah.
13       Q   Was there anything in the evaluation that
14   you thought was inaccurate?
15       A   I don't know if it was on this one or
16   another one.  I'd have to go through the whole
17   thing.
18       Q   If you would do that, please?
19       A   Okay.
20       Q   And if you see something that you don't
21   agree with or you believe it is inaccurate, if you
22   can point it out at the time that you see it, I
23   think it will be easier.
24       A   Okay.  I will.
25           I don't believe it was on that one.

123

M. ESTRADA

1
2    It may be on the other one.
3        Q   Well, I'd like you to make sure you go
4    through it.
5        A   It's not on this one.
6        Q   So would it be -- so you agreed with
7    everything in this evaluation?
8        A   Correct, yes.
9        Q   And you believe this evaluation accurately
10   reflected your performance?
11       A   Yes.
12       Q   And accurately reflected what you were
13   doing in your job?
14       A   Yes.
15       Q   I did have one question for you.
16       A   Okay.
17       Q   I'll refer to it by the Bates number:
18   MAG000097, under Analytical Skills.
19       A   Yes.
20       Q   It says, "He has designed innovative and
21   effective work flows and procedures."
22           What was it that you designed?
23       A   Excel spreadsheets.
24       Q   What kind of Excel spreadsheets?
25       A   There was one for total losses.  It just

124

M. ESTRADA

1
2    calculated the fees that the insured or claimant is
3    due when their vehicle is a total loss.
4        Q   Explain to me exactly what it was.
5        A   It's an Excel spreadsheet.  You put in the
6    vehicle information, the state, and it would
7    calculate -- you put in, you know, like the three
8    different, um, vehicles that are -- oh, shoot, how
9    do you say -- comparative vehicles.
10           When a vehicle is a total loss, the
11   appraiser will get a couple of other vehicles that
12   were the same year, make and model, same -- possibly
13   same mileage of what their selling for, to kind of
14   determine a fair market value for the vehicle.
15   Usually two, and then you average those out.  And
16   the spreadsheet just does it all for you.  It just
17   gives you a total at the bottom.
18       Q   So you designed the spreadsheet?
19       A   Yeah.
20       Q   Was this how you would determine how much
21   a total loss was?
22       A   Yes.
23       Q   It's a formula that you used?
24       A   Yeah.  Working with Mona.  She's the one
25   who helped me with a lot of the information, because

125

M. ESTRADA

1
2    it would go by different states.
3        Q   Right.  So you had to -- so the different
4    states determined what the comparative value would
5    be?
6        A   No.  It would determine how much they
7    would get as far as taxes.  If they're due
8    registration fees.  There's just different
9    guidelines states have on a total loss.
10       Q   And then you developed this Excel
11   spreadsheet?
12       A   Yeah.
13       Q   And do people use it besides you?
14       A   As far as I know, a couple of people
15   there.
16       Q   It says on the first page that you're
17   taking a course in negotiating techniques.  It
18   actually says, "Negotiating techniques in progress."
19       A   No courses.
20       Q   Do you know what that refers to?
21       A   I have no idea.  I didn't take any
22   negotiating courses, that I can recall.
23       Q   Did you do anything online, on the
24   computer?
25       A   No.

158

```
              M. ESTRADA
1
2     Q   Yes.
3     A   Just money I have.
4     Q   Who's paying for the deposition today, for
5  the transcript?
6     A   My attorney's office.
7     Q   And you've given your attorneys no money
8  to date?
9     A   Correct.
10    Q   Did anybody ever tell you to come in on a
11 weekend?
12    A   No.
13    Q   Did anybody know you would come in on a
14 weekend?
15    A   Yes.
16    Q   Who?
17    A   Mona, Vicky, Shakelia.
18    Q   How did Mona know?
19    A   She's seen me there.
20    Q   How many times?
21    A   I don't recall.
22    Q   When a claim is first opened, is there a
23 reserve set for the claim?
24    A   Yes.
25    Q   Who sets the reserve?
```

159

```
              M. ESTRADA
1
2     A   I believe home office does.
3     Q   And then as you investigate the claim,
4  you're supposed to re-evaluate whether the reserve
5  is sufficient or not?
6     A   Correct.
7     Q   Is that right?
8         And that's something that a claims
9  examiner like you does; is that right?
10    A   Yes.
11    Q   And what factors do you consider in
12 deciding whether the reserve is sufficient?
13    A   Based on how severe the accident was.
14 Usually their reserve is $777.  It's a really low
15 number.  It always has to be changed.
16    Q   And you would be, for your claims, the
17 person who decided how much to increase it?
18    A   Correct.
19    Q   And did you increase it in almost every
20 situation?
21    A   Yeah.  We had to increase it every time.
22    Q   And did you always increase it the same
23 amount?
24    A   Sometimes.  Really, it's based on previous
25 claims that I might have had that were similar.  You
```

160

```
              M. ESTRADA
1
2  kind of get an idea of about what the amount is
3  going to be as far as damages.  You know, a parking
4  lot accident isn't going to go over a couple of
5  thousand.
6     Q   So it's something that after awhile you
7  just know --
8     A   Yeah.
9     Q   -- intuitively?
10    A   You just kind of assume it's going to be
11 close to what you had before.
12    Q   So your experience let's you -- gives you
13 the judgment to know how much to assign to it; is
14 that right?
15    A   Yeah.
16    Q   And then -- do you ever alter it again in
17 the process before the claim is paid?
18    A   I never have.
19    Q   Did you ever look back to see whether your
20 judgment had been close to what was actually paid?
21    A   No.
22    Q   Any sense of that?
23    A   No.
24    Q   When you would get an appraisal from a
25 third-party appraiser and they would tell you what
```

161

```
              M. ESTRADA
1
2  they thought the damage was, it was then up to you,
3  if you were in a comparative negligence
4  jurisdiction, to determine what percentage should be
5  apportioned to each party, right?
6     A   Yeah.
7     Q   The appraiser did not do that; correct?
8     A   No.
9     Q   When you said that you took your calendar
10 with you, what calendar are you talking about?
11    A   It's just a little black calendar for the
12 year.
13    Q   What kind of information was on it?
14    A   How many claims I got in the day and, you
15 know, if I was off, I'd mark it off for vacation.
16 If Shakelia was off, I'd put down that she was going
17 to be off that day, so I'd know to expect more
18 claims that day than normal.
19    Q   Did you note if anybody else other than
20 Shakelia was out?
21    A   Yeah.  Everybody in the group.
22        If I had prior notice that they were
23 going to be out.
24        (Estrada-12, Calendar excerpts, was
25        received and marked for identification at this
```

166

M. ESTRADA

1
2  a serious issue that we'll need to take up with
3  the court, because this was proffered in
4  support of a motion for conditional cert.
5       And so my question to him was, what
6  information he provided that's in Exhibit-13.
7       Are you directing him not to answer that
8  question?
9       MS. COHEN:  Yes.
10 BY MS. BLOOM:
11      Q   Do you believe that Exhibit-13 is
12 accurate?
13      A   Somewhat.  To the best of my knowledge.
14      Q   When you say somewhat, what does that
15 mean?
16      A   To the best of my knowledge.  I haven't
17 gone through and read it to double-check it.
18      Q   When you signed it, did you go through and
19 read it?
20      A   I did.
21      Q   And when you signed it, were you swearing
22 that everything in this was accurate?
23      A   To the best of my knowledge at the time,
24 yes.
25      Q   Did you make any -- did you see a draft of

167

M. ESTRADA

1
2  it before the final?
3      A   Yes.
4      Q   Did you make any changes to the draft?
5       MS. COHEN:  Objection.  Privileged.
6       MS. BLOOM:  He can answer that yes or no.
7  That's not privileged.
8       MS. COHEN:  No.  Don't answer it.
9       MS. BLOOM:  Can you just mark this section
10 for me?
11 BY MS. BLOOM:
12      Q   Looking at Exhibit-13 right now, is there
13 anything in it that you believe is not accurate?
14      A   May I kind of go through all this?
15      Q   Of course.
16      A   It looks to be okay.
17      Q   If you look at paragraph 3 on the first
18 page --
19      A   Mm-hmm.
20      Q   -- it says, "I typically worked an average
21 of 50 hours per-week."
22       Do you see that statement?
23      A   Yes.
24      Q   How did you come up with that number?
25      A   It's just an approximation.

168

M. ESTRADA

1
2      Q   Well, if you look back at your Answers to
3  Interrogatories, Exhibit Number 3, Interrogatory
4  Number 6 and your Answer to Interrogatory Number
5  6 --
6      A   Mm-hmm.
7      Q   -- you swore that in 2009 you worked five
8  to six hours of overtime a week.  In 2010, seven to
9  ten hours of overtime per-week.  I'm sorry.  Strike
10 that.
11      You swore that you worked three to
12 four hours of overtime per-week in 2009.
13      A   Mm-hmm.
14      Q   Five to six hours of overtime per-week in
15 2010.
16      And, approximately, seven to ten
17 hours of overtime per-week in 2011.
18      So can you tell me how with those
19 sworn answers you get to a sworn statement of an
20 average of 50 hours a week?
21      A   It was just based on when I was last
22 there, when I was working, while I was there.
23      Q   So can you just --
24      A   So the 2011, you know, on the
25 interrogatory it says from -- what did you say it

169

M. ESTRADA

1
2  was?  From seven -- I'm sorry.
3       It was for the week of 2011, seven to
4  ten hours of overtime. (sic)  I was basing it off of
5  that.
6      Q   So if you're saying that you worked an
7  average of 50 hours a week based on seven to ten
8  hours of overtime a week, so what you're saying in
9  paragraph 3 -- strike that.
10      I want to make sure I understand your
11 testimony.
12      You're saying that the statement in
13 the declaration that you filed with the court where
14 you said, "I typically worked an average of 50 hours
15 per-week" was only intended to pertain to the
16 year 2011?
17      A   Correct.  But I was working at the time.
18 I didn't think about the years before where we
19 weren't getting as many claims as we were now.
20      Q   When you say you were working at the time
21 though, the declaration, the court declaration that
22 you signed was signed on April 13 of 2012; you were
23 no longer working for the company, right?
24      A   Right.
25      Q   And you hadn't worked for the company in

170

M. ESTRADA

1
2  at least four months, right?
3      A    Right.
4      Q    Okay.  So I just want to make sure that I
5  understand --
6      A    No, I --
7      Q    -- so that I can understand what all your
8  sworn testimony is.
9          So the statement in the court
10  declaration of the average of 50 hours a week was
11  referring only to the year 2011?
12      A    I was just thinking about that last year.
13      Q    The last year, okay.
14      A    That I was working.  I wasn't thinking as
15  to years before where we didn't have as many claims.
16  I didn't need to work that much.
17      Q    Okay.  And you got to 50 hours a week.
18  You got to an average of 50 hours a week.  That
19  would imply that some weeks you worked less than 50
20  hours, and some weeks you worked more than 50 hours;
21  correct?
22      A    Correct.
23      Q    And in your Answers to Interrogatories,
24  you said that you worked an average of seven to ten
25  hours of overtime?

171

M. ESTRADA

1
2      A    A week.
3      Q    Okay.  So can you explain to me how you
4  get to 50 hours a week based on seven to ten hours
5  of over time?
6      A    From three-and-a-half hours that we had to
7  work to ten hours more -- well, 47.  I was thinking
8  40 to ten hours, would be 50.
9      Q    And so that would be -- so there are no
10  hours that you worked more than 50 hours, right?
11      A    That I'm aware of, no.  I honestly don't
12  have an exact number.  I didn't keep track of it.
13      Q    Okay.  So when you said -- when you told
14  the court it was an average of 50 hours a week, what
15  you really meant was you never -- you didn't work
16  more than 50 hours a week in the year 2011, and for
17  the years before that, you worked less; correct?
18      A    Something like that.
19      Q    Okay.
20      A    But at the time I didn't realize, I wasn't
21  thinking about the entire three years.
22      Q    You understood, though, that Exhibit-13
23  was a sworn statement that was being given to a
24  federal judge?
25      A    Yes.

172

M. ESTRADA

1
2      Q    And just so that I understand, when we
3  were looking at your complaint, which was Exhibit-2,
4  filed in February of 2012, when you represented to
5  the court that you were still employed by the
6  company, that also was an inaccurate statement;
7  correct?
8      A    Right.
9      Q    If you look at Exhibit-2 again, your
10  complaint -- if you could pull it out, please?
11      A    Yes.
12      Q    If you look at paragraph 11, do you see
13  paragraph 11 on page 4?
14      A    Yes.
15      Q    In the second line it said, "Plaintiffs
16  seek injunctive and declaratory relief."
17          Do you know what the term
18  "injunctive" means?
19      A    No.
20      Q    If the ultimate outcome of this lawsuit
21  was that any current claims examiners handling Fast
22  Track claims were reclassified and became
23  non-exempt, but there was no money awarded, would
24  you still be interested in pursuing this?
25      A    Yes.

173

M. ESTRADA

1
2      Q    Even if you got no money?
3      A    Correct.
4      Q    Why?
5      A    Because it's not right.  I mean,
6  especially the amount of hours we had to work.  It
7  was ridiculous trying to keep up with the amount of
8  work that we had.
9      Q    Are you familiar with the term "hidden
10  damage"?
11      A    Yes.
12      Q    What is hidden damage?
13      A    Damage that isn't seen right away.
14      Q    And how does hidden damage impact an
15  estimate?
16      A    Whenever the vehicle's taken into the body
17  shop to be repaired, once they start removing the --
18  like the bumper and stuff, there could be damage
19  underneath that was not seen by the appraisers.  So
20  it could potentially cause more damage -- well, more
21  cost to repair the damages.
22      Q    And what is your role with regard to --
23  what was your role with regard to handling hidden
24  damage?
25      A    The appraiser handled that.  They would go

182

M. ESTRADA

1         M. ESTRADA
2 you were doing?
3   A   Right.
4   Q   Okay.  And when you say that you took it
5 from United Auto, when we were looking a few minutes
6 ago at your first resume that we marked as
7 Exhibit-15, which you testified was accurate, you
8 took language from -- you used language about your
9 job at United Auto and put it into Exhibit-11, and
10 then used that language to further describe your job
11 at the defendant; correct?
12   A   Yeah.
13   Q   And you would agree with me that the
14 second bullet point under the description of your
15 job at the defendant is language that you added;
16 correct?
17   A   From this United Auto Insurance.
18   Q   Well, you took it from -- because it was
19 something that you did at both places?
20   A   Right.
21   Q   Okay.  And now the third bullet, that
22 seems to come, again from Exhibit-14, from the job
23 description; the fourth and fifth paragraphs under
24 "essential duties and responsibilities."  Correct?
25   A   Correct.

183

1         M. ESTRADA
2   Q   And then the fourth bullet on Exhibit-11
3 that starts, "Created a standardized total loss
4 evaluation form that has saved the company thousands
5 of dollars in total loss negotiations."  You added
6 that bullet; correct?
7   A   Correct.
8   Q   And that's the form that you described
9 earlier today; correct?
10   A   That's correct.
11   Q   And you go on to say in that bullet, "This
12 form has a success rate of nine out of ten agreeing
13 to the total loss offer amount presented with
14 minimal negotiations needed."
15     That's your language; correct?
16   A   Correct.
17   Q   So by using your form, that basically --
18 that minimized the amount of negotiation that the
19 claims examiners needed to engage in; correct?
20   A   Correct.
21   Q   And then the last bullet, "Created a zip
22 code or by state searchable workbook for independent
23 appraisal companies," you added that entire bullet,
24 as well; isn't that right?
25   A   That's correct.

184

1         M. ESTRADA
2   Q   And that also describes something else
3 that you did -- another product that you say that
4 you created; correct?
5   A   Yes.
6   MS. BLOOM:  Thank you very much.
7   Subject to a court ruling on the things
8 that you were directed not to answer, I have no
9 further questions at this time.
10   THE WITNESS:  Thank you.
11   MS. COHEN:  We reserve our questions at
12 time of trial.
13   MR. WILEY:  We're done.
14   MS. BLOOM:  That's fine.  As long as you
15 understand what that means under the federal
16 rules, that's fine with me.
17   MR. WILEY:  We'll read.
18   (Witness excused.)
19 (The deposition is adjourned at 2:58 p.m.)

185

1    C E R T I F I C A T I O N
2
3   I, CORINNE J. BLAIR, a Certified
4 Realtime Reporter, Certified Professional Reporter,
5 Certified Livenote Reporter, and Notary Public, do
6 hereby certify:
7   That MICHAEL ESTRADA, the witness,
8 whose deposition is hereinbefore set forth, was duly
9 sworn by me and that such deposition is a true
10 record of the testimony given by such witness.
11   I further certify that I am not
12 related to any of the parties to this action by
13 blood or marriage and that I am in no way interested
14 in the outcome of this matter.
15
16
17   _____
   CORINNE J. BLAIR,
18   CRR, CCR, RPR, CLR
   License # X01641
19   Expires 6/30/14
20
21 Dated:_____
22
23
24
25