# EXHIBIT A

34

M. ESTRADA

1
2  Q   So you knew in going to Philadelphia that
3  this was going to be a change?
4  A   Yes.
5  Q   Under your experience at United, you say,
6  "Investigation of third-party auto accidents and
7  resolving claims made against the insured's policy,
8  negotiate settlement with third parties once
9  coverage and liability have been determined."
10         That's what you were doing at United
11 Auto Insurance Company?
12 A   Yes.
13 Q   And what, if anything, about that
14 experience did you believe was going to be helpful
15 at Philadelphia?
16 A   Handling the claims, the auto accidents.
17 Q   Why?
18 A   Because I had -- because of the experience
19 I got in doing that with United Auto.
20 Q   So the experience negotiating settlements?
21 A   Yes.
22 Q   And when you were investigating and
23 resolving claims at United Auto Insurance Company,
24 how did you go about that process?
25 A   I'm sorry?

35

M. ESTRADA

1
2  Q   At United Auto, how did you go about that
3  process?
4  A   I'm sorry.  What was the process?
5  Q   How did you go about the process of
6  investigating and resolving claims?
7  A   Oh.  I would contact both parties, the
8  claimant and insured, and get their statements on
9  how the accident happened; the police report, if
10 there is one, and make a liability decision.  If
11 there's coverage, then we would settle the claim.
12 Q   And you say "make a liability
13 determination," what do you mean?
14 A   Deciding who's at fault.
15        Usually, if there's a police report,
16 we usually went by the police report.
17 Q   And then what would you do?
18 A   Get an appraiser out there to do an
19 estimate on the damages, and pay the claim if
20 liability was accepted.
21 Q   Now, when you applied for the job at
22 Philadelphia, what, if anything, did you understand
23 you would be doing?
24 A   Handling minor claims in like parking
25 lots, just Fast Track simple claims.  Non-injury

36

M. ESTRADA

1
2  claims.
3  Q   When you say "Fast Track," what does that
4  mean?
5  A   Simple claims.  Easy claims that, you
6  know, insured backed into a parked vehicle.  Nothing
7  that -- that involves a lot of investigation.  Who
8  ran a red light.  Anything like that.
9  Q   When you got the job at Philadelphia, who
10 did you work for; who was your immediate boss?
11 A   Mona Born.
12 Q   And were there other claims examiners that
13 worked for Mona?
14 A   Yes.
15 Q   Who were they?
16 A   Craig Olleck, Vicky Manning.  I think she
17 was transitioning from an admin person to an
18 adjuster at that time when I started.
19 Q   Anybody else?
20 A   Marvel Webb.  And I believe Shakelia Hayes
21 came shortly after I did.
22 Q   Did you handle any claims involving rental
23 cars?
24 A   Not that I can recall.  Rent a cars being
25 damaged?

37

M. ESTRADA

1
2  Q   Correct?
3  A   No, not that I recall.
4  Q   Was there anybody besides Mona who was
5  responsible for supervising claims examiners in the
6  Addison office?
7  A   Yeah.  Rodger Terry.
8  Q   And did he supervise a different group of
9  people?
10 A   Correct.
11 Q   And did that group have responsibility for
12 handling damage to rental cars?
13 A   Yes.
14 Q   What state or states were you responsible
15 for?
16 A   There was quite a few of them.  I don't
17 recall them all.  It's been awhile.
18 Q   Well, can you recall any of them?
19 A   Yeah.  There was Colorado, I believe.
20 California, Florida, Washington.  New Mexico, I
21 think.  That's all I can recall right now.
22 Q   Now, did you understand that when you
23 started working for Philadelphia that you would also
24 be responsible for investigating claims?
25 A   Yes.

38

M. ESTRADA

1
2  Q   And you would also be responsible for
3  talking to the insured?
4  A   Yes.
5  Q   And you would also be responsible for
6  making a determination as to liability?
7  A   Yes.
8  Q   And you'd also be responsible for getting
9  an appraiser -- an appraisal, if one needed to be
10  gotten?
11  A   Yes.
12  Q   Are you familiar with the concept of
13  comparative negligence?
14  A   Yes.
15  Q   And what does that mean in terms of
16  resolving automobile claims?
17  A   Um, usually it's if both parties played
18  some part of the accident, you would determine,
19  percentage-wise, who was more at fault and who was
20  less at fault.  And I guess a percentage of the
21  damages would be paid, as opposed to a hundred
22  percent of it.
23  Q   And were you responsible for determining
24  percentages in comparative negligence jurisdictions?
25  A   Um, if I had some.

39

M. ESTRADA

1
2  Q   Well, which of the jurisdictions that you
3  were responsible for were comparative negligence
4  jurisdictions?
5  A   I don't recall.
6  Q   But you're aware that some of them were?
7  A   Yes.
8  Q   Okay.  And as to the ones that were part
9  of your duties and responsibilities, were one, to
10  determine that it was a comparative negligence
11  jurisdiction; correct?
12  A   Yes.
13  Q   And then once you determined that it was a
14  comparative jurisdiction, then you would have to
15  apportion percentages of fault; correct?
16  A   Yes.
17  Q   And that would impact how much ultimately
18  would get paid; correct?
19  A   Yes.
20  Q   Okay.  Now, going back to the
21  jurisdictions that you were responsible for, was
22  Texas one of them?
23  A   No.
24  Q   Florida was one of them?
25  A   Yes.

40

M. ESTRADA

1
2  Q   And you were licensed in Florida; is that
3  right?
4  A   Correct.
5  Q   Why?
6  A   I don't know.  They told us to get
7  licensed in Florida.
8  Q   Can you handle claims in Florida without a
9  license?
10  A   Not that I'm aware of, no.
11  Q   Did any of the other jurisdictions that
12  you were responsible for require a license?
13  A   Not that I'm aware of.
14  Q   Now, in terms of Rodger Terry's team, they
15  were responsible for different states; is that
16  correct?
17  A   Yes.
18  Q   And do you know what states those were?
19  A   No.
20  Q   And of the states that Rodger Terry's team
21  was responsible for, which of those states required
22  licenses?
23  A   I have no idea.
24  Q   Which of those states had comparative
25  negligence statutes?

41

M. ESTRADA

1
2  A   I have no idea.  I really don't know which
3  states they handled.
4  Q   Did you have to take a test to get
5  licensed in Florida?
6  A   In Florida, no.
7  Q   You said you're also licensed in Texas?
8  A   Mm-hmm.
9  Q   I'm sorry.  You have to answer yes or no.
10  A   Yes, I'm sorry.
11  Q   Do you have to take a test to get licensed
12  in Texas?
13  A   Yes.
14  Q   And what kinds of things were you tested
15  on?
16  A   It's been so many years ago.  I can't
17  remember what -- about coverage.  You know, there
18  had to be coverage in order for there to be a claim,
19  and just different questions.
20  Q   And we'll get back to coverage in a
21  minute.  But you mentioned that one of the
22  jurisdictions that you were responsible for was
23  California?
24  A   Yes.
25  Q   Did you have to be trained in California?

54

M. ESTRADA
1
2        So if you went into Image Right, you
3 would see if a new claim had been assigned to you?
4    A   Yes.
5    Q   And do you know what -- what criteria was
6 used in determining who would get a particular
7 claim?
8    A   If it was a simple claim, it would go to
9 Fast Track.  If it had bodily injury, it would go to
10 a different group.  Just depending on what group
11 handles which types of accidents.
12   Q   Within the groups, though, do you know who
13 decided which claims examiner got what claim?
14   A   No.
15   Q   And at least with regard to claims that
16 you got, you never got claims for rental car damage;
17 correct?
18   A   Correct.
19   Q   And no Grundy claims; you've never heard
20 of that?
21   A   Yeah.
22   Q   And the claims that you got were limited
23 to certain jurisdictions?
24   A   Yes.
25   Q   And your testimony is that you did or did

55

M. ESTRADA
1
2 not have responsibility for claims in Texas?
3    A   Did not.
4    Q   Did not.
5        So when you would get a new claim,
6 what is the first thing that you would do?
7    A   I would open it up and see what state it
8 was in, just to confirm that it was one that my --
9    Q   That it was what?
10   A   -- group handled.
11       Oh, to confirm that it was one that I
12 should be handling.
13       If there was any bodily injury on it,
14 I'd send it to my supervisor to send back to home
15 office to be reassigned.
16   Q   Okay.  So you would open up the claim.
17 And what would you see when you opened it up?
18   A   A Cord (ph) form.  And it would give you
19 the insurance information, the claim date, the city,
20 state, location of where the accident happened.
21 Give a description of the accident.
22   Q   Now, you said you looked to see what state
23 it was in.
24       Was that what state the accident
25 happened in or --

56

M. ESTRADA
1
2    A   Correct.
3    Q   And why was that important?
4    A   Because I only handle specific states.
5    Q   And within the states that you handled,
6 did it make a difference what state the claim
7 occurred in?
8    A   I'm sorry. I don't understand your
9 question.
10   Q   If it fell within one of the states that
11 you were responsible for, what, if anything, did you
12 need to know about the law in that state for
13 insurance?
14   A   Oh, I guess what laws that they had for
15 traffic accidents or -- the traffic laws.
16   Q   And that was something that you would look
17 up?
18   A   Yes.  Sometimes.  When I needed to.
19   Q   Okay.  And why would you be looking that
20 up?
21   A   It depends on the accident.  You know, if
22 it was something that I wasn't sure of, you know,
23 who was at fault, we'd look up the -- I guess the
24 driving handbook and see what it -- for that state
25 and see what it says about that particular scenario.

57

M. ESTRADA
1
2    Q   So you would determine -- if you felt
3 unsure, you would determine whether you needed to
4 consult the driving handbook for a particular state?
5    A   Right.
6    Q   And what would you be looking for in the
7 driving handbook?
8    A   For that scenario.
9    Q   When you say "for that scenario," can you
10 explain to me what you mean?
11   A   Honestly, um, I can't think of an example.
12   Q   Were you looking to see if it was a
13 comparative negligence state?
14   A   No.  No.  Looking to see if -- it hardly
15 ever happened to me.  That was something extremely
16 rare, but sometimes you weren't sure if the party
17 was at fault, because some states are different as
18 far as their lines or -- I don't know.  It's just --
19 I'm trying to think of an example.  I'm sorry.  You
20 got me at a blank right now.
21   Q   So one of the things that you had to do
22 initially when you would get a new claim is you had
23 to determine who was at fault; is that right?
24   A   Yes.  Yes.  One of the things, yes.
25   Q   Okay.  So one of the things.  And so in

58

M. ESTRADA

1  order to do that, there were times when you might
2  not be familiar with the law in a particular state
3  and you had to go look it up to see who would be --
4  who's liable in the situation that you're presented
5  with?
6     A    On rare occasion.  I mean, normally it was
7  parking lot accidents.  Insured backed into a parked
8  car.
9     Q    So normally you knew?
10    A    Yeah.  Yeah.  Because it was in Fast
11 Track.  I mean, it was mostly quick claims that --
12 simple accidents.
13    Q    Okay.  But there were times when you
14 didn't know; is that right?
15    A    There were occasions, yeah, that a claim
16 would come up.  If I wasn't sure, I would usually
17 ask my supervisor.  She's more knowledgeable and
18 more experienced.
19    Q    But you could ask your supervisor or you
20 could consult the driving manual --
21    A    Yes.
22    Q    -- for the particular state; correct?
23    A    Yes.
24    Q    And that was a decision that you made,

59

M. ESTRADA

1  right?
2     A    Yes.
3     Q    Now, you were talking about the types of
4  accidents.
5        Most of the accidents that you
6  handled were accidents that were worth about how
7  much money?
8     A    A couple thousand; three, four, 5,000.
9     Q    Small, right?
10    A    Yes.
11    Q    Okay.  Can you give me a sense of what
12 kinds of things you'd be handling?
13    A    As?
14    Q    You said a parking lot accident.
15 Somebody --
16    A    Insured backed into a parked vehicle.  Um,
17 normally we hit a parked car.
18    Q    So normally either your person hit a
19 parked car or somebody hit your insured?
20    A    Correct.
21    Q    Or how about if somebody broke into a car?
22    A    Yes.
23    Q    So there'd be -- it all centered on damage
24 to the car?

60

M. ESTRADA

1     A    Correct.
2     Q    And most times the damage was small?
3     A    Yes.
4     Q    Is that right?
5        And part of what you had to determine
6  is how much the damage was; correct?
7     A    No.  The appraiser would do that.
8     Q    Well, in every situation, were you
9  supposed to get an appraiser?
10    A    Absolutely.
11    Q    Even if it was under $2,000?
12    A    Absolutely.
13    Q    And so it's your testimony here today that
14 you always got an appraiser?
15    A    I always got an estimate.
16    Q    You always got an estimate?
17    A    Yeah.  If it was under a couple of
18 thousand, then we were allowed to have the insured
19 or the claimant get an estimate from a local body
20 shop.
21    Q    Okay.  So the claim comes in.  You would
22 check to see if there was coverage; correct?
23    A    Yes.
24    Q    Okay.  And then you would check to see if

61

M. ESTRADA

1  there was liability?
2     A    Yes.
3     Q    Okay.  And then you said that -- would you
4  call the insured?
5     A    Yes.
6     Q    And why were you calling the insured?
7     A    To get the statement from the driver on
8  what happened.  Usually, they say I backed into a
9  vehicle.  You know, whatever happened in the
10 accident.
11    Q    Did you ever have situations where the
12 insured said it wasn't their fault?
13    A    Yes.
14    Q    And how often would that happen?
15    A    On occasion.
16    Q    And what happened; what were you supposed
17 to do then?
18    A    I'd talk to the claimant and see their
19 side of the story.  A lot of times there's a police
20 report, which we would go by that, the police
21 report.  Being that it was a commercial insurance, a
22 lot of the companies made sure that the drivers
23 always got a police report, so that was really
24 helpful.

62

```
            M. ESTRADA
1
2    Q    Okay.  So you would talk to your insured;
3    if your insured said it wasn't their fault, then you
4    might reach out and talk to the other party?
5    A    Yeah.
6    Q    And what would you do if there was a
7    disagreement between two parties about what
8    happened?
9    A    Conflicting statements and there's no
10   independent witnesses, then we would side with our
11   insured.
12   Q    Okay.  And you made the decision to side
13   with your insured?
14   A    That's just something we're supposed to
15   do.
16   Q    Well, did you ever have any situations
17   where you felt that the person, the non-insured, had
18   the more credible story?
19   A    No.  If there's conflicting statements and
20   no evidence to confirm that my insured was at fault,
21   I would side with my insured.
22   Q    Now, when you say "no evidence," what kind
23   of evidence?
24   A    Witnesses.  If the damages didn't support
25   what the insured claimed.
```

63

```
            M. ESTRADA
1
2    Q    So if you have conflicting statements,
3    then you'd have to determine whether or not there's
4    other evidence; is that right?
5    A    Well, hopefully by then, you know, you
6    know all the evidence.
7    Q    But you would -- I assume you have to get
8    the evidence or look for the evidence; correct?
9    A    Yeah.  As in evidence, was there any
10   witnesses.
11   Q    Okay.
12   A    Independent witness.
13   Q    And how would you find out if there was
14   any witnesses?
15   A    Asking both the driver and the claimant if
16   there were any independent witnesses.  Was there a
17   police report done.  If none exists, then I would
18   side with my insured, if the statements were
19   conflicting.
20   Q    Okay.  Let's go one step at a time then.
21         So if there's a police report, what
22   would you do?
23   A    I'd go by the police report.
24   Q    You say you'd go by the police report.
25   What does that mean?
```

64

```
            M. ESTRADA
1
2    A    If the police report says this person was
3    at fault, which a lot of times it does.
4    Q    So you would follow the police report?
5    A    Correct.
6    Q    So if you have conflicting statements,
7    then you would ask whether there was a police
8    report?
9    A    No.  I'd ask that regardless.
10   Q    Okay.  So you always ask for the police
11   report?
12   A    If there's a police report.
13   Q    Okay.  You said that you would ask if
14   there had been independent witnesses.  Who would you
15   ask that question of?
16   A    Both the insured and the claimant.
17   Q    And what happens if there are independent
18   witnesses?
19   A    I would contact them and see what they
20   saw.
21   Q    Okay.  So then you'd talk to the
22   independent witnesses?
23   A    Correct.
24   Q    So who decides in that situation if the --
25   once you talked to the independent witness, what do
```

65

```
            M. ESTRADA
1
2    you do then?
3    A    Whichever they corroborate whose story,
4    that's who I go with.
5         If the witness says the insured
6    backed into the claimant's car, then -- and the
7    claimant is saying that the insured backed into his
8    car, you got two people saying the same thing, then
9    that's what you go with.
10   Q    So you'd make a judgment that if two
11   people --
12   A    Versus the one, correct.
13   Q    And that in your judgment is you believe
14   the two people?
15   A    Yes.
16   Q    Okay.  Now, you said before that sometimes
17   the damage didn't support the determination.
18   A    Didn't support the --
19   Q    The story.  Okay.  Yeah, what do you mean
20   by that?
21   A    Just, I've had people, like -- I had an
22   insured that was parked and she said somebody backed
23   into her car, but then she's claiming damages to the
24   front of the vehicle.
25         The other side is like, well, I mean,
```

66

M. ESTRADA

1    M. ESTRADA
2    you can tell where the car was backed into, but
3    you're claiming these damages. It just -- it
4    doesn't make sense.
5        Q    So in that situation you made a
6    determination that the insured wasn't telling the
7    truth?
8        A    Correct.
9        Q    Okay. And you would deny coverage based
10   on that?
11       A    No. I wouldn't deny coverage. I wouldn't
12   pay for the damages that didn't support --
13       Q    Okay. So then you'd have to decide which
14   damages, if any, actually supported the claim?
15       A    Yeah. And the appraiser would usually
16   tell us, "Well, they're trying to say this damage
17   was also caused in that accident, but I don't
18   believe that it could have been, judging by that."
19   Because they're the ones -- the appraiser's the ones
20   looking at the vehicle, and they can tell, you know,
21   if a vehicle was hit, by their experience, and say,
22   it's not possible to cause that other damage.
23       Q    So the appraiser comes back and tells you
24   that the damage is in a place that does make sense,
25   in terms of the story, and then you determine, okay,

67

M. ESTRADA

1    M. ESTRADA
2    I'm going to go with what the appraiser says?
3        A    Correct.
4        Q    Okay. Have you had situations where the
5    claimant is more credible, tells a story that makes
6    more sense than what your insured is telling you?
7        A    Not that I recall, no.
8        Q    Um, usually it's by, you know, police
9    report, if there is one, but if -- the only time I
10   would think that would happen if the damages that
11   the insured's saying just didn't match, if it just
12   didn't make sense like that, then, you know, yeah, I
13   think the claimant probably would be more credible.
14       Q    And then you'd side with the claimant --
15       A    Yes.
16       Q    -- or you'd decide that the claimant was
17   more credible?
18       A    Yes.
19       Q    Okay. Now, what if they both had some
20   degree of fault; what did you do then?
21       A    I would usually ask Mona, see what she
22   thought. See if she wanted comparative negligence
23   on that.
24       Q    You say you usually ask Mona.
25            What information would you bring to

68

M. ESTRADA

1    M. ESTRADA
2    Mona?
3        A    The estimates amounts; how the accident
4    happened; you know, what I believe to be how the
5    accident happened. I would ask her what she
6    thought.
7        Q    So you would go to Mona and say, this is
8    what I believe happened, and would you tell her who
9    you thought was at fault and how much and why?
10       A    Yes.
11       Q    So you'd make a recommendation to her?
12       A    Correct.
13       Q    Okay. And did she always adopt your
14   recommendations?
15       A    No. No. Not always.
16       Q    And can you think of any examples, sitting
17   here today, when she didn't accept your
18   recommendation?
19       A    Um, it's not that she just flat out
20   didn't. She just thought, well, it's not worth it.
21   Just go ahead and pay the whole claim.
22       Q    And how many times did that happen?
23       A    I couldn't tell you.
24       Q    More than five?
25       A    Yes. I'm sure.

69

M. ESTRADA

1    M. ESTRADA
2        Q    How many claims did you handle that were
3    more than $10,000?
4        A    Very few. But there were some, but not a
5    whole lot.
6        Q    Now, once you talked to your insured the
7    first time, how many other times would you talk to
8    the insured?
9        A    If I had more questions. It really
10   depends on -- on the -- depends on if there was any
11   other questions, or if the claimants had something,
12   I just wanted to confirm with the insured.
13       Q    So you might go back to the insured and
14   say, "I spoke to the claimant. They're saying
15   something different," and get the insured's view
16   again?
17       A    Correct.
18       Q    Right. And would you ever talk to the
19   insured about what you'd learn from third-party
20   witnesses?
21       A    Yes.
22       Q    So part of your job was really to
23   investigate what happened?
24       A    Yes. Yes.
25       Q    Are you familiar with the concept of

70

M. ESTRADA
1
2 betterment?
3   A   Yeah.  Isn't that like when -- take a
4 tire, you know, a tire.  We're going to give
5 somebody a brand new tire, but the tire that they
6 had on their vehicle before was older, a lot older,
7 wasn't new.  So you would take betterment to be more
8 even as to what they had.
9   Q   So you would reduce what you were going to
10 pay them?
11   A   Yes.
12   Q   And did you?
13   A   The appraiser would do that.
14   Q   The appraiser would come to you with a
15 recommendation about that?
16   A   It would be on their -- their estimate.
17   Q   And would you make a determination as to
18 whether to go along with what the appraiser said, or
19 not?
20   A   I always go along with what the appraiser
21 says.
22   Q   I understand that you're saying that you
23 always went along with it, but each time you decided
24 whether to go along with it or not; correct?
25      MS. COHEN:  Objection.  Asked and

71

M. ESTRADA
1
2 answered.
3      THE WITNESS:  I always go with what the
4 estimate is.
5 BY MS. BLOOM:
6   Q   So you made a decision to always go --
7   A   I was never told not to.
8   Q   Did anybody tell you to always go with the
9 appraiser?
10   A   No.
11   Q   So that was something that you decided for
12 yourself, because it made sense?
13   A   It's something we always did.  We were
14 never told otherwise.
15   Q   When you say, it's something that you
16 always did, what knowledge, if any, do you have
17 about how other claims examiners handled an
18 appraiser report?
19   A   By talking to them.
20   Q   Are you -- when you say "by talking to
21 them," what do you mean by that?
22   A   We talk to each other about claims that
23 we've had; sometimes to get an opinion from them on
24 what they thought about it.
25   Q   So other claims examiners would seek out

72

M. ESTRADA
1
2 your opinion about some of their claims?
3   A   Well, not to -- to make the decision for
4 them.  Just to say, "Hey, you know, what do you
5 think about this?  I don't know if the insured's
6 telling the truth."  You know, just talking.
7   Q   So other claims examiners were trying to
8 make a decision about a particular claim and they
9 might come and ask you your opinion?
10   A   Yeah.
11   Q   And did you do the same thing?
12   A   Yeah.
13   Q   So if you were trying to make a decision
14 about a particular claim, you might seek out the
15 opinion of one of your claims examiners; is that
16 right?
17   A   No.  Just talking to them.  Just to see
18 what they think, you know.
19      It wasn't to -- because I couldn't
20 make the decision.  Just, you know, "Hey, what do
21 you think about this?"
22   Q   Because you felt that you could make the
23 decision on any particular claim?
24   A   Yeah, usually, yes.
25   Q   Were there times when -- you said for some

73

M. ESTRADA
1
2 claims where the damage was like under a couple
3 thousand dollars, where the insured might go out and
4 get their own appraisal; is that right?
5   A   Yes.
6   Q   Did you get an independent appraisal in
7 those cases, also?
8   A   No.
9   Q   And did you always agree with what the
10 insured's appraisal said?
11   A   Yeah.  Pretty much.  Unless there was some
12 obvious, um -- you know, if -- if, um, the damages
13 are claimed on the left side and then there's
14 something on the right side that the estimate is
15 willing to repair, then I would call the body shop
16 and ask them, "How does that fit with the impact
17 over here?"
18   Q   The impact on the other side?
19   A   Correct.
20   Q   And then you might decide to pay a lesser
21 amount?
22   A   Yeah.
23   Q   And you'd make that decision?
24   A   No.  No.  I would usually ask Mona what
25 she thought, because I'm really not that great with

Capital Reporting Company

74

M. ESTRADA

1
2  estimates.
3     Q   So you would go to Mona and you'd say,
4  "I've investigated.  This is what I found out.  This
5  is when I think we should do.  What do you think?"
6     A   Yes.
7     Q   Okay.  So you'd make a recommendation?
8     A   Yes.
9     Q   Now, when you were going through this
10  process, would you keep notes of what you were
11  doing?
12     A   If speaking to people.  Depends what type
13  of notes.
14     Q   Did you -- every time you talked to the
15  insured, or a claimant, or an appraiser, did you
16  make notes of that?
17     A   Yes.
18     Q   And where did you keep those notes?
19     A   In the Apps System.
20     Q   Okay.  So you kept them electronically?
21     A   Correct.
22     Q   And you kept them as you went along?
23     A   Yes.
24     Q   When you talk about the Apps system, what
25  is the Apps system?

75

M. ESTRADA

1
2     A   It's where the note system is.  Been so
3  long.  What else does it have?
4         You can, um, do letters and faxes
5  from there.  Well, some forms.  Like a "request
6  appraisers" and stuff from it.
7     Q   So you could type in your notes of a
8  conversation that you had with a claimant, an
9  insured or a witness?
10     A   Correct.
11     Q   Okay.  And you could also -- what else
12  could you do from it?
13     A   Generate like a cover fax sheet.  You can
14  generate and request for an independent appraiser.
15     Q   Like a form letter?
16     A   Yes.  You could request payment from the
17  Apps System.
18     Q   Meaning, you could say to the Apps System,
19  I want you to issue a check for $4,500 to this
20  person?
21     A   Correct.
22     Q   And then a check would be issued?
23     A   It would go to home office.  They would
24  review and approve it, or whatever they needed to
25  do.

76

M. ESTRADA

1
2     Q   Okay.  So you'd make the request and then
3  it would go to home office and they'd pay it or not
4  pay it?
5     A   Correct.
6     Q   So you could just make the request through
7  the Apps System?
8     A   Yes.
9     Q   The Apps System didn't calculate how much
10  any particular claim was worth, did it?
11     A   No.
12     Q   You didn't have any software that did
13  that?
14     A   No.
15     Q   No, you had no software that did that?
16     A   Correct.
17     Q   Okay.  It did not -- the Apps System did
18  not put a value on any particular claim; is that
19  right?
20     A   No.
21     Q   No, it did not?
22     A   It did not.
23     Q   Did you ever have any situations where an
24  insured claimed that their car was totalled?
25         Do you understand what I mean by

77

M. ESTRADA

1
2  "totalled"?
3     A   Yes.
4     Q   Okay.  What do I mean by "totalled"?
5     A   Where it would cost more to repair it than
6  what the vehicle's actually worth, or a percentage
7  of.
8     Q   And did you have claims like that?
9     A   Yes.
10     Q   And did you have to make a determination
11  as to whether or not the car had actually been
12  totalled?
13     A   The appraiser usually does that.
14  They'll -- they'll -- different states have
15  different requirements, as far as what percentage of
16  the vehicle value before it can be considered a
17  total loss.
18     Q   So you would figure out what state it was
19  and then figure out what percentage of the vehicle
20  value loss there needed to be?
21     A   No.  Once -- depending on what state it
22  is, I send an appraiser from that state to go and do
23  an estimate on the vehicle.
24         If their estimate for that state
25  exceeds the total loss threshold, then they would

90

```
 1        M. ESTRADA
 2   efficient manner.
 3        MS. BLOOM:  Okay.  I hear you.  I think
 4   the rules are really clear.  I think if you
 5   have a question about what federal stips are,
 6   either you or her, you should read the rules.
 7        And my position is that under federal
 8   stips, she can only object to the form of the
 9   question, if she truly believes there's a
10   problem with the form of the question.
11        And so, to the extent anything other than
12   that occurs, you know, clearly, if I think it's
13   becoming intrusive, we'll take whatever action
14   we need to.
15        Do you have an objection to us continuing
16   the deposition?  And I would also ask that only
17   one attorney speak on the record.
18        MR. WILEY:  Well, Miss Cohen will continue
19   to defend the deposition.  I certainly have no
20   objection to continuing.
21   BY MS. BLOOM:
22        Q   You had the authority -- is there
23   something funny about that?
24        A   No.
25        Q   You had the authority to pay claims that
```

91

```
 1        M. ESTRADA
 2   were under $10,000; is that right?
 3        A   Yes.
 4        Q   And you didn't have to discuss that with
 5   your supervisor; correct?
 6        A   Correct.
 7        Q   When you got an appraiser, did you ask for
 8   pictures of the property damage?
 9        A   Yeah.  They would always send pictures.
10        Q   Did you look at the pictures?
11        A   Yes.  Sometimes.
12        Q   And in looking at the pictures, would
13   you -- why would you be looking at the pictures?
14        A   To see where the damages are.  See what
15   damages were caused.
16        Q   And would you want to see where the damage
17   was?
18        A   Yes.
19        Q   And would you want to compare that with
20   what you were being told by your insured?
21        A   Correct.
22        Q   Why?
23        A   Just to make sure that it fit -- fit the
24   statement of what happened.
25        Q   Okay.  So to make sure that -- that you
```

92

```
 1        M. ESTRADA
 2   thought you agreed with what your insured was
 3   telling you about how the accident happened;
 4   correct?
 5        A   Yes.
 6        Q   One of the things that you were evaluating
 7   as a claims examiner in the first instance was
 8   whether there was or was not actually coverage;
 9   correct?
10        A   Yes.
11        Q   And if there was coverage, whether there
12   was liability; correct?
13        First you would determine coverage,
14   and then you'd have to determine if there was
15   liability; is that right?
16        A   Correct.  Correct.
17        Q   And if you determined that there was
18   liability, then you'd have to determine the value of
19   the claim; correct?
20        A   Right.
21        Q   And as part of that process, you would
22   interview your insured, right?
23        A   Yes.
24        Q   If there was -- if there were witnesses,
25   you would interview witnesses?
```

93

```
 1        M. ESTRADA
 2        A   Correct.
 3        Q   And you would also interview a claimant if
 4   there was somebody other than your insured involved;
 5   correct?
 6        A   Correct.
 7        MS. COHEN:  Objection.  Asked and
 8   answered.
 9   BY MS. BLOOM:
10        Q   And other than Miss Manning, you did not
11   help any of the other claims examiners with their
12   claims; is that right?
13        A   Correct.
14        Q   And with regard to the help that you gave
15   Miss Manning, that help was limited to helping her
16   find an independent appraiser; correct?
17        A   No.  No.  There was other times where I
18   helped her with other things.
19        Q   Like what?
20        A   She, um, her liability.  She kind of
21   questioned herself sometimes.  And I'd kind of just
22   help her walk through it, how the accident happened,
23   and she figures out that she was right to begin
24   with.
25        Q   So she was trying to determine whether
```

Capital Reporting Company

94

M. ESTRADA
1
2 there was liability or not?
3    A   She just second-guessed herself, because
4 she was new to being an adjuster, so she was really
5 unsure.  And it was more just to kind of reassure
6 her that she's correct in how she's doing what she's
7 doing.
8    Q   Okay.  So she was making a decision about
9 liability, and because she was new, she was unsure
10 about that decision, so she was coming to you for
11 your opinion?
12    A   Right.
13    Q   Did you ever disagree with her?
14    A   Not that I recall.  She was real good
15 about what she was doing.
16    Q   So you found her judgment to be sound?
17    A   Yes.
18    Q   Did you ever suggest to her that she seek
19 Mona's put?
20    A   Oh, she used to seek Mona's input more.
21       It's just that when Mona wasn't
22 around that she would come and talk to me.
23    Q   Did you ever suggest to her that after
24 she'd come and talk to you, that she should go and
25 talk to Mona as well?

95

M. ESTRADA
1
2    A   Yes.
3    Q   For what purpose?
4    A   Because it was unsure.  I wasn't clear
5 about it either.
6    Q   So you wanted to get some additional
7 input?
8    A   Yeah.  From my supervisor.
9    Q   So she would take a recommendation -- she
10 would take her investigation and explain what she
11 had done, make a recommendation, and see if Mona
12 agreed?
13    A   Yes.
14    Q   And that was the same thing that you would
15 do; correct?
16    A   Correct.
17    Q   Are there any other ways in which you
18 assisted Vicky?
19    A   No.
20    Q   During the course of the day, how much of
21 your time was spent handling claims?
22    A   The entire day.
23    Q   And so were you pretty busy?
24    A   Yes.
25    Q   What percent of your time did you spend

96

M. ESTRADA
1
2 watching what other people were doing?
3    A   None.
4       MS. BLOOM:  Can you mark this as two?  And
5    this as three.
6       (Estrada-2, Complaint, was received and
7    marked for identification at this time.)
8       (Estrada-3, Answers to Interrogatories,
9    was received and marked for identification at
10    this time.)
11 BY MS. BLOOM:
12    Q   I'm going to hand you what's been marked
13 as Estrada-2 and ask if you recognize that as a copy
14 of your complaint in this case?
15    A   Yes.
16    Q   And when you said that you had reviewed
17 the petition, were you referring to the document
18 that we have marked as Exhibit 2?
19    A   Yes.
20    Q   I'm going to hand you what's been marked
21 as Estrada Exhibit 3 and ask you if that is a copy
22 of your Answers to Interrogatories in this case?
23    A   Yes.
24    Q   You recall preparing the Answers to
25 Interrogatories?

97

M. ESTRADA
1
2    A   Yes.
3    Q   And what was the process that you went
4 through in doing that?
5    A   In preparing the answers?
6    Q   Yes.
7    A   Just writing down what -- the answer to
8 the questions.
9    Q   So somebody sent you the questions?
10    A   Yes.
11    Q   Would that be your attorneys?
12    A   Correct.
13    Q   And then you wrote in answers.  Did you
14 write them in hand or type them?
15    A   I think I did it on Word.
16    Q   And then sent it back?
17    A   And sent it back.
18    Q   Okay.  And in looking at what's been
19 marked as Exhibit 3, does this look like your
20 Answers to Interrogatories?
21    A   Yes.
22    Q   Now, when you would make a notation in
23 Apps on a claim, would that also have the date and
24 time of the notation?
25

138

```
 1          M. ESTRADA
 2     A    Yes.
 3     Q    And is number 4, is Roman Numeral IV the
 4  insured vehicle or not the insured vehicle?
 5     A    Insured vehicle.  IV.  Instead of Roman
 6  Numeral IV, it's IV for "insured vehicle."
 7     Q    And in this case, you made a decision not
 8  to assign an independent appraiser; is that right?
 9     A    I don't know.  I'd have to go through all
10  the notes to see.
11     Q    Well, if you look down to 56091336 --
12     A    Okay.
13     Q    -- on the left, it says, "No appraiser
14  will be assigned for Roman Numeral IV."
15     A    Okay.
16     Q    That reflects your decision not to get --
17     A    Yes.
18     Q    -- an independent appraisal?
19     A    Yes.
20     Q    And you made that decision based upon what
21  you reviewed in the police report?
22     A    I'm sorry?
23     Q    And you made that decision based on what
24  you reviewed in the police report?
25     A    No.  There was a note that the insured
```

139

```
 1          M. ESTRADA
 2  point of contact said the insured's driver got an
 3  attorney for workman's comp.
 4          I'm not sure why.  I wasn't sure why
 5  he got an attorney.
 6          But the insured vehicle is at a tow
 7  lot and the insured is abandoning it.
 8          So he's not wanting that vehicle.  I
 9  guess it's too old.  So I'm not going to assign an
10  appraiser to go out and look at a vehicle that the
11  insured doesn't want, that he's abandoning --
12     Q    So you reviewed the facts and said this is
13  not a situation where I should assign an appraiser?
14     A    From what the insured said, yes.
15     Q    Okay.  So you made a judgment based on
16  what the insured told you?
17     MS. COHEN:  Objection.
18  Mischaracterization.
19     THE WITNESS:  Um, yes.
20  BY MS. BLOOM:
21     Q    And did you get anyone's approval not to
22  send out an appraiser before you made that decision?
23     A    I don't recall.  I may have asked Mona
24  just to make sure, and that's why I put a note like
25  that in there.
```

140

```
 1          M. ESTRADA
 2     Q    But we don't see any indication as to why
 3  you got --
 4     A    I don't put notes when I go and ask Mona
 5  for everything, otherwise the notes would be like
 6  horrendous.
 7     Q    Based on what we see here, you made the
 8  determination not to send the appraiser because of
 9  what you were being told by the insured; correct?
10     A    Correct.  Yeah.  That he was abandoning
11  the vehicle at the tow yard.  We wouldn't be able to
12  get access to it anyway, since we don't own the
13  vehicle.
14     Q    If you can look at Exhibit-10, please.
15     A    Okay.
16     Q    These are more of your case notes;
17  correct?
18     A    Correct.
19     Q    If you can look at 227091711?
20     A    Okay.
21     Q    You write, "Correct, which they will pay
22  on their own, I think.  Pretty much I am just
23  negotiating for our insured."
24          Those were your words reflecting what
25  you were doing; correct?
```

141

```
 1          M. ESTRADA
 2     A    Yes.
 3     Q    So you wrote here that you were
 4  negotiating for your insured, right?
 5     A    Yeah.  For -- because they were wanting to
 6  get the rental back from the other party's
 7  insurance, and I was just helping the insured
 8  negotiate what they should get back.
 9     Q    So you were negotiating for them?
10     A    Yes.  On their behalf.
11     Q    Okay.  So when you said that you didn't do
12  any negotiating, you were excluding negotiating for
13  your insured, like we see here in example 10 -- in
14  Exhibit-10?
15     A    That's not my job function.  I was just
16  doing it as a favor for the insured.
17     Q    But at least in this one situation, you
18  were actually negotiating?
19     A    Um, it wasn't really negotiating.  I was
20  just letting them know what the insured was out of
21  and what they wanted back, as far as what they paid
22  out on their rental, and what I thought was fair.
23     Q    Well, it doesn't say that here, does it?
24  Right here it says, "I'm just negotiating for our
25  insured."  Correct?
```

142

M. ESTRADA

1
2    A    Right.  I don't sit there and type
3  word-for-word on the notes.  I just put enough to
4  where I know what I was talking about in case there
5  was any questions of it.
6    Q    And by saying you were negotiating, that
7  gave you -- that gave you enough of a description
8  about what you were doing; correct?
9    A    Yes.
10    Q    And if somebody else picked this up,
11  presumably that would also describe for them what
12  you were doing; correct?
13    A    Right.  Correct.
14    Q    If you could go back to Exhibit-9, please.
15    A    Okay.
16    Q    The second page, right above 515091433 --
17    A    Okay.
18    Q    -- this -- you wrote, "Advise.  We use a
19  percentage for the salvage."
20         What does "salvage" mean?
21    A    The salvage is the vehicle at its existing
22  condition, damaged condition.
23    Q    Saying, "I am more than happy to take a
24  look at what she has and negotiate it with her."
25         So right here -- these are your

143

M. ESTRADA

1
2  notes; correct?
3    A    Yes.
4    Q    And so in the example that we're looking
5  at now in Exhibit-9, you were offering to negotiate
6  the salvage value with one of your insureds; is that
7  right?
8    A    Right.  Which I went to Mona to see what
9  they wanted to do with it, because that's something
10  that the -- the salvage percentage is what --
11  co-parts (sic) gives us a certain percentage for all
12  salvages.
13    Q    But what you write here is that you will
14  negotiate it with her, not Mona will negotiate it
15  with her.  These are your words, and your words were
16  that you would negotiate it with her; correct?
17    A    Right.  And I went to Mona and asked her
18  what to do with it on it.  But I'm the one who
19  talked to her and let her know what we can do.
20    Q    So you looked at the situation; you
21  evaluated the situation; you said that you would
22  negotiate it with the insured --
23    A    Mm-hmm.
24    Q    -- and you negotiated --
25    A    The claimant.

144

M. ESTRADA

1
2    Q    The claimant.  And you did negotiate it?
3    A    Yeah.  Yes.  Based off of what Mona said.
4    Q    You did the actual negotiation; correct?
5    A    I'm the one who notified them what we
6  would pay, yes.
7    Q    It doesn't say here "and notify them what
8  we will pay."  It says negotiate and --
9    A    I don't put notes word-for-word.  I'm
10  sorry.
11    Q    But you chose the word "negotiate."
12  Correct?
13    A    Yes.
14    Q    And that was based on -- and that was
15  intended to give you a record of what it was that
16  you had done; correct?
17    A    Yeah.  Well, I didn't think of another
18  word that I could use there.
19    Q    "Negotiate" best described what you were
20  doing; correct?
21    A    Yeah.  Yeah.
22         MS. BLOOM:  Okay.  This would be a good
23  time to break for lunch.
24         MR. WILEY:  Okay.  Off the record.
25         (A luncheon recess was taken from

145

M. ESTRADA

1
2         12:45 p.m. until 1:57 p.m.)
3  BY MS. BLOOM:
4    Q    Can you look at Exhibit-3, please?  Those
5  are your Answers to Interrogatories.
6         Before you open them, I just wanted
7  to make sure I understood what you were telling me
8  about your work space.
9         You worked in a cubicle; is that
10  right?
11    A    Correct.
12    Q    And it was your own individual cubicle;
13  you didn't share it with anybody?
14    A    That's correct.
15    Q    And you had your own computer there?
16    A    Yes.
17    Q    And then did you get a work e-mail
18  address?
19    A    Yes.
20    Q    And did you use your work e-mail address
21  to send e-mails related to your work?
22    A    Yes.
23    Q    Did you ever use your work e-mail address
24  to send personal e-mails?
25    A    A couple of times, yeah.

158

M. ESTRADA

1
2    Q    Yes.
3    A    Just money I have.
4    Q    Who's paying for the deposition today, for
5    the transcript?
6    A    My attorney's office.
7    Q    And you've given your attorneys no money
8    to date?
9    A    Correct.
10   Q    Did anybody ever tell you to come in on a
11   weekend?
12   A    No.
13   Q    Did anybody know you would come in on a
14   weekend?
15   A    Yes.
16   Q    Who?
17   A    Mona, Vicky, Shakelia.
18   Q    How did Mona know?
19   A    She's seen me there.
20   Q    How many times?
21   A    I don't recall.
22   Q    When a claim is first opened, is there a
23   reserve set for the claim?
24   A    Yes.
25   Q    Who sets the reserve?

159

M. ESTRADA

1
2    A    I believe home office does.
3    Q    And then as you investigate the claim,
4    you're supposed to re-evaluate whether the reserve
5    is sufficient or not?
6    A    Correct.
7    Q    Is that right?
8         And that's something that a claims
9    examiner like you does; is that right?
10   A    Yes.
11   Q    And what factors do you consider in
12   deciding whether the reserve is sufficient?
13   A    Based on how severe the accident was.
14   Usually their reserve is $777.  It's a really low
15   number.  It always has to be changed.
16   Q    And you would be, for your claims, the
17   person who decided how much to increase it?
18   A    Correct.
19   Q    And did you increase it in almost every
20   situation?
21   A    Yeah.  We had to increase it every time.
22   Q    And did you always increase it the same
23   amount?
24   A    Sometimes.  Really, it's based on previous
25   claims that I might have had that were similar.  You

160

M. ESTRADA

1
2    kind of get an idea of about what the amount is
3    going to be as far as damages.  You know, a parking
4    lot accident isn't going to go over a couple of
5    thousand.
6    Q    So it's something that after awhile you
7    just know --
8    A    Yeah.
9    Q    -- intuitively?
10   A    You just kind of assume it's going to be
11   close to what you had before.
12   Q    So your experience let's you -- gives you
13   the judgment to know how much to assign to it; is
14   that right?
15   A    Yeah.
16   Q    And then -- do you ever alter it again in
17   the process before the claim is paid?
18   A    I never have.
19   Q    Did you ever look back to see whether your
20   judgment had been close to what was actually paid?
21   A    No.
22   Q    Any sense of that?
23   A    No.
24   Q    When you would get an appraisal from a
25   third-party appraiser and they would tell you what

161

M. ESTRADA

1
2    they thought the damage was, it was then up to you,
3    if you were in a comparative negligence
4    jurisdiction, to determine what percentage should be
5    apportioned to each party, right?
6    A    Yeah.
7    Q    The appraiser did not do that; correct?
8    A    No.
9    Q    When you said that you took your calendar
10   with you, what calendar are you talking about?
11   A    It's just a little black calendar for the
12   year.
13   Q    What kind of information was on it?
14   A    How many claims I got in the day and, you
15   know, if I was off, I'd mark it off for vacation.
16   If Shakelia was off, I'd put down that she was going
17   to be off that day, so I'd know to expect more
18   claims that day than normal.
19   Q    Did you note if anybody else other than
20   Shakelia was out?
21   A    Yeah.  Everybody in the group.
22        If I had prior notice that they were
23   going to be out.
24        (Estrada-12, Calendar excerpts, was
25        received and marked for identification at this

178

M. ESTRADA
1
2    you used the job description for the claims examiner
3    position to put together?
4        A   Or something that was on the Philly
5    website that I saw.
6        Q   And then you revised it?
7        A   I made some minor changes to it, yes.
8        Q   Okay.  Well, I'd like you first to look at
9    Estrada Exhibit-14.  And that is the job description
10   for the claims examiner position that was on the
11   website at the company?
12       A   Mm-hmm.
13       Q   You remember seeing that?
14       A   Yes.
15       Q   Yes, you're familiar with it?
16       A   I've seen it before.
17       Q   So I'd like to look together at Estrada
18   Exhibit-11, your current resume, and the job
19   description -- the defendant's job description for a
20   claims examiner position.  And focus your attention
21   on the description of your position as a claims
22   examiner for Philadelphia Indemnity Insurance
23   Company.  Okay?
24          So starting with the first paragraph,
25   where it says, "Primarily functions include

179

M. ESTRADA
1
2    comparing data."  Do you see that?
3        A   Yes.
4        Q   If you look at Exhibit-14, under
5    "essential duties and responsibilities," the second
6    paragraph starts with "compare data."  Is that
7    right?
8        A   Correct.
9        Q   So would it be fair for me to conclude
10   that you added the words "primary functions
11   include"?
12       A   Correct.
13       Q   And then you -- instead of compare, you
14   had comparing data; is that right?
15       A   Yes.
16       Q   And then you took the language from
17   Exhibit-14, the rest of the language in that
18   paragraph up through and under insurance contract;
19   is that right?
20       A   Yes.
21       Q   And you put from "compare data" to under
22   "an insurance contract" into Exhibit-11; correct?
23       A   Correct.
24       Q   And then you added the following language:
25   And the investigation, evaluation, and negotiation

180

M. ESTRADA
1
2    of complex claims employing discretion and
3    independent judgment; correct?
4        A   I don't know if I added it or took it off
5    of something else on here.
6        Q   Do you see that in Exhibit-14, that
7    language?
8        A   Well, I didn't take it just off of here.
9    I also took it off of the -- the, um, evaluation
10   that I got from the three years that I was there.
11       Q   You would agree with me that -- strike
12   that.
13          A few minutes ago you testified that
14   in putting together Exhibit-11 that you were in a
15   hurry, so you basically took the language from the
16   job description; correct?
17       A   Yes.  But not all of it.  I got it from
18   different places.
19       Q   And some of it --
20       A   I just needed to get something to him that
21   day.
22       Q   And some of it you added on your own; is
23   that right?
24       A   Yeah.  Yeah.  Absolutely.
25       Q   Okay.  So the job description, which we're

181

M. ESTRADA
1
2    looking at as Exhibit-14, does not include the
3    language, "And the investigation, evaluation, and
4    negotiation of complex claims employing discretion
5    and independent judgment."  Is that right?
6        A   That's correct.
7        Q   And then the next paragraph in your
8    resume, Exhibit-11, that says, "Handle complex
9    claims matters involving various commercial lines of
10   automobile insurance within the states of
11   California, Colorado, Florida, Idaho, Kansas,
12   Minnesota, Montana, North Dakota, Nebraska, Nevada,
13   Oregon, South Dakota, Utah and Washington," that's
14   also language that you added; correct?
15       A   I'm sorry.  That was the second bulletin?
16   (sic)
17       Q   The second bullet.
18       A   Yeah.  That was the second bulletin (sic)
19   off of United Auto, because it was the same type of
20   job, essentially.  So I just -- like I said, I took
21   it from different places.
22          Some of it was -- I took from here,
23   the work that I did at United Auto and stuck it up
24   there.
25       Q   Because it was the same kind of work that

Capital Reporting Company

182

M. ESTRADA

1
2  you were doing?
3      A   Right.
4      Q   Okay.  And when you say that you took it
5  from United Auto, when we were looking a few minutes
6  ago at your first resume that we marked as
7  Exhibit-15, which you testified was accurate, you
8  took language from -- you used language about your
9  job at United Auto and put it into Exhibit-11, and
10  then used that language to further describe your job
11  at the defendant; correct?
12      A   Yeah.
13      Q   And you would agree with me that the
14  second bullet point under the description of your
15  job at the defendant is language that you added;
16  correct?
17      A   From this United Auto Insurance.
18      Q   Well, you took it from -- because it was
19  something that you did at both places?
20      A   Right.
21      Q   Okay.  And now the third bullet, that
22  seems to come, again from Exhibit-14, from the job
23  description; the fourth and fifth paragraphs under
24  "essential duties and responsibilities."  Correct?
25      A   Correct.

183

M. ESTRADA

1
2      Q   And then the fourth bullet on Exhibit-11
3  that starts, "Created a standardized total loss
4  evaluation form that has saved the company thousands
5  of dollars in total loss negotiations."  You added
6  that bullet; correct?
7      A   Correct.
8      Q   And that's the form that you described
9  earlier today; correct?
10      A   That's correct.
11      Q   And you go on to say in that bullet, "This
12  form has a success rate of nine out of ten agreeing
13  to the total loss offer amount presented with
14  minimal negotiations needed."
15          That's your language; correct?
16      A   Correct.
17      Q   So by using your form, that basically --
18  that minimized the amount of negotiation that the
19  claims examiners needed to engage in; correct?
20      A   Correct.
21      Q   And then the last bullet, "Created a zip
22  code or by state searchable workbook for independent
23  appraisal companies," you added that entire bullet,
24  as well; isn't that right?
25      A   That's correct.

184

M. ESTRADA

1
2      Q   And that also describes something else
3  that you did -- another product that you say that
4  you created; correct?
5      A   Yes.
6          MS. BLOOM:  Thank you very much.
7          Subject to a court ruling on the things
8  that you were directed not to answer, I have no
9  further questions at this time.
10          THE WITNESS:  Thank you.
11          MS. COHEN:  We reserve our questions at
12  time of trial.
13          MR. WILEY:  We're done.
14          MS. BLOOM:  That's fine.  As long as you
15  understand what that means under the federal
16  rules, that's fine with me.
17          MR. WILEY:  We'll read.
18              (Witness excused.)
19  (The deposition is adjourned at 2:58 p.m.)
20
21
22
23
24
25

185

1      C E R T I F I C A T I O N
2
3          I, CORINNE J. BLAIR, a Certified
4  Realtime Reporter, Certified Professional Reporter,
5  Certified Livenote Reporter, and Notary Public, do
6  hereby certify:
7          That MICHAEL ESTRADA, the witness,
8  whose deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11          I further certify that I am not
12  related to any of the parties to this action by
13  blood or marriage and that I am in no way interested
14  in the outcome of this matter.
15
16
17  _____
        CORINNE J. BLAIR,
18      CRR, CCR, RPR, CLR
        License # X01641
19      Expires 6/30/14
20
21  Dated:_____
22
23
24
25